Jason Chuan (SBN 261868)
Law Office of Mary Sun
128 E. Huntington Drive, Suite B
Arcadia, CA 91006
Phone:  626-616-6526
Fax:      626-303-7882
Email:  jason@sunlegalgroup.com

H.G. Robert Fong (SBN 53535)
Ku & Fong
444 S Flower St Ste 2530
Los Angeles, CA 90071
Phone: (213) 488-1400
Fax: (213) 236-9235
Email: bobfong@ix.netcom.com

Attorneys for Defendant, Hyperkin, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATARI INTERACTIVE, INC., | Case No. 2:19-CV-0608-CAS (AFMx) |
| Plaintiff, | Hon. Christina A. Snyder |
| v. | **DEFENDANT HYPERKIN, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT** |
| HYPERKIN INC., | |
| Defendant. | Date: July 13, 2020 |
| | Time: 10:00 a.m. |
| | Location: First Street Courthouse Courtroom 8D, 8th Floor |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 13, 2020 at 10:00 a.m. in Courtroom 8D, 8th Floor of the First Street Courthouse, 350 W. First Street, Los Angeles, CA 90012, Defendant, Hyperkin, Inc. ("Hyperkin"), by and through its undersigned counsel, will and hereby moves this Honorable Court for summary judgment, or, in the alternative, partial summary judgment, for the reason that:

1) Plaintiff Atari Interactive, Inc. ("A.I.I.") does not have standing to bring claims for trademark infringement, unfair competition, and dilution because it does not own any registered trade dress rights in the Atari VCS/2600 console or 2600 Joystick, and it did not acquire any such trade dress rights from predecessor Atari companies.

2) A.I.I. cannot establish that it acquired distinctiveness in the claimed trade dress, since it never sold any 2600 console or joystick.

3) Consumers are not likely to be confused as to the source of the 2600/VCS and Hyperkin's Retron ® 77.

4) Consumers are not likely to be confused as to the source of the 2600/VCS joystick and Hyperkin's CirKa ® A77 joystick.

5) There can be no trade dress rights in the 2600 Joystick because it is the subject of an expired utility patent showing that its design is functional.

6) There is no dilution because the alleged trade dress is not famous and there is no blurring or tarnishment.

7) There is no unfair competition because the Lanham Act claims fail.

8) An award of attorneys' fees to Hyperkin is appropriate because the totality of circumstances

This Motion is made following the conference of the parties' counsel pursuant to L.R. 7-3, which took place on April 8, 2020.  This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and

1   Authorities, the documents filed in support, and upon such other pleadings and

2   evidence that may be presented prior to or at the hearing on this matter.

3

4   Dated: June 1, 2020                    Respectfully Submitted,
                                           Law Office of Mary Sun
5

6                                          /s/Jason Chuan
                                           Jason Chuan
7                                          Attorneys for Defendant,
8                                          Hyperkin, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................1

PROCEDURAL HISTORY .....................................................................2

FACTS ................................................................................................2

ARGUMENT .......................................................................................5

I.   A.I.I. DOES NOT HAVE STANDING TO ASSERT A TRADE DRESS INFRINGEMENT CLAIM BECAUSE IT DID NOT ACQUIRE ANY SUCH RIGHTS FROM PRECEDESSOR ATARI COMPANIES ......................................................................5

     A.   A.I.I. Does Not Own Any Registered Trade Dress Rights....5

     B.   A.I.I. Cannot Establish That it Acquired Unregistered Trade Dress Rights From any Atari Predecessor Companies Because Those Companies Abandoned any Rights They Had. ...................................................................................5

     C.   A.I.I. Also Cannot Establish Acquired Distinctiveness in the Joystick Design Because it Became Generic.........................7

II.   A.I.I. CANNOT ESTABLISH ANY OF ITS OWN TRADE DRESS RIGHTS IN THE ORIGINAL 2600 CONSOLE AND JOYSTICK DESIGNS, BECAUSE IT CANNOT SHOW THAT THE DESIGNS ACQUIRED DISTINCTIVENESS .....................8

     A.   A.I.I. Cannot Show that the Designs Identify A.I.I. As the Source of the Original 2600 Console and Joystick...............8

     B.   A.I.I. Cannot Establish Any Trade Dress Rights Through Residual Goodwill. ............................................................10

     C.   Any Assignments of the Claimed Trade Dress Would Also be Invalid Assignments in Gross. ........................................10

     D.   A.I.I. Cannot Rely Upon the Sale of Flashbacks to Establish Acquired Distinctiveness. ....................................................11

III.  A.I.I. CANNOT DEMONSTRATE THAT HYPERKIN FALSELY DESIGNATED A.I.I. AS THE ORIGIN OF ANY OF

ITS PRODUCTS ...........................................................................11

IV.   PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF
      LIKELIHOOD OF CONFUSION BETWEEN THE VIDEO
      GAME CONSOLES IS APPROPRIATE BECAUSE NO
      REASONABLE JURY COULD FIND SUFFICIENT
      SIMILARITY BETWEEN THE PRODUCTS ..............................12

      A.   The Claimed Trade Dress is Weak and Only Entitled to a
           Narrow Scope of Protection...................................................12

      B.   The Products Differ Completely in Appearance. ................13

      C.   The Consumers are Discriminating. ....................................14

      D.   The Target Markets are Distinct and Goods are Unrelated. 15

      E.   Hyperkin Took Extensive Efforts to Avoid Confusion.......16

      F.   There was No Actual Confusion...........................................16

      G.   A.I.I. Is Not Likely to Expand into Hyperkin's Market. .....16

V.    PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF THE
      JOYSTICK'S FUNCTIONALITY IS APPROPRIATE BECAUSE
      IT WAS THE SUBJECT OF AN EXPIRED UTILITY PATENT
      ........................................................................................16

      A.   Atari Bears the Burden of Proving that the Trade Dress is
           Nonfunctional. ...................................................................17

      B.   The Trade Dress is Functional Because its Features Were
           Explicitly Claimed in a Utility Patent.................................17

VI.   HYPERKIN SUCCESSFULLY TOOK STEPS TO ASSURE
      THAT THERE IS NO LIKELIHOOD OF CONFUSION AS TO
      THE A77 ....................................................................................19

VII.  PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF
      DILUTION IS APPROPRIATE BECAUSE THERE IS NO
      EVIDENCE THAT THE TRADE DRESS IS FAMOUS .............20

VIII. SUMMARY JUDGMENT AS TO THE UNFAIR
      COMPETITION CLAIM IS PROPER SINCE THERE IS NO
      TRADE DRESS INFRINGEMENT.............................................21

IX.   AN AWARD OF ATTORNEYS FEES IS APPROPRIATE AS

THE TOTALITY OF CIRCUMSTANCES SHOW THAT A.I.I.
BROUGHT FRIVOLOUS AND OBJECTIVELY
UNREASONABLE CLAIMS AGAINST HYPERKIN ...............21

CONCLUSION.................................................................................22

Notice of Motion and Motion for Summary Judgment, or in the Alternative, For Partial
Summary Judgment

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1574-75 (1990) ................................................................................................3

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999) ..........................................................................5

*Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) ........................21

*Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1014–15 (S.D. Cal. 2000) ........................................................................17

*Corp. v. Corp.*, 94 U.S.P.Q.2d 1399 (T.T.A.B. 2010)........................................15

*Deckers Outdoor Corp. v. J.C. Penney Co. Inc.*, 45 F. Supp. 3d 1181, 1185-1186 (2014) ..............................................................................11

*Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998)18

*Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998) ................................................................................12

*EFS Mktg., Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 491 (2nd Cir. 1996) ..........9

*Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 716 (Fed. Cir. 1992) ................................................................................15

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1143 (9th Cir. 2002) .........13

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999)................................................................................9

*First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir.1987) ..14

*Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007) ...................8

*Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008) ..............................................................................5, 6

*Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th Cir. 2011)..............................12

*Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012–13 (9th Cir.1999)................................................................................5

*M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005) ......12

*Mister Donut of America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969) ................................................................................................................10

*Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 675 (7th Cir. 1982) ..........6

*Monster Energy Co. v. BeastUp LLC*, 395 F. Supp. 3d 1334, 1364 (E.D. Cal. 2019) ..................................................................................................................20

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1224 (C.D. Cal. 2004)................................................................................................13

*Network Automation, Inc., v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011)............................................................................................12

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018) ..........................................................................................................8

*Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 165 (1995)...........17

*Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987) ............17

*Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 667, 684 (9th Cir. 2012) ..........................................................................................................................18

*Sunbeam Prods., Inc. v. West Bend Co.*, 39 U.S.P.Q.2d 1545 (S.D. Miss. 1996), aff'd, 123 F.3d 246 (5th Cir. 1997) ..................................................................19

*SunEarth, Inc. v. Sun Earth Solar Power Co. Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016) ........................................................................................................21

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016) ..................................................................................................................18

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) ..............17

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-211 (2000) ......9

*Zamacona v. Ayvar*, No. CV0702767ABCFMOX, 2009 WL 279073, at *2 (C.D. Cal. Feb. 3, 2009)....................................................................................10

**Statutes**

15 U.S.C. § 1117..................................................................................................21

Notice of Motion and Motion for Summary Judgment, or in the Alternative, For Partial Summary Judgment

15 U.S.C. § 1125............................................................................................20

15 U.S.C. § 1127..............................................................................................6

**Rules**

Fed. R. Civ. P. 56.............................................................................................5

# INTRODUCTION

This case involves trade dress and dilution claims regarding two video game products.  Defendant Hyperkin, Inc. ("Hyperkin") is a company that specializes in retro gaming and produces a number of different consoles to play games for abandoned game systems.  As a natural extension of its product line, Hyperkin released its Retron ® 77 console to play old, original cartridges for the abandoned Atari 2600 Video Computer System ["2600/VCS"].  Hyperkin also released its CirKa® A77 joystick designed to plug into a 9-pin connector used on a variety of game systems.   Hyperkin, following its standard practice to avoid possible infringement, searched for any intellectual property rights in the 2600/VCS.  Hyperkin's searches disclosed only design and utility patents for the joystick used with the 2600/VCS, known as the 2600 Joystick.  Those patents expired in 1993, 1994, and 1999. Plaintiff A.I.I. has disclosed no other registered rights for that joystick.  To further avoid any possible confusion, Hyperkin (1) used packaging highly distinct from the original packaging for the Atari Corp. 2600/VCS and the 2600 joystick, (2) affixed its own registered trademarks on the packaging and products, and (3) applied disclaimers as to ownership of any rights to the Atari brand.  These efforts paid off.  Hyperkin has no information that anyone has ever been confused as to the source of the accused Hyperkin products.

Plaintiff, Atari Interactive, Inc. ("A.I.I.") is not the owner of any intellectual property rights in the design of the 2600/VCS system and 2600 joystick.  Rather, the original owner(s) were separate companies named Atari, Inc. ("Atari Inc.") and Atari Corporation ("Atari Corp.").  A.I.I. is none of those companies – it changed its name from "Infogrames Interactive, Inc." to "Atari Interactive Inc." in 2003, several years after Atari Inc. and Atari Corp. ceased to exist.  In Paragraph 1 of the Complaint, A.I.I. confusingly identifies itself as "collectively 'Atari'" in an apparent attempt to lead the reader into believing

A.I.I. is one or all of the other Atari companies, which it is not.  Any trade dress rights Atari Inc and Atari Corp. may have had in the 2600/VCS system and 2600 joystick were never identified as being assigned to A.I.I.  In fact, Atari Corp. abandoned any possible trade dress rights when it stopped selling all versions of the 2600/VCS in 1992.

Despite knowing that it has no rights in the abandoned trade dress, A.I.I. has accused Hyperkin of infringing and diluting its purported rights by selling the CirKa ® branded A77 joystick and Retron ® 77 console. It even seeks the imposition of punitive damages.  Because its claims are objectively baseless this is an exceptional case under 15 U.S.C. § 1117(a), it is A.I.I. who should pay for attorneys fees as requested in Defendant's Prayer for Relief ¶ D.

No likelihood of confusion or dilution exists since Hyperkin took every reasonable step to inform customers that it was the origin of its Hyperkin and CirKa products. Summary judgment as to the claims against Hyperkin is therefore appropriate.

## PROCEDURAL HISTORY

A.I.I. filed its complaint against Hyperkin on January 25, 2019, specifically basing its claims for unregistered trade dress infringement, unfair competition, and dilution upon alleged ownership of rights in the original Atari 2600 game console (the "2600 Console"), and the 2600 Joystick.   A.I.I. alleged that the USPTO issued two design patents for the ornamental design elements of the 2600 Joystick.  Those design patents, however, expired over twenty years ago.

## FACTS

The current Atari company is not the original Atari company that existed back in the 1970s.  Statement of Undisputed Facts ("SUF") ¶ 5, 6.  The true Atari company, Atari Incorporated ("Atari Inc."), was started in 1972 in California.  SUF ¶ 6.  In 1977, Atari Inc. released the Atari VCS, which came

with the 2600 Joystick.  SUF ¶ 7.  In 1982, Atari Inc. officially rebranded the Atari VCS as the Atari 2600, releasing it as an all-black version with no wood paneling.  SUF ¶ 23.  Atari, Inc. abandoned the design completely in 1984, and would never again produce any console using wood grain.  SUF ¶ 32-33.

By 1983, Atari, Inc. suffered tremendous losses, forcing its sale to Jack Tramiel in 1984, who then founded Atari Corporation ("Atari Corp.").  SUF ¶ 29-33.  Atari Corp. lost so much of the market that another Atari company that had split from Atari Inc., Atari Games Corporation, admitted in court filings that a competitor, Nintendo of America, had so much market power that it ended up dominating the entire home video game industry.  *See Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1574-75 (1990); SUF ¶ 38.

From 1986 onwards, Atari Corp. released products that all discarded the wood grain and ribbed design of the 2600 Console.  SUF ¶ 34-46.   On January 1, 1992, Atari Corp. formally discontinued the Atari 2600 line. SUF ¶ 42.  Atari Corp.'s last product, the Jaguar, flopped, and it was merged into JTS Corp., a hard-drive maker, by 1996.  SUF ¶ 47-48.

In 1998, Hasbro Interactive then bought the Atari name from JTS.  SUF ¶ 50.  Shortly after, Hasbro Interactive released the Atari Jaguar patents into the public domain, making it an open platform.  SUF ¶ 51.

In 2001, Infogrames Entertainment SA, a French company, purchased Hasbro Interactive, and along with it came the Atari name.  SUF ¶ 52.  Plaintiff A.I.I., operating as Infogrames Interactive, Inc., did not adopt the Atari name until 2003. SUF ¶ 53.

In 2005, A.I.I. released a Flashback 2 device with the help of Curt Vendel, who designed the device.  SUF ¶ 111.  The Flashback 2 could not play old Atari 2600 cartridges, and instead played games built into the device.  SUF ¶ 114.

Since 2007, Hyperkin has led the niche retro gaming industry by

designing and marketing gaming systems to play games for abandoned game consoles. SUF ¶ 77-79, 120.  Hyperkin's consoles can play cartridges on modern TVs for a variety of abandoned platforms.  SUF ¶ 120.  Before selling a product, Hyperkin makes sure that there are no existing intellectual property ("IP") rights for any of these consoles, and it obtains licenses if needed.  SUF ¶ 82-85.

Hyperkin began receiving requests from its customers for replacements of broken or missing 2600 Joysticks.  SUF ¶ 86.  Following its customary practice, Hyperkin searched for IP rights in the 2600 Joysticks and was only able to locate expired patents.  SUF ¶ 87-88.  Hyperkin also noticed many third parties selling generic 2600 Joysticks online.  SUF ¶ 89.  Hyperkin then went to one of the companies already manufacturing generic retro 2600 joysticks and ordered joysticks from it, calling its new product the CirKa® A77 (the "A77"). SUF ¶ 90.  To ensure that consumers were aware that the A77 was not an Atari product, Hyperkin sold the A77 in packages labeled with its federally registered CirKa® trademark, affixed  "CirKa" on the A77, and printed disclaimers on the packaging to make sure customers knew that it was sourced from Hyperkin, and not A.I.I., or any other source. SUF ¶ 91-97.

Later, Hyperkin had the idea of expanding its product line to include a machine that could play old Atari 2600 cartridges on a modern TV, the Retron ® 77 (the "Retron ® 77").  SUF ¶ 118-128.  Again, Hyperkin could not locate any existing enforceable intellectual property rights relating to it.  SUF ¶ 122. In designing the Retron ® 77, Hyperkin decided to use wood paneling and ribbing to emulate the style of 1970s electronics.  SUF ¶ 125.  Numerous game systems from the 1970s, other than the Atari VCS, similarly used wood grain and ribbing.  SUF ¶ 127-128.  At the same time, Hyperkin specifically chose to use a design that was so different from the 2600 Console that no one would ever be confused that it was the same product.  SUF ¶ 129-151.

**ARGUMENT**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Product design trade dress claims are examined with greater scrutiny than claims involving other trade dress. *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012–13 (9th Cir.1999).

As explained in further detail below, the material facts establish that A.I.I. cannot prevail on its claims.

## I. A.I.I. DOES NOT HAVE STANDING TO ASSERT A TRADE DRESS INFRINGEMENT CLAIM BECAUSE IT DID NOT ACQUIRE ANY SUCH RIGHTS FROM PRECEDESSOR ATARI COMPANIES

### A. A.I.I. Does Not Own Any Registered Trade Dress Rights.

"To claim trademark infringement, a plaintiff must have a "valid, protectable trademark." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999). A plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark. *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008).

Here, A.I.I. fails to allege ownership of any relevant federal trade dress registration. SUF ¶ 66. Therefore, it must establish the existence and ownership of unregistered trade dress.

### B. A.I.I. Cannot Establish That it Acquired Unregistered Trade Dress Rights From any Atari Predecessor Companies Because Those Companies Abandoned any Rights They Had.

The party claiming ownership of an unregistered mark must have been the first to use the mark in the sale of goods. *Halicki Films, LLC v. Sanderson*

1  *Sales & Mktg.*, 547 F.3d at 1226.  In this case, however, it is indisputable that
2  Atari Inc. was the first to use the claimed trade dress by selling the original
3  2600 Console and Joystick.  SUF ¶ 5-7.  Therefore, A.I.I. needs to show a chain
4  of assignments of unregistered, existing trade dress from Atari Inc., to Atari
5  Corp., to JTS, to Hasbro, and then to A.I.I. and that the trade dress was not
6  abandoned.

7          A.I.I. cannot establish this chain, because (1) it cannot show any specific
8  assignment of such rights, and (2) every company along the chain abandoned
9  any acquired rights in the alleged trade dress.  A mark shall be deemed to be
10  "abandoned" when its use has been discontinued with intent not to resume such
11  use.  15 U.S.C. § 1127(1).  Nonuse for 3 consecutive years shall be prima facie
12  evidence of abandonment.  *Id.*  "Use" of a mark means the bona fide use of such
13  mark made in the ordinary course of trade, and not made merely to reserve a
14  right in a mark.  *Id.*  An abandoned trademark is not capable of assignment.
15  *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 675 (7th Cir. 1982).

16          In this case, the undisputable facts show that Atari Inc. was the first to
17  abandon its rights to the wood grain design "element" in 1983, with (1) its
18  adoption of the all-black "Darth Vader" 2600 console, and (2) its adoption of
19  the wedge design in 1984.  SUF ¶ 23-28, 32.  Next, Atari Corp. abandoned the
20  original 2600 Console design in its entirety by 1986, when it began selling the
21  2600 Jr.  SUF ¶ 34-36.  For the next few years, Atari Corp. released systems
22  that lacked the wood grain and ribbing of the original 2600 Console.  SUF ¶ 37-
23  46.  Atari Corp. then abandoned the claimed trade dress in in both the 2600
24  console and joystick in 1992, when it completely discontinued the 2600 product
25  line.  SUF ¶ 42.  Since this occurred four (4) or more years before the Atari
26  Corp./JTS merger in 1996, this is prima facie evidence that Atari Inc and Atari
27  Corp abandoned the claimed trade dress before it could be assigned to A.I.I.
28          A.I.I. also cannot overcome the mountain of evidence showing that Atari

Corp., JTS, and Hasbro never had any intent to resume use of the claimed trade dress.  First, it is undisputable that no company, including A.I.I., ever resumed sales of the original 2600 Console.  SUF ¶ 24, 42-44.  Next, it is undisputable that while Atari Corp. obtained trade dress registrations for the 2600 Jr. wedge shape design which had no ribbing and no wood, it failed to do so for the original 2600 Console with its complex three tiered trapezoidaly intense shapes.  SUF ¶ 59, 61.  In its final days, Atari Corp. admitted that it had lost the console market and decided to instead focus on software development.  SUF ¶ 47.  JTS allowed the 2600 Jr. trade dress registrations to expire in 1998, reflecting that it had absolutely no intent to resume use of the 2600 product line.  SUF ¶ 59, 61.  The final nail in the coffin came from Hasbro, who relinquished all rights in the Jaguar, demonstrating its intent to exit the video game console market.  SUF ¶ 51.  These undisputed facts show that there was never any intent to resume trade dress use in these obsolete products.

Furthermore, the evidence shows that A.I.I. itself failed to consider itself the owner of any trade dress rights.  In a 2013 bankruptcy proceeding, A.I.I. filed several asset schedules listing its intellectual property rights.  SUF ¶ 64-65.  None of those schedules claimed ownership of any trade dress rights.

Finally, every Atari company failed to stop numerous third-party sales of joysticks identical to the 2600 Joysticks.  SUF ¶ 105-111.  A.I.I.'s own in-house counsel knew about Curt Vendel's sale of his "Legacy" joysticks that were identical to the original 2600 Joystick, and she admitted to him that A.I.I. could do nothing to stop him.  SUF ¶ 111.

### C.   A.I.I. Also Cannot Establish Acquired Distinctiveness in the Joystick Design Because it Became Generic.

The 2600 Joystick design is also not protectable because it became generic for retro 2600 style joysticks.  Over time, the holder of a valid trademark may become a "victim of 'genericide.'"  *Freecycle Network,*

*Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007).  Such genericide can occur "as a result of a trademark owner's failure to police the mark, resulting in widespread usage by competitors leading to a perception of genericness among the public, who sees many sellers using the same term." *Id.*

In this case, the 2600 joystick design is generic due to every Atari company's failure to police the claimed trade dress, leading to numerous third-party sales of generic product.  SUF ¶ 89, 104-111.  Most third-party sellers do not claim that the joysticks they sell are actual Atari product, but refer to them generically as joysticks for the Atari 2600, or retro joysticks.  SUF ¶ 107.  Further, one of the designers of A.I.I.'s own products, Curt Vendel, independently sold USB 2600 joysticks that he made, with A.I.I.'s knowledge, since 2009.  SUF ¶ 109-111.  A.I.I. even admitted that it could not stop him, thereby admitting to the generic nature of the design.  SUF ¶ 111.  In fact, the 2600 Joystick design became so generic that it was used for non-Atari products.  SUF ¶ 98, 100-102.  Becoming generic, the 2600 joystick design became and remains unprotectable.

## II.   A.I.I. CANNOT ESTABLISH ANY OF ITS OWN TRADE DRESS RIGHTS IN THE ORIGINAL 2600 CONSOLE AND JOYSTICK DESIGNS, BECAUSE IT CANNOT SHOW THAT THE DESIGNS ACQUIRED DISTINCTIVENESS

### A.   A.I.I. Cannot Show that the Designs Identify A.I.I. As the Source of the Original 2600 Console and Joystick.

A.I.I. also cannot establish that the 2600 Console and Joystick acquired distinctiveness.  If a trademark is not registered, the plaintiff bears the burden to establish distinctiveness and non-functionality.  *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018).  In evaluating distinctiveness, a mark can be inherently distinctive or can acquire distinctiveness.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205,

210-211 (2000).  Product design can never be inherently distinctive.  *Id.* at 212.
Consumers are aware of the reality that, almost invariably, even the most
unusual of product designs—such as a cocktail shaker shaped like a penguin—
is intended not to identify the source, but to render the product itself more
useful or more appealing.  *Id.* at 213.  Thus, A.I.I. must show that the claimed
trade dress acquired distinctiveness.  Acquired distinctiveness occurs when in
the minds of the public, the primary significance of a mark is to identify the
source of the product rather than the product itself.  *Id.* at 211.  This can be
established through direct consumer testimony; survey evidence; exclusivity,
manner, and length of use of a mark; amount and manner of advertising;
amount of sales and number of customers; established place in the market; and
proof of intentional copying by the defendant.  *Filipino Yellow Pages, Inc. v.
Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

Here, A.I.I. cannot present evidence to satisfy any factor.  A.I.I. failed to
satisfy the first two factors since there are no surveys or consumer declarations.
SUF ¶ 75-76.  A.I.I. cannot establish exclusivity and length of use of the
claimed designs, advertising, sales, or place in the market because no company
has sold original 2600 Consoles or Joysticks since 1992.  SUF ¶ 42-44.

Also, A.I.I. cannot demonstrate exclusivity as to the joystick design
because since third parties have sold joysticks similar in design to the 2600
Joystick since at least 2008, with A.I.I.'s knowledge.  SUF ¶ 89, 104-111; *See
EFS Mktg., Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 491 (2nd Cir. 1996) (there
was no inherent distinctiveness or secondary meaning in the dolls the parties
produced, because there were many other similar dolls already on the market).

A.I.I. also admitted that it could not prove the advertising factor since it
does not "track advertising and promotional expenses per design." SUF ¶ 165.

The last factor fails because Hyperkin's Retron ® 77 is not a direct copy
of any Atari system, and it took meaningful steps to conduct IP clearance and

1   clearly differentiate its products from the originals.  SUF ¶¶ 80-97, 122-130.

2   The A77 was no more a copy of the 2600 Joystick than it was of the myriad of

3   other similar joysticks from multiple sources.  SUF ¶ 89, 104-111

4        Therefore, A.I.I. cannot establish acquired distinctiveness in the original

5   2600 Console and Joystick designs.

6   **B.    A.I.I. Cannot Establish Any Trade Dress Rights Through**

7        **Residual Goodwill.**

8        Furthermore, A.I.I. cannot claim any trade dress in the 2600 Console and

9   Joystick through residual goodwill.  "[a] party cannot defend against a claim of

10  abandonment by relying on some residual goodwill generated through post-

11  abandonment sales of the product by distributors or retailers."  *Zamacona v.*

12  *Ayvar*, No. CV0702767ABCFMOX, 2009 WL 279073, at *2 (C.D. Cal. Feb. 3,

13  2009).  A.I.I.'s own expert admitted that there were no 2600 Consoles sold after

14  1992, and there were no Atari 2600 joysticks sold in the 21st century.  SUF ¶

15  42-44.  Thus, any goodwill that arose after abandonment could only have come

16  about sales by retailers or individuals, which is not sufficient.

17  **C.    Any Assignments of the Claimed Trade Dress Would Also be**

18        **Invalid Assignments in Gross.**

19       Assuming *arguendo* that there was any attempted transfer of trade dress

20  from Atari Corp. to JTS, it would be an invalid assignment in gross.  A

21  trademark assignment that functionally severs the trademark from its

22  accompanying goodwill is an invalid assignment in gross.  *Mister Donut of*

23  *America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969).

24       As explained *supra*, Atari Corp. stopped selling all iterations of the 2600

25  Console and Joystick long before merging with JTS.  SUF ¶ 42.  Since Atari

26  Corp., JTS, and Hasbro did not sell the 2600 Console and Joystick at the time

27  any assignments occurred, any such assignments would not be accompanied by

28  the goodwill in the products, and thus would be invalid assignments in gross.

### D.   **A.I.I. Cannot Rely Upon the Sale of Flashbacks to Establish Acquired Distinctiveness.**

A.I.I.'s sale of Flashback devices also cannot support a claim of acquired distinctiveness in the original trade dress.  The lack of survey, customer and marketing evidence is fatal to the claim.  SUF ¶ 75-76, 165.  Further, the 2600 Console and Joystick designs entered the public domain via abandonment long before anyone sold the Flashback devices.  Thus, any rights that A.I.I. could have acquired would have been limited to what A.I.I. added over the generic and abandoned design.  Hyperkin does not use that added trade dress.

## III.   **A.I.I. CANNOT DEMONSTRATE THAT HYPERKIN FALSELY DESIGNATED A.I.I. AS THE ORIGIN OF ANY OF ITS PRODUCTS**

Summary judgment is also appropriate because Hyperkin's products designate Hyperkin, not A.I.I., as the origin of the CirKa ® A77 and Retron ® 77.  Where a defendant does not sell a plaintiff's product as their own, there is no false designation origin based upon similar trade dress.  *See Deckers Outdoor Corp. v. J.C. Penney Co. Inc.*, 45 F. Supp. 3d 1181, 1185-1186 (2014).

In *Deckers*, the plaintiff sued the defendant for trade-dress infringement, alleging that defendant sold boots with similar designs.  *Id.* at 1182.  The court dismissed that claim, holding that there was no false origin when, like here, the defendant sold its goods as its own goods.  *Id.* at 1185.

Like the defendant in *Decker*, Hyperkin identifies its CirKa ® A77 and Retron ® 77 products as originating from Hyperkin itself, not A.I.I.  Hyperkin does this through the use of its registered trademarks and disclaimers.  SUF ¶ 77-102, 118-161.  On the Retron ® 77, Hyperkin went so far as to put its Retron ® and Hyperkin ® trademarks on both the top and bottom.  SUF ¶ 141-142.  The trademarks are even in the wood grain.  SUF ¶ 141.  Assuming *arguendo* that wood grain had any source-identifying significance, customers drawn to

that element would immediately be informed that the Retron ® 77 was a Hyperkin product.

Due to all of these measures, no one is confused as to the source of Hyperkin's products.  SUF ¶ 163.  Since Hyperkin does not identify A.I.I. as the source of its products, and it identifies Hyperkin products with its own trademarks, no tenable false origin claim exists.

## IV.   PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIKELIHOOD OF CONFUSION BETWEEN THE VIDEO GAME CONSOLES IS APPROPRIATE BECAUSE NO REASONABLE JURY COULD FIND SUFFICIENT SIMILARITY BETWEEN THE PRODUCTS

The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998).  A.I.I. bears the burden of showing that confusion is "probable," not merely "possible."  *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005).

This requires analysis of the *Sleekcraft* factors: (1) strength of the mark(s); (2) relatedness of the goods;(3) similarity of the marks; (4) evidence of actual confusion;(5) marketing channels; (6) degree of consumer care; (7) the defendants' intent; and (8) likelihood of expansion.  *Network Automation, Inc., v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011).  As explained below, the undisputed facts show that A.I.I. cannot meet this burden.

### A.   <u>The Claimed Trade Dress is Weak and Only Entitled to a Narrow Scope of Protection.</u>

The claimed trade dress is weak.  Strength of the mark is determined with a two-part test, conceptual strength and commercial strength.  *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th Cir. 2011).  The conceptual strength in

the 2600 Console trade dress is non-existent because, under *Samara Bros.*, product design cannot be inherently distinctive.

Commercial strength is absent because wood in the 2600/VCS was abandoned in 1982 with the all-black model.  SUF ¶¶ 23-32.  The original complex trapezoidally intense ribbed shape was abandoned in 1986 with the introduction of the 2600 Jr. with its non-ribbed simple wedge shape, and all versions of the 2600/VCS were abandoned in 1992.  SUF ¶¶ 34-44.  Also, there is no evidence that consumers purchased products based upon appearance, rather than functionality.

Furthermore, any scope of protection would very narrow due to widespread third-party use of wood grain and ribbing elements in electronics and video games.  Widespread use of part of a mark by others may lessen the likelihood of confusion.  *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1143 (9th Cir. 2002); *see also Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1224 (C.D. Cal. 2004) (finding that plaintiff's moose mark was weak due to widespread use of moose by third parties).  Electronics commonly contained wood grain for decades.  SUF ¶ 9, 11-22, 124.  Indeed, Atari Inc. only adopted wood grain in its product after its use in competing products, such as the Fairchild channel F, with the intent to mimic other living room electronics of the 1970s.  SUF ¶ 11-22.  Even in the modern era, third parties continue to produce wood-grained skins and parts for video game consoles.  SUF ¶ 126.  Thus, A.I.I. does not have the right to claim exclusive right to wood grain for video game consoles.

Similarly, almost every single game manufacturer has used ribbing on their consoles.  SUF ¶ 9, 124, 127.  Ribbing is such a generic element in video game systems that no one would consider them to be a source identifier.  Rather, they operate as a well-known form of ornamentation.

**B.**     **<u>The Products Differ Completely in Appearance.</u>**

"[A] product's trade dress will not be protected from an imitator that is sufficiently different in its features to avoid such confusion." *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir.1987).

In this case, there are numerous material differences between the consoles. SUF ¶¶ 131-148. The consoles have a different shape because the original 2600 was a three-level design incorporating multiple trapezoids, was wider than longer, had bezels, had switches, and had ports in the rear. In comparison, the Retron ® 77 is longer than wider, in shape, and it is devoid of the complex trapezoidal motif. The Retron ® 77 also uses buttons, not switches, in a completely different location, has a unique triangular corner facet with Hyperkin's (H) logo, no bezels, and ports and slots in a different location than the 2600. *Id.* The product packaging also drastically differs. SUF ¶ 149-151.

The only elements in common also differ completely in appearance. SUF ¶¶ 131-148. The Atari 2600 model with wood grain has the wood grain running across the front of the console. In comparison, the Retron ® 77 has a different color and pattern wood grain that runs across the rear top part of the console and is broken up by the cartridge slot. The wood portion contains both the Retron ® 77 name and the Hyperkin name. The ribbing on the Retron ® 77 is narrower than the 2600, with fewer ribs that taper off as you move towards the bottom, thanks to the corner cutout with the Hyperkin logo. The Hyperkin logo is prominently on the front of the Retron ® 77. The Hyperkin ® and Retron ® trademarks also appear on the bottom of the Retron ® 77.

## C.   The Consumers are Discriminating.

Confusion is also not likely because the Retron ® 77 is only of interest to the very narrow niche of consumers who own Atari cartridges and want to play them on a modern television. SUF ¶¶ 152-160. No company has produced 2600 cartridges for more than twenty (20) years. SUF ¶ 42-44. Thus, the

consumers are limited to either people who have held onto their cartridges for over twenty (20) years (and thus would understand that no one is producing the original 2600 Consoles) and those who know where to acquire vintage 2600 game cartridges.  Retro game collectors would already know and could readily determine from the Internet that A.I.I. does not make cartridge-playing consoles.  If they just wanted to play the games on a Flashback, they would not bother buying the more expensive Retron ® 77.  SUF ¶ 161.  In either case, customers are looking for something that A.I.I does not provide.

Similarly, there is an extremely limited market of consumers interested in purchasing a 2600 Console, which no one has produced for almost thirty (30) years.  SUF ¶ 42-44.  Those consoles are only being bought and sold used.  People who actively seek to purchase a 2600 Console know exactly what they are looking for.  These consumers must  necessarily be discriminating and sophisticated to know what they want and need and that Hyperkin, not A.I.I., is the only source who can fill their need for a new console that plays 2600 cartridges via an HDMI output and into a modern TV.  SUF ¶ 160.

### D.   The Target Markets are Distinct and Goods are Unrelated.

Confusion is also not likely because the parties target different markets.  Confusion can be avoided even if both parties' products are marketed and sold in the same field.  *See Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 716 (Fed. Cir. 1992) (finding no likelihood between use of "E.D.S." computer services and "EDS" power supplies, even though they overlapped in the medical field); see also *Corp. v. Corp.*, 94 U.S.P.Q.2d 1399 (T.T.A.B. 2010) (no likelihood where devices were marketed for different purposes in the medical care field, even though they were used in the same hospital).

In this case, Hyperkin specifically targets people who already own Atari cartridges, and want to play their old games on a modern television.  SUF ¶ 154-160.  A.I.I. only licenses systems that come bundled with games and

cannot play old Atari cartridges.  SUF ¶¶ 153, 159.  Since the products differ in functionality, the markets are distinct and products unrelated.

### E.   Hyperkin Took Extensive Efforts to Avoid Confusion.

Hyperkin also took extensive efforts to avoid confusion.  Hyperkin designed the Retron® 77 packaging to look completely different than the 2600 Console packaging.  SUF ¶¶ 149-151.  Hyperkin rejected designs that might look similar to both the original 2600 console and the 2600 Jr.  SUF ¶ 130. Hyperkin further put the Retron ® and Hyperkin ® trademarks on both the top and the bottom of the Retron ® 77.  SUF ¶ 141, 142.  In fact, the trademarks appear in the very wood grain that A.I.I. claims as an element of its trade dress. SUF ¶ 141.  Even a customer who focused on the wood grain would immediately know that the Retron ® 77 was a Hyperkin product.

### F.   There was No Actual Confusion.

As a result of Hyperkin's extensive efforts to avoid confusion, no actual confusion occurred.  SUF ¶ 163.  A.I.I. also failed to present any customer declarations or survey evidence on this issue.  SUF ¶ 74-76.  Therefore, there is no actual confusion, which favors Hyperkin.

### G.   A.I.I. Is Not Likely to Expand into Hyperkin's Market.

There is also no evidence that A.I.I. is likely to expand into Hyperkin's market.  Rather, A.I.I. has never sold or licensed any cartridge-playing console. SUF ¶ 153.  Therefore, this factor also favors Hyperkin.

Because the alleged trade dress is weak, the products look completely different, the relevant consumers are sophisticated, the parties target distinct markets, Hyperkin took extensive efforts to avoid confusion, and no actual confusion exists, confusion is, as a matter of law, not likely.

## V.   PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF THE JOYSTICK'S FUNCTIONALITY IS APPROPRIATE BECAUSE IT WAS THE SUBJECT OF AN EXPIRED UTILITY PATENT

## A.   Atari Bears the Burden of Proving that the Trade Dress is Nonfunctional.

In general terms, a product feature is functional and cannot serve as a trademark, if it is essential to the use of purpose of the article or if it affects the cost or quality of the article. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 165 (1995). The person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). The accused need not prove that the trade dress at issue is functional. *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987). Summary judgment is proper when a plaintiff fails to produce evidence such that a reasonable trier of fact could find the design nonfunctional. *Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1014–15 (S.D. Cal. 2000).

Here, A.I.I. admitted in paragraph 14 of its Complaint that its claims are based upon alleged common law rights. Also, A.I.I. did not produce any trademark registrations in this case. Since there is no registered trade dress, Atari bears the burden of proving that the trade dress is nonfunctional.

## B.   The Trade Dress is Functional Because its Features Were Explicitly Claimed in a Utility Patent.

A.I.I. cannot meet its burden of proof because of an expired utility patent. Where there is an expired utility patent claiming the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional. *TrafFix*, 532 U.S. at 29–30. Four factors are typically considered to determine functionality: (1) whether advertising touts the utilitarian advantages of the design, (2) whether the particular design results from a comparatively simple or inexpensive method of manufacture, (3) whether the design yields a utilitarian advantage and (4) whether alternative designs are available. *See Disc Golf Ass'n v. Champion*

1   *Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998).  Functionality may be found

2   where "the whole is nothing other than the assemblage of functional parts" and

3   "there is no evidence that anything about the appearance exists for any

4   nonfunctional purpose." *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d

5   667, 684 (9th Cir. 2012), abrogated on other grounds by *SunEarth, Inc. v. Sun*

6   *Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).

7          Here, the utility patent establishes that the 2600 Joystick's design yields a

8   utilitarian advantage.  SUF ¶¶169- 184.  The drawings of U.S. Patent No.

9   4,349,708 (the "'708 Patent") depict the preferred embodiment of the invention.

10  The only element not depicted in the drawings is the dashed circle

11  circumscribing the base.  The rectangular housing, hexagonal joystick, button,

12  and rubber boot with concentric rings, are all claimed in claims 11 and 13 of the

13  '708 patent and defined in the description and drawings.  SUF ¶ 171, 174.  The

14  rectangular base is claimed in claim 13 as the controller housing, and various

15  parts of the specification describe the functions of the base.  SUF ¶ 171-172.

16  The joystick is claimed in claim 13 and shown in the figures with a hexagonal

17  shape.  SUF ¶ 170.  The rubber boot is explicitly claimed in claim 11 as a

18  "flexible boot" that maintains the handle in a rest position and claim 13 as a

19  "resilient boot".  SUF ¶ 174.  The button is expressly mentioned in claim 13 as

20  "a firing button", so is functional.  SUF ¶ 175.  The placement of the button is

21  also shown in figures as a location relative to the handle.  SUF ¶ 176.

22  Therefore, the alleged features of the trade dress are claimed and described in

23  the '708 Patent.

24         Additionally, the '708 Patent does not expressly state the word

25  "hexagonal," but the hexagonal shape is functional since it provides contour

26  and texture to aid grip.  SUF ¶ 182.  The concentric rings help center the

27  joystick.  SUF ¶ 183. The base was rectangular to fit into Atari Inc.'s console,

28  the Tank II.  SUF ¶ 184.  Finally, A.I.I.'s own expert admitted that the dashed

circle was functional because it let users know the directions for the joystick. SUF ¶ 179. Since all the elements of the asserted trade dress were included in the utility patent, or are admittedly functional, there can be no trade dress protection for the joystick.

## VI.   HYPERKIN SUCCESSFULLY TOOK STEPS TO ASSURE THAT THERE IS NO LIKELIHOOD OF CONFUSION AS TO THE A77

There is also no likelihood of confusion as to the joysticks because Hyperkin took every reasonable step to avoid confusion. When a design patent expires, the design becomes copyable. *Sunbeam Prods., Inc. v. West Bend Co.*, 39 U.S.P.Q.2d 1545 (S.D. Miss. 1996), aff'd, 123 F.3d 246 (5th Cir. 1997). It may not, however, be copied in such a way that customers are deceived about what they are buying. *Id.*

Here, though there is similarity in appearance between the original 2600 Joystick and the A77, there are many other products on the market that mimic the appearance of the 2600 Joystick. SUF ¶ 89, 104-111. Those third parties differentiate their products by using their own brands on the product and listings. SUF ¶ 107. Indeed, A.I.I. itself followed this practice by plastering the Atari logo on the joysticks for the Flashback 2. SUF ¶ 114. Similarly, with the CirKa ® A77, Hyperkin labeled both the product and packaging with its federally registered CirKa ® trademark. SUF ¶ 92-93. Hyperkin also called the A77 a "Atari-style" joystick for the 2600, rather than an actual Atari joystick. SUF ¶ 96. Hyperkin further placed disclaimers on the packaging, informing consumers that they were not purchasing an A.I.I. product. SUF ¶ 95. As a result, no actual confusion occurred. SUF ¶¶ 74, 163. These facts, especially when combined with the sophistication of the relevant consumers, show that consumers are much more likely to believe that the A77 is a CirKa or Hyperkin product, not A.I.I.'s product.

## VII.  PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF DILUTION IS APPROPRIATE BECAUSE THERE IS NO EVIDENCE THAT THE TRADE DRESS IS FAMOUS

Summary judgment as to dilution is appropriate because A.I.I. failed to produce evidence that the relevant trade dress is famous among the general public.  A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.  15 U.S.C. § 1125(c)(2).  Specialized or niche market fame does not satisfy the rigorous fame standard of trademark dilution.  *Monster Energy Co. v. BeastUp LLC*, 395 F. Supp. 3d 1334, 1364 (E.D. Cal. 2019)

In this case, A.I.I. failed to produce evidence that its asserted marks in Paragraph 46 of its complaint ["Joystick Designation of Origin and Console Designation of Origin"] are famous among the general consuming public as originating from A.I.I.  As explained *supra*, there is no evidence, such as surveys or consumer declarations, showing that the general consuming public associates the relevant trade dress with A.I.I.  SUF ¶ 75-76.  Without "such evidence, A.I.I. can, at most, show some recognition in the niche of retro gamers.  Per *Monster Energy Co.*, this niche fame is not sufficient for dilution.

Furthermore, A.I.I. cannot rely upon Atari Inc. and Atari Corp.'s faded glory to demonstrate fame.  History is rife with companies that were successful for a time, but ultimately disappeared from public awareness.  PanAm, Standard Oil, KB Toys and Blockbuster Video were famous in their time, but are largely forgotten today.  Likewise, the Atari brand is largely forgotten, leaving companies like Nintendo, Sony and Microsoft to dominate the video game industry.  A.I.I. cannot establish its own fame just by adopting the name of a faded brand.

Additionally, there can be no tarnishment by Hyperkin's acts since the Atari brand already suffered a negative image through its numerous failures.

There is also no blurring since there were already numerous third-party sellers of 2600 compatible joysticks before Hyperkin began selling its A77.

## VIII.   SUMMARY JUDGMENT AS TO THE UNFAIR COMPETITION CLAIM IS PROPER SINCE THERE IS NO TRADE DRESS INFRINGEMENT

State common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are "substantially congruent" to claims made under the Lanham Act.  *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994).  Thus, if the Lanham Act claims fail, the unfair competition claims similarly fail.

## IX.   AN AWARD OF ATTORNEYS FEES IS APPROPRIATE AS THE TOTALITY OF CIRCUMSTANCES SHOW THAT A.I.I. BROUGHT FRIVOLOUS AND OBJECTIVELY UNREASONABLE CLAIMS AGAINST HYPERKIN

As demonstrated above, an award of attorneys' fees is appropriate, because A.I.I.'s claims are deceptive and untenable, qualifying as an "exceptional case" under the Lanham Act.  15 U.S.C. § 1117(a).  The nonexclusive factors include frivolousness, motivation, objective unreasonableness (factually and legally) and the need to advance considerations of compensation and deterrence.  *SunEarth, Inc. v. Sun Earth Solar Power Co. Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016).

The frivolousness and objective unreasonableness of this case justifies an award of attorneys' fees.  A.I.I. continues to assert rights in and to the original Atari VCS and 2600 Joystick, even though those rights were abandoned many years ago, and the design patents expired.  It is factually unreasonable for A.I.I. to assert ownership of rights it knew did not exist.

A.I.I.'s objective unreasonableness is also evident from its lack of evidence.  A.I.I. failed to present the strongest evidence it could of

distinctiveness, likelihood of confusion or dilution: survey evidence.

A.I.I.'s claims as to the Retron ® 77 are objectively unreasonable due to the vast differences in overall look and feel of the products.  A.I.I. also has no right to claim exclusive use of design "elements" that are common within the video game industry.  No one is likely to be confused as to the source of the Retron ® 77, and this fact is reinforced by the utter lack of any actual confusion.

The claims as to the CirKa ® A77 are objectively unreasonable because A.I.I. completely ignored the existence of many third parties selling identical joysticks.  In Curt Vendel's Legacy Engineering case, A.I.I. even admitted that it had no right to stop third party sales of the joysticks.

The overall facts show that A.I.I. had an improper motive in pursuing claims as to the A77 in order to stop sales of the Retron ® 77.  Since the Retron ® 77 is vastly different in appearance to the VCS/2600, A.I.I. tacked on claims as to the A77 to give its complaint a veneer of credulity.  Ultimately, however, those claims failed for the reasons above.

## CONCLUSION

Based upon the foregoing, Defendant Hyperkin, Inc. respectfully requests summary judgment be granted in its favor, or, in the alternative, that partial summary judgment as to the issues and facts presented be granted and that this be deemed an exceptional case warranting the award of attorneys' fees.

Dated: June 1, 2020                        Respectfully Submitted,
                                           Law Office of Mary Sun

                                           /s/Jason Chuan
                                           Jason Chuan
                                           Attorneys for Defendant,
                                           Hyperkin, Inc.

## CERTIFICATE OF SERVICE
## CENTRAL DISTRICT OF CALIFORNIA

The undersigned certifies that on June 1, 2020, the following documents and all related attachments ("Documents") were filed with the Court using the CM/ECF system.

**DEFENDANT HYPERKIN, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to L.R. 5-3.2, all parties to the above case and/or each attorneys of record herein who are registered users are being served with a copy of these Documents via the Court's CM/ECF system. Any other parties and/or attorneys of record who are not registered users are being served by e-mail and facsimile.

By: /s/ Jason Chuan
Jason Chuan