Jason Chuan (SBN 261868)
Law Office of Mary Sun
128 E. Huntington Drive, Suite B
Arcadia, CA 91006
Phone: 949-328-4097
Fax:      626-303-7882
Email: jason@sunlegalgroup.com

H.G. Robert Fong (SBN 53535)
Ku & Fong
444 S Flower St Ste 2530
Los Angeles, CA 90071
Phone: (213) 488-1400
Fax: (213) 236-9235
Email: bobfong@ix.netcom.com

Attorneys for Defendant,
Hyperkin, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATARI INTERACTIVE, INC.,<br><br>                 Plaintiff,<br><br>        v.<br><br>HYPERKIN INC.,<br><br>                 Defendant. | Case No. 2:19-CV-0608-CAS (AFMx)<br><br>Hon. Christina A. Snyder<br><br>**REVISED STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT HYPERKIN, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date: July 13, 2020<br>Time: 10:00 a.m.<br>Location: First Street Courthouse<br>             Courtroom 8D, 8th Floor |

Defendant Hyperkin, Inc. ("Hyperkin") respectfully submits this revised Statement of Uncontroverted Facts and Conclusions of Law in support of its Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, filed against Atari, Inc. ("A.I.I."), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1:

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| **The Allegations of the Complaint** | |
| 1.   A.I.I. filed a complaint against Hyperkin on January 25, 2019 for 1) false designation of origin, 2) common law unfair competition, and 3) trademark dilution. | Declaration of Jason Chuan ("Chuan Decl.") ¶ 1, Exhibit 1.  *See* ECF No. 1. |
| 2.   A.I.I. alleged that it has trade dress in its Atari 2600 game console (the "2600 Console") and Atari 2600 joystick controller (the "2600 Joystick"). | Chuan Decl. ¶ 1, Exhibit 1, ¶ 7 |
| 3.   A.I.I. alleges that the trade dress for the 2600 Console includes wood paneling, black and brown color scheme, and lateral grooves in top of the device. | Complaint ¶ 25 |
| 4.   A.I.I. alleges that the trade dress for the 2600 Joystick includes a rectangular base with a protruding hexagonal joystick mounted substantially | Complaint ¶ 19 |

| <u>**Hyperkin's Uncontroverted Fact**</u> | <u>**Supporting Evidence**</u> |
|---|---|
| centrally thereon, a single prominent red button located at the top left corner of the base, a rubber boot that connects the joystick to the base, and is characterized by three concentric rings of progressively decreasing height, a two-tiered tapered design to the base, and a dashed circle circumscribing the base of the joystick and rubber boot. | |
| <u>**The Claimed Design Elements of the 2600 Console are Not Distinctive Because They Were Commonly Used in the Video Game Industry**</u> | |
| 5.   A.I.I. is not the original company that sold the 2600 Console and Joystick. | Chuan Decl. ¶ 2, Exhibit 2; Declaration of Curt Vendel ("Vendel Decl.") ¶ 9. |
| 6.   The original Atari company ("Atari Inc.") was a California corporation formed in 1972. | Chuan Decl. ¶ 2, Exhibit 2. |
| 7.   Atari Inc. sold the 2600 Console and Joystick beginning in 1977. | Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 2 |
| 8.   The 2600 Joystick was also known as the model CX40. | Vendel Decl. ¶ 31 |
| 9.   Wood grain and ribbing were common design elements for electronics from the 1970s. | Declaration of Steven Mar ("Mar Decl.") ¶ 24<br><br>Vendel Decl. ¶ 11 |

| Hyperkin's Uncontroverted Fact | | Supporting Evidence |
|---|---|---|
| | | Declaration of Ian Bogost ("Bogost Decl.") ¶ 18-19. |
| 10. | The 2600 Console included wood grain in order to match other home electronics from the 1970s. | Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 9<br><br>Vendel Decl. ¶ 10 |
| 11. | The 2600 Console was not the first to use wood grain in its design. | Vendel Decl. ¶ 11, 12, Exhibit C Bogost Decl. ¶ 19-20, Exhibit E. |
| 12. | Numerous video game companies during the 1970s and early 1980s used wood grain in their console designs. | Vendel Decl. ¶ 11-15, Exhibits C-F Bogost Decl. ¶ 19-20, Exhibit E |
| 13. | The Magnavox Odyssey was a video game system released in 1972, before the 2600 Console. | Vendel Decl. ¶ 9 Bogost Decl. ¶ 19 |
| 14. | The Magnavox Odyssey used wood grain in its console design. | Vendel Decl. ¶ 14, Exhibit E Bogost Decl. ¶ 19 |
| 15. | The Coleco Telestar game system, released in 1976, used a wood grain panel on the top of the console. | Vendel Decl. ¶ 14, Exhibit E Bogost Decl. ¶ 19 |
| 16. | The Fairchild Channel F game system, released in 1976, also used wood grain in its design. | Vendel Decl. ¶ 12, Exhibit C. Bogost Decl. ¶ 19 |
| 17. | The Bally Professional Arcade video game console, released | Bogost Decl. ¶ 20, Exhibit E<br><br>Vendel Decl. ¶ 13 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| in 1978, used wood grain in its design. | |
| 18. The 1978 APF MP1000 used wood grain in its design. | Vendel Decl. ¶ 15, Exhibit F<br>Bogost Decl. ¶ 20, Exhibit E |
| 19. The Mattel Intellivision, released in 1980, also used wood grain in its design. | Vendel Decl. ¶ 15, Exhibit F<br>Bogost Decl. ¶ 19 |
| 20. Atari, Inc. never sued Mattel for use of wood grain in the Intellivision design. | Bogost Decl. ¶ 19 |
| 21. The 1982 Vtech CreatiVision used wood grain in its design. | Bogost Decl. ¶ 20, Exhibit E. |
| 22. The 1982 Emerson Arcadia used wood grain in its design. | Bogost Decl. ¶ 20, Exhibit E. |
| **A.I.I. Cannot Claim any Acquired Distinctiveness in Designs Atari Inc. and Atari Corp. Abandoned Decades Ago** | |
| 23. In 1982, Atari, Inc. ceased use of the wood grain in the 2600 Console, and released an all-black version instead nicknamed the "Darth Vader". | Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 183:20-23<br><br>Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 4<br><br>Bogost Decl. ¶ 21 |
| 24. From 1983 to when sales of the 2600 Console ceased, Atari Inc. never resumed use of wood grain. | Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 183:20-23<br><br>Bogost Decl. ¶ 21, 22<br>Vendel Decl. ¶ 17-25, Exhibits I-O. |
| 25. Even the 2600 consoles that were licensed for production | Bogost Decl. ¶ 21 |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| did not use any wood grain, or horizontal ribbing. | |
| 26. Numerous companies other than Atari Inc. used wood grain and ribbing in their design. | Vendel Decl. ¶ 15, Exhibit F |
| 27. Ribbing is a common element used for video game systems over the past few decades. | Vendel Decl. ¶ 16 |
| 28. In 1982, Atari Inc. released the 5200, which did not have wood grain and horizontal ribbing. | Bogost Decl. ¶ 22<br><br>Vendel Decl. ¶ 20<br><br>Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 5 |
| 29. By 1982, Atari Inc.'s sales slowed, causing Atari's sales numbers to plummet. | Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 3 |
| 30. Atari also had a number of high-profile missteps that year, with poor critical reception of several games, such as E.T. and Pac-Man. | Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 3 |
| 31. Atari Inc.'s stumbles sent shockwaves through the video game industry, killing companies, canceling, products, and causing layoffs. | Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 3 |
| 32. In 1984, Atari tried releasing a version of the Atari VCS/2600 that completely dropped the | Vendel Decl. ¶ 18, Exhibit J. |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| original design and replaced it with a low wedge shaped design. | |
| 33.   By 1984, Atari Inc. was a shadow of its former self, and its parent company sold the remains to Jack Tramiel, as part of Tramel Technology, Ltd.  The new company was known as Atari Corp. ("Atari Corp.") | Chuan Decl. ¶ 3, Exhibit 3<br><br>Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 3<br><br>Bogost Decl. ¶ 7<br><br>Vendel Decl. ¶ 19 |
| 34.   In 1986, Atari Corp. released a cheaper version of the 2600, nicknamed the 2600 Jr. | Vendel Decl. ¶ 21, Exhibit L<br>Bogost Decl. ¶ 21, Exhibit F<br><br>Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 4 |
| 35.   The 2600 Jr. was lower in quality than the original 2600 Console. | Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 201:8-202:22. |
| 36.   The 2600 Jr. lacked the wood grain and ribbing of the original 2600 Console. | Vendel Decl. ¶ 21, Exhibit L<br><br>Bogost Decl. ¶ 21, Exhibit F<br><br>Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 4 |
| 37.   Atari Corp. also released a 7800 Prosystem in 1986, which had a completely different appearance than the 2600/VCS and lacked the wood grain and ribbing. | Vendel Decl. ¶ 22<br><br>Bogost Decl. ¶ 22<br><br>Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 5 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 38. By the time Atari Corp. reentered the market in 1986, Nintendo and Sega had become the iconic symbols of video games with the Nintendo Entertainment System and Sega Master System. | Vendel Decl. ¶ 23<br><br>*Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1574-75 (1990) |
| 39. Atari Corp. released the Atari XE Video Game System in 1987, which again lacked wood grain and ribbing. | Vendel Decl. ¶ 24 |
| 40. Atari Corp. then tried the handheld market in 1989 with the release of the Lynx, which again lacked wood grain and ribbing. | Vendel Decl. ¶ 25 |
| 41. Atari Corp. never used wood grain in its consoles, including the 2600 Jr., 7800, Lynx, and Jaguar. | Bogost Decl. ¶ 21-22, Exhibit F<br>Vendel Decl. ¶ 21-26, Exhibits L-O |
| 42. Atari Corp. ceased sales of the 2600 Console and 2600 Joystick in 1992. | Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 4 |
| 43. A.I.I. has not sold any 2600 Consoles since 1992. | Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 127:23-128:1, 183:24-184:1 |
| 44. A.I.I. has not sold any 2600 Joysticks since 1992. | Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 112:16-113:21 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 45. By 1994, Atari Corp. had developed a new console, the Atari Jaguar. | Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 7<br><br>Vendel Decl. ¶ 26<br><br>Bogost Decl. ¶ 7 |
| 46. The Jaguar had an entirely black and rounded shape. | Bogost Decl. ¶ 22 |
| 47. The Atari Jaguar was a failure, despite Atari Corp.'s significant investments into the platform. | Chuan Decl. ¶ 5-6, Exhibit 4, p 3; Exhibit 5, p. 3.<br><br>Vendel Decl. ¶ 26<br><br>Bogost Decl. ¶ 7 |
| 48. In 1996, Atari Corp. was acquired by JTS Corporation ("JTS") via merger. | Chuan Decl. ¶ 3, Exhibit 5, p. 2<br><br>Vendel Decl. ¶ 26<br><br>Bogost Decl. ¶ 7 |
| 49. JTS intended to use Atari Corp.'s assets to conduct its business of designing, developing, manufacturing and marketing hard disk drives for use in notebook computers and desktop personal computers. | Chuan Decl. ¶ 7, Exhibit 6, p 2-3. |
| 50. JTS sold the Atari name to Hasbro Interactive in 1998. | Vendel Decl. ¶ 26<br><br>Bogost Decl. ¶ 8 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 51. Hasbro Interactive released all rights to the Jaguar, declaring it an open platform. | Vendel Decl. ¶ 27, Exhibit P<br><br>Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 7 |
| 52. Infogrames Entertainment SA purchased the Atari name from Hasbro Interactive in 2001. | Vendel Decl. ¶ 28<br><br>Bogost Decl. ¶ 8 |
| 53. In 2003, Infogrames Entertainment SA changed the name of its Infogrames Interactive, Inc. subsidiary to Atari Interactive, Inc. | Vendel Decl. ¶ 28<br><br>Bogost Decl. ¶ 8 |
| 54. From 1996 to 2004, JTS, Hasbro Interactive, and the Atari/Infogrames companies did not release any standalone video game systems.  They were software publishers with licenses to third parties. | Vendel Decl. ¶ 29 |
| 55. From 1996 to 2004, JTS, Hasbro Interactive, and the Atari/Infogrames companies did not design, manufacture, or sell video game console products. | Vendel Decl. ¶ 29 |
| 56. A.I.I. had no intent to re-enter the video game system market from 1996-2004. | Vendel Decl. ¶ 30 |
| 57. Atari Corp. owned the design patents nos. D254544 and D255565. | Chuan Decl. ¶ 8, Exhibit 7 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 58. Atari Corp. did not record any assignment of the design patent nos. D254544 or D255565 to JTS, Hasbro, or A.I.I. | Chuan Decl. ¶ 8, Exhibit 7 |
| 59. Atari Corp. had trade dress registrations for the 2600 Jr., which were cancelled. | Bogost Decl. ¶ 11. |
| 60. Atari Corp. did not record the assignment of a trade dress registration in the 2600 Jr. to Hasbro or A.I.I. | Chuan Decl. ¶ 19, Exhibit 17 |
| 61. A trade dress registration for the 2600 Jr. was cancelled on July 27, 1998. | Chuan Decl. ¶ 19, Exhibit 17 |
| 62. Atari Corp. did not record the assignment of a trademark registration for the mark "2600" to JTS, Hasbro, or A.I.I. | Chuan Decl. ¶ 18, Exhibit 16 |
| 63. A trademark registration for a "2600" word mark owned by Atari Corp. was cancelled on May 1, 1995 | Chuan Decl. ¶ 18, Exhibit 16 |
| 64. A.I.I. declared bankruptcy in 2013. | Chuan Decl. ¶ 9, Exhibit 8 Bogost Decl. ¶ 8 |
| 65. In the bankruptcy asset schedules, A.I.I. failed to identify any trade dress rights. | Chuan Decl. ¶ 9, Exhibit 8 |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| 66. A.I.I. failed to allege the existence of any trademark registrations for the trade dress in the Atari 2600 Console or Atari 2600 Joystick. | Complaint ¶ 1-50 |
| 67. A.I.I. did not take action to protect its claimed trade dress. | Bogost Decl. ¶ 11 |
| 68. A.I.I. failed to produce any live trade dress registrations for the Atari 2600 Console or Joystick | Chuan Decl. ¶ 11<br><br>Bogost Decl. ¶ 11 |
| 69. A.I.I. failed to produce any non-expired design patents for the 2600 Console or Joystick. | Chuan Decl. ¶ 11<br><br>Bogost Decl. ¶ 11 |
| 70. A.I.I. does not have any detailed, formal guideline detailing its trade dress for employees or licensees to follow. | Bogost Decl. ¶ 12, 13<br><br>Vendel Decl. ¶ 31 |
| 71. An organization claiming a distinctive trade dress would be expected to maintain a detailed, formal guideline documenting the features of its distinctive product design. | Bogost Decl. ¶ 12 |
| 72. Companies, like the Tetris Company, who actively protect their trade dress, register their trade dress with the USPTO. | Bogost Decl. ¶ 12 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 73. There is no claim of trade dress rights on the packaging for the Flashback products. | Bogost Decl. ¶ 14 |
| **A.I.I. Cannot Establish any Acquired Distinctiveness in the Claimed Designs** | |
| 74. A.I.I. failed to produce any declarations from its customers regarding any association with the relevant trade dress and A.I.I. | Chuan Decl. ¶ 11 |
| 75. A.I.I. failed to produce any surveys in this case. | Chuan Decl. ¶ 10, Exhibit 9 (A.I.I.'s Amended Response to Hyperkin's Interrogatory No. 15) |
| 76. A.I.I.'s expert Tim Lapetino did not perform any surveys in this case. | Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 66:24-67:1<br><br>Chuan Decl. ¶ 10, Exhibit 9 (A.I.I.'s Amended Response to Interrogatory No. 15) |
| **Hyperkin Took Extensive Effort to Avoid a Likelihood of Confusion With the Claimed Designs** | |
| 77. Hyperkin was formed in 2007 to develop, manufacture, and distribute retrogaming products. | Mar Decl. ¶ 3 |
| 78. Hyperkin is well-known in the retrogaming community for producing quality retrogaming systems and peripherals. | Mar Decl. ¶ 3 |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| 79. Since its creation, Hyperkin developed various retro products to play games for products that can no longer be found on the market. | Mar Decl. ¶ 29, 30 |
| 80. Hyperkin has made it a point to seek trademark registrations for its products, including the Retron series of products. | Mar Decl. ¶ 31 |
| 81. Hyperkin also owns a portfolio of patents. | Mar Decl. ¶ 31 |
| 82. Hyperkin takes great care in making sure they do not infringe on any intellectual property rights before developing their products. | Mar Decl. ¶ 6 |
| 83. Hyperkin engages in intellectual property clearance practices before deciding to sell products. | Mar Decl. ¶ 6-7 |
| 84. When Hyperkin finds designs protected by copyright, trademark or patent, it seeks licenses before making products using protected intellectual property. | Mar Decl. ¶ 7 |
| 85. Hyperkin obtained a license from Microsoft to make a "Duke" Xbox controller. | Mar Decl. ¶ 7, 16, Exhibit E |

| **<u>Hyperkin's Uncontroverted Fact</u>** | **<u>Supporting Evidence</u>** |
|---|---|
| 86. Hyperkin considered making a retro 2600 style joystick, which it calls the A77 (the "A77"), because its customers kept asking for Hyperkin to make replacements for the 2600 joystick. | Mar Decl. ¶ 5, 6, 9 |
| 87. Before deciding to sell the A77, Hyperkin researched to see if there were any existing intellectual property rights. | Mar Decl. ¶¶ 6-10 |
| 88. The only records relating to intellectual property rights in the original 2600 joystick that Hyperkin could find were the expired design and utility patents. | Mar Decl. ¶ 8 |
| 89. Hyperkin found many third parties selling generic retro 2600 style joysticks online and on Amazon.com. | Mar Decl. ¶ 9 |
| 90. Hyperkin itself did not manufacture the actual A77. Instead, Hyperkin went to a company already producing generic retro 2600 style joysticks and ordered them with Hyperkin's own packaging. | Mar Decl. ¶¶ 10-11 |
| 91. Hyperkin specifically designed the A77 packaging and design to differentiate the A77 from the original 2600 joystick. | Mar Decl. ¶ 11-12, Exhibits A-C |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 92. Hyperkin branded the packaging for the A77 with its own CirKa ® trademark. | Mar Decl. ¶ 12 |
| 93. Hyperkin also placed the CirKa ® trademark on the A77 itself. | Mar Decl. ¶ 12, Exhibit A |
| 94. CirKa ® is a federally registered trademark owned by Hyperkin. | Mar Decl. ¶ 12, Exhibit B |
| 95. Hyperkin also placed disclaimers on the packaging for the CirKa ® A77. | Mar Decl. ¶ 13, Exhibit C |
| 96. The disclaimer on the first edition of the CirKa ® A77 packaging specified that the A77 was an "Atari Style Joystick," rather than an actual Atari-branded product. | Mar Decl. ¶ 13, Exhibit C |
| 97. The disclaimer for the CirKa ® A77 also specified that product was not designed, manufactured, approved, endorsed, or licensed by Atari Interactive, Inc. | Mar Decl. ¶ 13, Exhibit C |
| 98. The 9-pin D-connector used on the CirKa ® A77 and in the Atari 2600 can be found on a variety of systems in the 1970s, 1980s, and beyond. | Bogost Decl. ¶ 26 |
| 99. For those who collect, archive, or preserve video game | Bogost Decl. ¶ 26 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| systems, controllers that are decades old might have failed or begun to behave erratically, making it desirable to find new ones. | |
| 100. The CirKa ® A77 offers one option for replacement use, on a variety of hardware platforms. | Bogost Decl. ¶ 26 |
| 101. The CirKa ® A77 itself is compatible with multiple products that use the 9-pin D-connector, not just the original 2600 Console. | Mar Decl. ¶ 17 |
| 102. The Amazon listing for the CirKa ® A77 also specified that it was not machine specific. | Bogost Decl. ¶ 26 |
| 103. The 2600 Joystick is not iconic. | Vendel Decl. ¶ 33, Exhibit Q. |
| 104. Third parties sold joysticks using the elements that A.I.I.'s expert claims is iconic. | Vendel Decl. ¶ 34, Exhibit R |
| 105. Since at least as early as 2008, third parties have sold joysticks that are nearly identical to the original 2600 joystick. | Vendel Decl. ¶¶ 36-39, Exhibit S<br><br>Chuan Decl. ¶ 14, Exhibit 12<br><br>Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 15:3-23:21<br><br>Mar. Decl. ¶ 9 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 106. A.I.I. has allowed third parties to sell 2600 Joysticks since 2008. | Chuan Decl. ¶ 14, Exhibit 12<br><br>Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 15:3-23:21<br><br>Vendel Decl. ¶¶ 36-39, Exhibit S<br><br>Mar Decl. ¶ 9 |
| 107. These third parties refer to their products as joysticks for the Atari 2600, or retro joysticks. | Chuan Decl. ¶ 14, Exhibit 12 |
| 108. A.I.I.'s current CEO, Frederick Chenais, considered selling generic retro 2600 style USB joysticks under a non-Atari brand name, after he left A.I.I. | Vendel Decl. ¶ 39 |
| 109. A.I.I. has never asserted or threatened to assert infringement of the 2600 Joystick trade dress against any of these third-party companies. | Chuan Decl. ¶ 10, Exhibit 9 (A.I.I.'s Amended Response to Hyperkin's Interrogatory No. 14) |
| 110. A.I.I. has not tried to stop third parties from selling joysticks that are nearly identical to the original 2600 joystick. | Chuan Decl. ¶ 10, Exhibit 9 (A.I.I.'s Amended Response to Hyperkin's Interrogatory No. 14)<br><br>Vendel Decl. ¶¶ 35-39, Exhibit S |
| 111. A.I.I. acknowledged that it had no right to stop third parties from selling joysticks that are nearly identical to the original 2600 joystick. | Vendel Decl. ¶ 37-38, Exhibit S |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 112.   A.I.I. had a Flashback 2 device. | Vendel Decl. ¶ 31 |
| 113.   The Flashback 2 was not identical to the original 2600/VCS | Vendel Decl. ¶ 31 |
| 114.   The joystick for the Flashback 2 was not identical to the 2600 Joystick, and added an Atari logo to the upper right corner. | Vendel Decl. ¶ 31 |
| 115.   The Flashback 2 did not have the same functionality as the original 2600/VCS, as it could not play original 2600 cartridges. | Vendel Decl. ¶ 31 |
| 116.   A.I.I. does not separately sell the joysticks that come with Flashbacks. | Bogost Decl. ¶ 26 |
| 117.   The A77 is not bundled with any Flashback device. | Bogost Decl. ¶ 26 |
| **No Confusion is Likely Because the Retron ® 77 is Very Different Compared to the Original 2600/VCS** | |
| 118.   Hyperkin also sells the Retron ® 77 video game console. | Mar Decl. ¶ 5 |
| 119.   Hyperkin began selling the Retron ® 77 in or around July 2018. | Mar Decl. ¶ 18 |
| 120.   Retron ® is a registered trademark of Hyperkin. | Mar Decl. ¶ 23 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 121. Since at least 2009, Hyperkin has used the Retron ® trademark on a wide range of products for a number of different abandoned systems by Nintendo and Sega. | Mar Decl. ¶ 31 |
| 122. Before selling the Retron ® 77, Hyperkin searched for any existing intellectual property rights, and found none. | Mar Decl. ¶ 8 |
| 123. Hyperkin placed the Retron ® mark on the packaging for the Retron ® 77 to make sure customers knew that it was a Hyperkin product. | Mar Decl. ¶ 23, Exhibit H. |
| 124. Even before Hyperkin began selling the Retron ® 77, wood grain and ribbing was a common element in video game systems. | Mar Decl. ¶ 24-25, Exhibits I-K |
| 125. Hyperkin modeled the appearance of its Retron ® 77 on electronics of the 1970s era, which had wood grain panels and ribbing. | Mar Decl. ¶ 21, Exhibit F. |
| 126. Numerous third parties sell wood grain stickers and faceplates for use with video game systems. | Mar Decl. ¶ 25 |
| 127. Numerous third parties, including the video game | Vendel Decl. ¶ 16 Mar Decl. ¶ 24 |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| industry leaders, use ribbing in their video game consoles. | |
| 128. The Retron ® 77 is distinct from any other product sold on the market because it plays cartridges for the original 2600/VCS | Mar Decl. ¶ 19<br>Bogost Decl. ¶ 23-25. |
| 129. The Retron ® 77 is different in appearance than the original 2600/VCS | Vendel Decl. ¶ 32<br><br>Bogost Decl. ¶ 15-16, Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 130. In designing the Retron ® 77, Hyperkin tried to avoid making the product look similar to past 2600 consoles. | Mar. Decl. ¶ 22, Exhibit G |
| 131. The 2600 VCS is low-slung and rectangular, wider than it is deep, and short in height. | Bogost Decl. ¶ 16(1), Exhibit C |
| 132. The Retron ® 77 is nearly square in width and depth, and its height is proportionally larger relative to its other dimensions compared to the VCS. | Bogost Decl. ¶ 16(1), Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 133. The 2600 VCS is comprised of multiple trapezoidal elements, one of which protrudes from the top rear of the device, extending across its entire width.  Some of the device's | Bogost Decl. ¶ 16(2), Exhibit C |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| controls are located on this surface. | |
| 134. The Retron ® 77 has no protrusion, but instead features a triangular cut-out at its front, right corner. | Bogost Decl. ¶ 16(2), Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 135. Viewing the 2600 VCS from the front and back, it has three levels, with the protrusion on a trapezoidal midsection on top of a pedestal base. | Bogost Decl. ¶ 16(2), Exhibit C |
| 136. Unlike the three level 2600 VCS, the Retron ® 77 has a single, rectangular level when viewed from the front and back. | Bogost Decl. ¶ 16(2), Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 137. The front face of the Atari VCS is plain, with a simulated wood grain surface. | Bogost Decl. ¶ 16(3), Exhibit C |
| 138. The Retron ® 77's front face is plain black, and many of its controls and ports are located in this area. | Bogost Decl. ¶ 16(3), Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 139. The 2600 VCS has a thick, black bezel on either side of the console when viewed from the front. This bezel curves toward the center of the unit as it reaches its bottom, creating a U-shaped appearance at the front, bottom edge of the | Bogost Decl. ¶ 16(4), Exhibit C |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| console. That edge continues the thick, black bezel appearance. | |
| 140.  The Retron ® 77 is rectilinear at its top and side edges, and its bottom left and right edges introduce a small, 45° angle rather than a curve at the bottom of the unit. | Bogost Decl. ¶ 16(4), Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 141.  The Retron ® 77 also has the Retron ® and Hyperkin ® trademarks in the wood grain portion on the top of the unit. | Chuan Decl. ¶ 20, Exhibit 18 |
| 142.  The Retron ® and Hyperkin ® trademarks also appear on the bottom of the Retron ® 77. | Chuan Decl. ¶ 20, Exhibit 18 |
| 143.  The 2600 VCS locates its 9-pin controller ports at the rear of the console. | Bogost Decl. ¶ 16(5), Exhibit C |
| 144.  The Retron ® 77 locates its controller ports on the front face. | Bogost Decl. ¶ 16(5), Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 145.  The cartridge port on the VCS is located in the front face of the trapezoidal protrusion, positioned such that it faces up and out toward the front of the device. This orientation creates a distinctive, angular orientation of a game cartridge when inserted. | Bogost Decl. ¶ 16(5), Exhibit C |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 146.   The cartridge port on the Retron ® 77 faces directly up, such that cartridges sit orthogonally to its top surface when inserted. | Bogost Decl. ¶ 16(5), Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 147.   The Atari VCS's top-accessible controls include six (6) chrome colored, long cylindrical switches, three (3) each symmetrically flanking the cartridge slot. | Bogost Decl. ¶ 16(6), Exhibit C |
| 148.   The Retron ® 77 has an array of four (4) flat square buttons, two (2) rectangular buttons, and one (1) up/down switch on the front face of the device. | Bogost Decl. ¶ 16(6), Exhibit C<br><br>Chuan Decl. ¶ 20, Exhibit 18 |
| 149.   The original VCS boxes depicted the console and controllers on a silver gray foreground surface, with images of the games and players in a mosaic behind. | Bogost Decl. ¶ 17, Exhibit D |
| 150.   The Retron ® 77 box uses red, orange, and yellow color blocks to highlight a photo of the console and controller. The Retron ® 77 box also replicates the triangular cutout on the face of the console on one corner—a highly distinctive feature of Hyperkin's designs. | Bogost Decl. ¶ 17, Exhibit D |
| 151.   The original VCS box further prominently displays the Atari | Bogost Decl. ¶ 17, Exhibit D |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| name and logo, whereas the Retron ® 77 box prominently displays "Hyperkin" and does not claim to be an Atari product. | |
| 152.  Video-game consoles are generally understood to be hardware devices that connect to a television and allow users to insert compatible cartridges, disks, or cards in order to play a variety of games. | Bogost Decl. ¶ 23 |
| 153.  The Flashback devices are totally incapable of playing cartridges. | Bogost Decl. ¶ 23 |
| 154.  The Hyperkin Retron ® 77 is an interchangeable cartridge video-game system that plays cartridge ROMs built to run on the Atari VCS and its compatible successors. | Bogost Decl. ¶ 24 |
| 155.  To use the Retron ® 77, the customer would need to acquire original or make their own Atari VCS-compatible cartridges. | Bogost Decl. ¶ 24 |
| 156.  Both fans/collectors and archivists have no easy way to play the cartridge-based games they have amassed for their Atari VCS systems on modern televisions. | Bogost Decl. ¶ 25 |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| 157. There are hundreds and hundreds of Atari 2600 compatible game cartridges out there, created by companies other than Atari, Inc. Some of those companies were larger, like Imagic and Activision. Others were small, even tiny. The games they created were often weird and esoteric. | Bogost Decl. ¶ 25 |
| 158. The website AtariAge.com catalogs at least 2,000 Atari VCS games | Bogost Decl. ¶ 25 |
| 159. The Flashback devices play built-in games and only play a small portion of existing 2600 games. | Bogost Decl. ¶ 25 <br><br> Vendel Decl. ¶ 31 <br><br> Mar Decl. ¶ 19 |
| 160. People who wish to play their original cartridges on modern televisions using HDMI have few, if any, viable options by which to do so, apart from Hyperkin's Retron ® 77 device. | Bogost Decl. ¶ 25 <br><br> Mar Decl. ¶ 19 |
| 161. The Retron ® 77 is sold for more than the Atari Flashback systems. | Mar Decl. ¶ 28 |
| 162. Hyperkin never sold the CirKa ® A77 together with the Retron ® 77 system.  The Retron ® 77 system was | Mar. Decl. ¶ 20 |

| __Hyperkin's Uncontroverted Fact__ | __Supporting Evidence__ |
|---|---|
| bundled with a two-button joystick. | |
| 163. To date, no one has asked Hyperkin whether the Retron ® 77 or CirKa ® A77 were sold or licensed by any Atari company or A.I.I. | Mar. Decl. ¶ 26 |

### __A.I.I. Cannot Establish that the Trade Dress is Famous__

| | |
|---|---|
| 164. Retrogaming is a small niche of the video gaming market. | Mar Decl. ¶ 4 |
| 165. A.I.I. did not track how much it spent on advertising and promotional expenses for the claimed trade dress. | Chuan Decl. ¶ 10, Exhibit 9 (A.I.I.'s Amended Responses to Hyperkin's Interrogatories, Set One, pp. 6-7) |
| 166. A.I.I.'s number of Twitter followers is just under 80,000. | Bogost Decl. ¶ 9 |
| 167. The Sony Playstation Twitter account has over 17 million followers. | Bogost Decl. ¶ 9 |
| 168. The Microsoft Xbox Twitter account has over 13 million followers. | Bogost Decl. ¶ 9 |
| 169. The Nintendo of America Twitter account has over 10 million followers. | Bogost Decl. ¶ 9 |
| 170. The SEGA Twitter account has over 1 million followers. | Bogost Decl. ¶ 9 |

| Hyperkin's Uncontroverted Fact | Supporting Evidence |
|---|---|
| **A Utility Patent for the 2600 Joystick Demonstrates the Design is Functional** | |
| 171.   Atari, Inc. obtained a utility patent for the Atari 2600 joystick, Patent No. 4,349,708 (the "'708 Patent"), which was issued on September 14, 1982, and has since expired. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent] |
| 172.   The drawings of the '708 Patent depict the preferred embodiment of the invention. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], col. 4, lines 13-18, 29-32, FIGS. 1 and 2. |
| 173.   Claim 13 of the '708 Patent claims a control unit comprising a generally enclosed housing with a central major apeture, a elongate handle projecting up through the major aperture, and a resilient boot circumscribing and attached to the handle, and a means for attaching the outer periphery of the boot to the housing. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], col. 6, lines 1-20 |
| 174.   The specification of the '708 Patent discloses the generally enclosed housing being a rectangular base with a protruding hexagonal joystick mounted substantially centrally thereon. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], col. 2, lines 29-40, FIGS. 1 and 2. |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 175.   The specification of the '708 Patent discloses the resilient boot being one attached to the handle and has three concentric circular ridges of progressively decreasing height. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], col. 2, lines 38-45, col.3 lines 19-20, FIGS. 1, 3A, 3B. |
| 176.   Claim 11 of the '708 Patent claims a flexible boot that serves to maintain the handle in a nominal rest position until the handle is actuated. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], col. 5, lines 56-61 |
| 177.   Claim 13 of the '708 Patent claims a firing button. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], col. 6, lines 6-8. |
| 178.   The specification of the '708 Patent discloses a single button located at a corner of the base. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], col. 3, lines 54-64, FIGS. 4 and 5. |
| 179.   The specification of the '708 Patent discloses a two-tiered tapered design to the base. | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], col. 2, lines 29-34, FIGS. 1 and 2. |
| 180.   The only claimed trade dress element not depicted in the '708 Patent is the dashed circle circumscribing the base of the joystick and rubber boot, which is also known as the "compass rose". | Chuan Decl. ¶ 17, Exhibit 15 ['708 Patent], FIGS. 1, 2 and 4. |
| 181.   The compass rose in in the original 2600 joystick design functioned to inform the user of the four directions that joystick could be tilted. | Chuan Decl. ¶ 12, Exhibit 11 [Lapetino Depo.], p. 156:2-18. Mar Decl. ¶ 15 |

| **Hyperkin's Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 182.   The color of the button in the A77 makes it stand out from the black housing and draws the user's attention. | Mar Decl. ¶ 15 |
| 183.   Many third parties, including Nintendo and Microsoft, used and continue to use the color red for buttons in their game controllers. | Mar Decl. ¶ 16, Exhibits D and E |
| 184.   The hexagonal shape of the A77 aids the user in gripping the joystick. | Mar Decl. ¶ 15 |
| 185.   The concentric rings in the A77 help center the joystick handle. | Mar Decl. ¶ 15 |
| 186.   The base of the 2600 Joystick was rectangular to fit into Atari, Inc.'s Tank II console. | Chuan Decl. ¶ 12, Exhibit 10 [Art of Atari], p. 10 |

## DEFENDANT'S CONCLUSIONS OF LAW

1)     Summary judgment for the moving party is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

2)     A fact is material if it may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).

3)     A dispute over a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).

4)      The opposition must go beyond the allegations and assertions of the pleadings and set forth specific facts by providing the court with competent evidence that establishes a genuine issue for trial. Fed. Rule of Civ. Proc. §56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, (1986).

5)      Merely suggesting that facts are disputed or merely providing conclusory or speculative affidavits cannot defeat summary judgment. *Thornhill Publishing Company, Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

6)      That is so because a party must do more than show that there is some metaphysical doubt as to the material facts. *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 853 (9th Cir. 1995).

7)      The non-moving party must come forward with admissible evidence to oppose the motion. Fed. Rule Civ. Proc. §56(c)(4); *7-Up Bottling Co. v. Archer Daniels Midland Co.*, 191 F.3d 1090, 1101 (9th Cir. 1999).

8)      Though the moving party must show that there are no triable issues of material fact as to matters upon which it has the burden of proof at trial, on issues where the moving party does not have the burden of proof at trial, the moving party needs to show only that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catret*t, 477 U.S. 317, 325, (1986).

9)      Rule 56(a) provides that a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.".  If the court does not grant summary judgment, it may nevertheless "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g)

10)     "To claim trademark infringement, a plaintiff must have a "valid, protectable trademark." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).

11) The plaintiff bears the ultimate burden of proof in a trademark-infringement action that the trademark is valid and protectable. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927–28 (9th Cir. 2005).

12) Because affording trade dress protection to product designs may hinder legitimate competition, such claims are examined with greater scrutiny than claims involving other forms of trade dress. *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012–13 (9th Cir.1999).

13) To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark. *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008).

14) A mark shall be deemed to be "abandoned" when its use has been discontinued with intent not to resume such use. 15 U.S.C. § 1127(1). Intent not to resume may be inferred from circumstances. *Id.* Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. *Id.* "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark. *Id.* An abandoned trademark is not capable of assignment. *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 675 (7th Cir. 1982).

15) "[a] party cannot defend against a claim of abandonment by relying on some residual goodwill generated through post-abandonment sales of the product by distributors or retailers." Zamacona v. Ayvar, No. CV0702767ABCFMOX, 2009 WL 279073, at *2 (C.D. Cal. Feb. 3, 2009).

16) If a trademark is not registered, the plaintiff bears the burden to establish distinctiveness and non-functionality. *OTR Wheel Eng'g, Inc. v. W.*

*Worldwide Servs., Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018).  This burden is high when it involves product design trade dress.  *See Olem Shoe Corp. v. Washington Shoe Co.*, No. 09-23494-CIV, 2011 WL 6202282, at \*21 (S.D. Fla. Dec. 1, 2011), aff'd sub nom. *Olem Shoe Corp. v. Washington Shoe Corp.*, 591 F. App'x 873 (11th Cir. 2015).

17) In evaluating distinctiveness, a mark can be inherently distinctive or can acquire distinctiveness.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-211 (2000).  Product design can never be inherently distinctive.  *Id.* at 212.  Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.  *Id.* at 213.  Acquired distinctiveness occurs when in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.  *Id.* at 211.  This can be established through direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant.  *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

18) Ownership of a mark requires both appropriation and use in trade.  *Chance v. Pac–Tel Teletrac*, 242 F.3d 1151, 1157 (9th Cir. 2001).

19) The fractured ownership of a trademark may make it legally impossible for a trademark holder to prove secondary meaning.  *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 967 (9th Cir. 2011).

20) Factors considered in determining secondary meaning include 1. direct consumer testimony; 2. consumer surveys; 3. exclusivity, length, and manner of use; 4. amount and manner of advertising; 5. amount of sales and number of customers; 6. established place in the market; and 7. proof of

1    intentional copying.  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23,

2    29, 121 S. Ct. 1255, 1259, 149 L. Ed. 2d 164 (2001).

3         21)    The test for likelihood of confusion is whether a 'reasonably

4    prudent consumer' in the marketplace is likely to be confused as to the origin of

5    the good or service bearing one of the marks." *Dreamwerks Prod. Group, Inc.*

6    *v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).  The plaintiff bears the

7    burden of showing that confusion is "probable," not merely "possible."  *M2*

8    *Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005).  In

9    making this determination, courts look to the Sleekcraft factors: (1) strength of

10   the mark(s); (2) proximity or relatedness of the goods;(3) similarity of the

11   marks; (4) evidence of actual confusion;(5) marketing channels; (6) degree of

12   consumer care; (7) the defendants' intent; and (8) likelihood of expansion.

13   *Network Automation, Inc., v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137,

14   1145 (9th Cir. 2011).

15        22)    Where there is an expired utility patent claiming the features in

16   question, one who seeks to establish trade dress protection must carry the heavy

17   burden of showing that the feature is not functional.  *TrafFix*, 532 U.S. at 29–

18   30.  Four factors are typically considered to determine functionality: (1)

19   whether advertising touts the utilitarian advantages of the design, (2) whether

20   the particular design results from a comparatively simple or inexpensive

21   method of manufacture, (3) whether the design yields a utilitarian advantage

22   and (4) whether alternative designs are available. *See Disc Golf Ass'n v.*

23   *Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998).  Functionality may

24   be found where "the whole is nothing other than the assemblage of functional

25   parts" and "there is no evidence that anything about the appearance exists for

26   any nonfunctional purpose." *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668

27   F.3d 667, 684 (9th Cir. 2012), abrogated on other grounds by *SunEarth, Inc. v.*

28   *Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).

23)    When a design patent expires, the design becomes copyable. *Sunbeam Prods., Inc. v. West Bend Co.*, 39 U.S.P.Q.2d 1545 (S.D. Miss. 1996), aff'd, 123 F.3d 246 (5th Cir. 1997).  It may not, however, be copied in such a way that customers are deceived about what they are buying.  *Id.*

24)    A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.  15 U.S.C. § 1125(c)(2).  Specialized or niche market fame does not satisfy the rigorous fame standard of trademark dilution. *Monster Energy Co. v. BeastUp LLC*, 395 F. Supp. 3d 1334, 1364 (E.D. Cal. 2019)

25)    State common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are "substantially congruent" to claims made under the Lanham Act.  *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994).

26)    The court in exceptional cases may award reasonable attorney fees to the prevailing party.  15 U.S.C. § 1117(a).  The nonexclusive factors to consider include frivolousness, motivation, objective unreasonableness (factually and legally) and the need to advance considerations of compensation and deterrence.  *SunEarth, Inc. v. Sun Earth Solar Power Co. Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016).

Dated: June 2, 2020

Respectfully Submitted,
Law Office of Mary Sun

/s/Jason Chuan
Jason Chuan

Robert Fong

Attorneys for Defendant,
Hyperkin, Inc.

## <u>CERTIFICATE OF SERVICE</u>
## CENTRAL DISTRICT OF CALIFORNIA
2:19-CV-0608-CAS (AFMx)

The undersigned certifies that on June 2, 2020, the following documents and all related attachments ("Documents") were filed with the Court using the CM/ECF system.

**REVISED STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT HYPERKIN, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

Pursuant to L.R. 5-3.2, all parties to the above case and/or each attorneys of record herein who are registered users are being served with a copy of these Documents via the Court's CM/ECF system. Any other parties and/or attorneys of record who are not registered users from the following list are being served by e-mail and facsimile.

By: /s/ Jason Chuan
Jason Chuan