BROWNE GEORGE ROSS LLP
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Milin Chun (State Bar No. 262674)
  mchun@bgrfirm.com
Eric C. Lauritsen (State Bar No. 301219)
  elauritsen@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff
ATARI INTERACTIVE, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ATARI INTERACTIVE, INC., | Case No. 2:19-cv-00608 CAS (AFMx) |
| Plaintiff, | **District Judge Christina A. Snyder**<br>**Magistrate Judge Alexander F.**<br>**MacKinnon** |
| vs. | |
| HYPERKIN INC., | **PLAINTIFF ATARI**<br>**INTERACTIVE, INC.'S**<br>**OPPOSITION TO DEFENDANT**<br>**HYPERKIN, INC.'S MOTION FOR**<br>**SUMMARY JUDGMENT, OR IN**<br>**THE ALTERNATIVE FOR**<br>**PARTIAL SUMMARY JUDGMENT** |
| Defendant. | |
| | Hearing Date: July 13, 2020 |
| | Hearing Time: 10:00 a.m. |
| | Hearing Place: Courtroom 8D |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................ 1

II.   RELEVANT FACTS ...................................................................... 3

    A.    Atari and the Joystick Trade Dress ................................... 3

        1.    Atari is a Famous Video Game Brand ......................... 3

        2.    The Atari Joystick Design is Distinctive and Iconic .................. 3

        3.    Atari Interactive Owns and Licenses the Atari Brand,
            Including Products Incorporating the Joystick Trade Dress ........ 4

    B.    Hyperkin's Knowing Trade Dress Infringement ................. 6

        1.    Hyperkin Licenses and Sells Imitation Retro Video Game
            Equipment, Including Officially Licensed Atari Products ........... 6

        2.    Hyperkin Customers Request the Atari Classic Joystick,
            and Hyperkin Starts Selling an Imitation Named the A77 ........... 7

        3.    Atari Interactive Declines Hyperkin's License Request;
            Hyperkin Keeps Selling Anyway ................................. 9

        4.    Hyperkin Releases an Imitation Atari Console, Which It
            Marketed Alongside the A77 Joystick............................ 9

        5.    In Response to Atari's Cease-and-Desist Letter, Hyperkin
            Indicates It Will Comply, But Continues Selling Anyway ........ 10

        6.    Hyperkin Continues Selling the A77 Joystick After Being
            Sued, and the A77 Joystick Remains on Hyperkin's
            Amazon Page to this Day ........................................ 10

III.  STANDARD OF REVIEW ........................................................ 11

IV.   SUMMARY JUDGMENT SHOULD BE DENIED ...................................... 11

    A.    The Law of Trade Dress........................................... 11

    B.    A Reasonable Juror Could Conclude That Atari Interactive Owns
        The Joystick Trade Dress.......................................... 12

1
2

## <u>TABLE OF CONTENTS</u>
### (Continued)

Page

3
4
5

        1.    Atari Interactive Is the Senior User of the Joystick Trade Dress, Having Used It Continuously and Extensively For Over a Decade Prior to Hyperkin ................................................ 12

6
7

        2.    Atari Interactive Would Still Own Superior Rights Even if its Predecessors-In-Interest Did Not Abandon the Joystick Trade Dress ........................................................................ 14

8

        3.    The Joystick Trade Dress Is Not "Genericized" ......................... 15

9
10

C.    A Reasonable Juror Could Conclude That The Joystick Trade Dress Has Acquired Distinctiveness ...................................... 17

11

D.    The *Deckers* Case Does Not Exonerate Hyperkin ................................ 19

12
13

E.    The Use Of The Joystick Trade Dress Alongside Hyperkin's "Retron77" Console Increased A Likelihood of Confusion ................ 19

14
15

F.    A Reasonable Juror Could Find That The Joystick Trade Dress Is Non-Functional ...................................................................... 20

16

G.    Disclaimers Do Not Eliminate Liability As A Matter Of Law ............ 22

17

H.    The Joystick Trade Dress Could Be Found To Be Famous ................ 23

I.    Hyperkin's Remaining Arguments Should Be Moot ........................... 24

18
19

V.    CONCLUSION ................................................................................. 25

20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## <u>FEDERAL CASES</u>

4
5
*Adidas-Salomon AG v. Target Corp.*,
    228 F. Supp. 2d 1216 (2002) .................................................................... 24

6
7
*Adobe Sys. v. Stargate Software, Inc.*,
    216 F. Supp. 2d 1051 (N.D. Cal. 2002) .............................................. 11

8
*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................ 11

9
10
*Au-tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
    457 F.3d 1062 (9th Cir. 2006) ....................................................... 22

11
12
*Best Lock Corp. v. Schlage Co.*,
    413 F.2d 1195 (C.C.P.A. 1969) ..................................................... 21

13
14
*Bobbleheads.com, LLC v. Wright Bros., Inc.*,
    259 F. Supp. 3d 1087 (S.D. Cal. 2017) ....................................... 19

15
16
*Brighton Collectibles, Inc. v. Coldwater Creek, Inc.*,
    2009 WL 10671818 (S.D. Cal. April 22, 2009) ............................ 18

17
18
*Brown Jordan Int'l, Inc. v. The Mind's Eye Interiors, Inc.*,
    236 F. Supp. 2d 1152 (D. Hawaii 2002) ..................................... 17

19
20
*Charles of the Ritz Group Ltd. v. Quality King Dist.*,
    636 F. Supp. 433 (S.D.N.Y. 1986) ............................................... 23

21
*Charles Schwab & Co., Inc. v. Hibernia Bank*,
    665 F. Supp. 800 (N.D.Cal. 1987) ............................................... 16

22
23
*Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*,
    870 F.2d 512 (9th Cir. 1989) ....................................................... 18

24
25
*Clicks Billiards Inc. v. Sixshooters Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ..................................... 12, 17, 18, 21

26
27
*Committee for Idaho's High Desert, Inc. v. Yost*,
    92 F.3d 814 (9th Cir. 1996) ....................................... 13, 14, 15

28

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Coty Inc. v. Excel Brands, LLC*,
   277 F. Supp. 3d 425 (S.D.N.Y. 2017) ................................................. 23

*Deckers Outdoor Corp. v. J.C. Penney Co. Inc.*,
   45 F. Supp. 3d 1181 (C.D. Cal. 2014) ................................................ 19

*Dogloo, Inc. v. Doskocil Mfg. Co.*,
   893 F. Supp. 911 (C.D. Cal. 1995) ................................................ 20, 21

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
   314 F.2d 149 (9th Cir. 1963) ............................................................. 22

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
   826 F.2d 837 (9th Cir. 1987) ....................................................... 11, 18

*Fuji Kogyo Co., Ltd. v. Pacific Bay Int'l, Inc.*,
   461 F.3d 675 (6th Cir. 2006) ....................................................... 21, 22

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
   111 F.3d 993 (2d Cir. 1997) ............................................................. 16

*Golden Door, Inc. v. Odisho*,
   646 F.2d 347 (9th Cir. 1980) ............................................................ 18

*Green Crush, LLC v. Paradise Splash 1, Inc.*,
   2019 WL 8640654 (C.D. Cal. Nov. 25, 2019) ................................... 20

*Green Crush LLC v. Paradise Splash I, Inc.*,
   2018 WL 4940825 (C.D. Cal. May 3, 2018) ..................................... 19

*Heartland Bank v. Heartland Home Finance, Inc.*,
   335 F.3d 810 (8th Cir. 2003) ............................................................ 17

*Herman Miller, Inc. v. Blumenthal Distributing, Inc.*,
   2019 WL 1416472 (C.D. Cal. March 4, 2019) ............................ 16, 22

*Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*,
   832 F.2d 1311 (2d. Cir. 1987) .......................................................... 23

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*International Jensen, Inc. v. Metrosound U.S.A., Inc.*,
    4 F.3d 819 (9th Cir. 1993) ....................................................................... 17

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008) ........................................................... 11, 23

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
    828 F.3d 1098 (9th Cir. 2016) ................................................................ 11

*Marketquest Group, Inc. v. BIC Corp.*,
    862 F.3d 927 (9th Cir. 2017) .................................................................. 11

*Mercado Latino, Inc. v. Indio Products, Inc.*,
    649 Fed.Appx. 633 (9th Cir. May 13, 2016) ......................................... 19

*Nissan Motor Co. v. Nissan Computer Corp.*,
    378 F.3d 1002 (9th Cir. 2004) ................................................................ 22

*Qualitex Co. v. Jacobson Products Co.*,
    Inc., 514 U.S. 159 (1995) ....................................................................... 12

*Sambonet Paderno Industrie, S.P.A. v. Sur La Table, Inc.*,
    2015 WL 4498795 (C.D. Cal. 2015) ...................................................... 19

*San Diego Comic Convention v. Dan Farr Productions*,
    336 F. Supp. 3d 1172 (S.D. Cal. 2018) ................................................. 16

*Sengoku Works Ltd. v. RMC International, Ltd.*,
    96 F.3d 1217 (9th Cir. 1996) .................................................................. 13

*Vaad L'Hafotzas Sichos, Inc. v. Kehot Publication Soc.*,
    935 F. Supp. 2d 595 (E.D.N.Y. 2013) ................................................... 15

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000) ....................................................................... 11, 17

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

## FEDERAL STATUTES

15 U.S.C. [Lanham Act] ......................................................... 3, 13, 19, 21, 24
    § 43(a) ............................................................................................ 11
    §1125(a) ................................................................................... 11, 12
    §1125(c)(2)(A) ................................................................................. 23

## RULES

Federal Rules of Civil Procedure
    Rule 30(b)(6) ........................................................................................ 6

Local Rule 54-7 ........................................................................................ 25

## OTHER AUTHORITIES

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
    § 32:120 (5th ed. June 2020) ............................... 11, 13, 15, 16, 17, 19, 21

# I.    <u>INTRODUCTION</u>

Atari was *the* creator of the now multi-billion-dollar video game industry.  In light of Atari's seminal role in video game development and history, the Atari name and brand – which are currently owned by plaintiff Atari Interactive, Inc. and its affiliates ("Atari Interactive"), www.atari.com – remain widely known and instantly recognizable decades after their debut.  The Atari 2600 (depicted immediately below), in particular, was the home video game system that placed the Atari brand and products directly in Americans' homes throughout the late 1970s and 1980s and in American popular history and culture to this day.



Over the past two decades, in an effort to preserve and build upon the Atari legacy, Atari Interactive has continuously promoted, licensed, and sold various products depicting the design of the 2600 system (including the joystick in particular), from t-shirts to keychains to a series of "Atari Flashback" gaming consoles and joysticks to a "Plug and Play" joystick modeled off the original 2600 joystick.  Atari Interactive has also raised millions of dollars for development of a soon-to-be-released modern gaming system that is an updated version of the original 2600, including a modernized version of the original joystick – see below.



THE COMPLETE PACKAGE

ATARI VCS 800 SYSTEM ⓘ     ATARI CLASSIC JOYSTICK ⓘ     ATARI MODERN CONTROLLER ⓘ

Defendant Hyperkin has built a successful business based on the popularity of and public interest in retro video games and brands, including Atari. For years, Hyperkin has sold the officially licensed Atari Flashback series, which includes the original 2600 joystick design. In fact, Hyperkin sells officially licensed Atari products to this day.

A few years back, however, Hyperkin concluded that selling officially licensed Atari products was not enough. Hyperkin desired a new Atari-related profit stream, whether Atari liked it or not. Hyperkin thus began selling a near-exact replica of the original Atari 2600 joystick design. Below is a photo of Hyperkin's "A77" joystick held in front of a picture of the original Atari 2600 joystick.



When Hyperkin requested that Atari Interactive license Hyperkin the right to sell its imitation joystick, Atari Interactive respectfully declined. Undeterred, Hyperkin continued selling the Atari knockoff joystick (on the same site as officially licensed Atari products) anyway. In fact, shortly after Atari declined Hyperkin's licensing overture, Hyperkin *expanded* its use of the A77 by using the joystick to market a gaming console inspired by the Atari 2600 console. When Atari Interactive's lawyer sent a cease-and-desist letter demanding Hyperkin stop, Hyperkin indicated that it would do so. Undeterred by the cease-and-desist letter or its own promises, Hyperkin kept selling anyway. Even after Atari Interactive filed

1   this lawsuit, Hyperkin continued selling the A77 joystick for months, and the A77

2   joystick remains on Hyperkin's Amazon page to this day.

3       This is a case of obvious, deliberate trade dress infringement in violation of the

4   Lanham Act and the common law of unfair competition.  At the least, a reasonable

5   juror could so conclude.  Summary judgment should be denied.[1]

6   **II.    RELEVANT FACTS**

7       **A.    ATARI AND THE JOYSTICK TRADE DRESS**

8           **1.    Atari is a Famous Video Game Brand**

9       Atari is one of the most famous brands in video game history.  As described by

10  Tim Lapetino, the former Executive Director of the Museum of Video Game Art, and

11  the author of *Art of Atari*, an over 350-page book on the art and design history of the

12  Atari brand:  "The Atari brand is one of the most iconic brands in video game history

13  and has been and remains well-known through the public at large.  Not only are the

14  Atari name and logo itself well-known, but so are individual Atari games, its

15  consoles and their unique design elements, and the historical imagery associated with

16  them."  (Declaration of Tim Lapetino ("Lapetino Decl.") , Ex. A, ¶16.)

17          **2.    The Atari Joystick Design is Distinctive and Iconic**

18      Following Atari's release of a string of successful coin-operated, arcade video

19  games, including the groundbreaking PONG game in the early 1970s, Atari branched

20  out into the nascent field of home video gaming.  (*Id.*, ¶18.)  The Atari Video

21  Computer System (later re-christened the Atari 2600) became the first widespread

22  home video game console, selling an estimated 30 million units.  (*Id.*, ¶19.)  As

23  Lapetino notes, "[t]he heavy advertising and marketing created and employed by

24  Atari ensured that the overall design and visual presentation of the console would go

25

---

26  [1] As explained in more detail below, Atari Interactive will base its case at trial on (a)
    Hyperkin's A77 joystick design; and (b) Hyperkin's promotion of its Retron77
27  console in conjunction with the A77 joystick design.  Atari Interactive will not claim
    liability based on the Retron77 console in isolation.  To the extent that the complaint
28  indicates otherwise, Atari Interactive clarifies the scope of its claims for trial.

on to symbolize not just Atari, but video games as a whole, decades after its release." (*Id.*)

The design of the 2600 joystick in particular – *i.e.*, "its single, bright orange-red button, matching compass rose graphic, and the protective joystick 'boot'" -- became synonymous with the Atari brand. (*Id.*, 24.) As Hyperkin's own witness, Curt Vendel, wrote in his book *Atari, Inc.*: "In the end, this model of the joystick would become nearly as iconic for Atari as its 'Fuji' logo." (Declaration of Keith Wesley ("Wesley Decl."), Ex. B.) The distinctive joystick design was registered as a design patent in 1980. (Wesley Decl., Ex. C.)[2]

The Atari 2600 joystick continues to conjure immediately the Atari brand and to generate coverage in both industry and general press. ) *See, e.g.*, Declaration of Casandra Brown ("Brown Decl."), Ex. M (*The Atari 2600 Joystick*, https://www.oldschoolgamermagazine.com/the-atari-2600-joystick/ ("The Atari 2600 'Joystick' to me is the father of them all") (Feb. 9, 2018); *Joy of sticks: 10 greatest video controllers*, https://www.theguardian.com/technology/gallery/2017/jul/21/joy-of-sticks-10-greatest-video-game-controllers (July 21, 2017) (describing the joystick as "an absolute icon of video game design"); *The five best game console controllers of all time*, https://www.cnet.com/news/the-five-best-game-console-controllers-of-all-time/ (April 20, 2009) ("[I]t's so crucial to gaming history there's no way we couldn't mention it")).

**3. Atari Interactive Owns and Licenses the Atari Brand, Including Products Incorporating the Joystick Trade Dress**

The Atari brand changed corporate ownership over the years. (Brown Decl., ¶6, Exs. P-X.) As Hyperkin acknowledges, the current owner of the Atari brand (a group of affiliated companies, including Atari Interactive) acquired it in 2000. After a downturn that resulted in Chapter 11 bankruptcy in 2013, Atari Interactive and its

[2] The significance of the classic joystick design to the Atari brand is also underscored by Vendel's placement of it on the cover of his Atari book.

affiliates re-emerged with a new vision and strategy, which has resulted in a return to profitability and growth.  (Declaration of Frederic Chesnais ("Chesnais Decl."), ¶5.)

Over the last two decades, Atari Interactive has marketed and sold myriad products incorporating the look and feel of the 2600 joystick design (hereinafter the "Joystick Trade Dress").  As Hyperkin's witness, Vendel, noted, Atari Interactive started marketing and selling a replica of the 2600 joystick more than a decade prior to Hyperkin's sale of the A77.  (Doc. 41-5 at ¶31; Brown Decl., ¶10.)  And officially licensed Atari products incorporating the Joystick Trade Dress have been marketed and sold nationally in well-known retailers such as Walmart, Amazon, Target, and others.  (Brown Decl., ¶10.)  Below are just a few examples.










Younger generations in particular first experienced Atari games through the 21st Century products developed and licensed by Atari Interactive.  Hyperkin's own Terence Calsacan testified about his introduction to Atari through the Plug and Play in 2003 or 2004:  "[E]ventually in high school, my friend purchased one of those Plug and Play Atari consoles by Jakks Pacific.  And I loved that thing.  And that's the first time I ever really played any Atari games."  (Wesley Decl., Ex. E at 22:7-23:2.)

Atari Interactive has raised millions of dollars and been actively creating, promoting, and readying to launch a new modern-day system that puts a 21st Century spin on the original 2600 designs – see pages 1-2 *supra*.  (Brown Decl., ¶18.)

**B.**   **HYPERKIN'S KNOWING TRADE DRESS INFRINGEMENT**

**1.**   **Hyperkin Licenses and Sells Imitation Retro Video Game Equipment, Including Officially Licensed Atari Products**

Founded in 2006 by brothers Steven and Thomas Mar, Hyperkin sells retro video gaming equipment.  (Wesley Decl., Ex. D at 42:16-44:7.)  Hyperkin's CEO and Rule 30(b)(6) representative, Steven Mar, agrees that Atari is a well-known video game brand, (*id.* at 85:6), and Mar has found that people still want to play Atari games and systems.  (*Id.* at 46:16-18.)  Mar believes that the 2600 Atari joystick is a well-known design amongst people who are into retro gaming.  (*Id.* at 95:21-96:18 & Ex. L.)  Hyperkin has thus sold (and continues to sell) the officially

licensed Atari Flashback series described above, which incorporates the Joystick Trade Dress.  (Wesley Decl., Ex. D at 85:7-19.)  Hyperkin thus markets and sells to the very same customers as Atari.  (*Id*.; *see also* Ex. E at 89:18-22.)

### 2. Hyperkin Customers Request the Atari Classic Joystick, and Hyperkin Starts Selling an Imitation Named the A77

Multiple Hyperkin customers requested "the old Atari controller."  (Ex. D at 69:21-5, 86:15-87:13.) In response, Hyperkin began advertising and selling a joystick "modeled off the old Atari 2600 joystick," (*id.* at 70:9-11), on or around September 21, 2016.  (*Id.* at 30:17-31:5.)  Hyperkin's Chinese manufacturer supplied the joysticks, although Hyperkin designed the product packaging and named the product A77.[3]  (*Id.* at 93:11-94:7.)  Below are pictures of the A77 packaging and product. (Wesley Decl., Ex. K)

 

As can be seen from the packaging designed by Hyperkin itself, the joystick is an "Atari Style Joystick Controller."  In the tiny text at the bottom of the picture on the right, there is a disclaimer stating:  "Atari and 2600 are trademarks owned by Atari Interactive, Inc.  This product is not designed, manufactured, sponsored, endorsed, or licensed by Atari Interactive, Inc."  Mar testified that he added the disclaimer because he was "concerned that if that language wasn't there, that some consumers would think that the A77 is associated with Atari."  (Ex. D at 102:3-24.)

---

[3] Mar could neither confirm nor deny the obvious truth that A77 is short-hand for Atari 1977.  (Wesley Decl., Ex. D at 94:6-14.)

1    Even beyond the miniscule size of the font of the disclaimer, there are other

2  glaring issues that could lead a juror, especially when viewing the evidence and all

3  inferences in favor of Atari Interactive, to conclude that Hyperkin did not sincerely

4  intend for the disclaimer to eliminate consumer confusion.  For example, the

5  disclaimer is totally invisible in most of the product shots that advertise the A77.

6  Below is a photo from an A77 still on sale on Amazon.  (Brown Decl., ¶19, Ex. EE).

7  The side of the box with the disclaimer is invisible (and would be too small to read

8  anyway).



15  Furthermore, the disclaimer does nothing to mitigate or eliminate post-sale confusion

16  – *i.e.*, when Johnny visits his friend's house to play video games, Johnny will see

17  solely the Atari joystick, not the box with the disclaimer.  The likelihood of post-sale

18  confusion only increases because the A77 is designed to be hooked up to and used

19  with original Atari 2600 systems, *as well as Atari Interactive's own current newly*

20  *manufactured Flashback systems*.  (Wesley Decl., Ex. D at 110:23-112:10.)  Finally,

21  Hyperkin's own actions evidence that Hyperkin takes affirmative steps to increase

22  the likelihood of consumer confusion.  When a customer inquired as to whether

23  Hyperkin's controllers worked with the Atari Flashback 6, a Hyperkin representative

24  responded that the Atari Flashback 6 is compatible with "Atari 2600 peripherals,"

25  thereby suggesting an affiliation between Hyperkin and Atari Interactive. (Wesley

26  Decl., Ex. HH at 3.)

### 3.   Atari Interactive Declines Hyperkin's License Request; Hyperkin Keeps Selling Anyway

Hyperkin knew that licenses are oftentimes needed in order to lawfully sell retro gaming equipment.  Hyperkin buys officially licensed Atari games from Atari's licensee.  And Hyperkin has official licenses with brands such as Xbox, Samsung, Vive, Oculus, and Capcom.  (Wesley Decl., Ex. D at 74:10-76:24.)  Hyperkin, therefore, approached Atari Interactive in approximately 2016 or 2017 to try to obtain a license to sell its imitation Atari joystick and console.  (*Id.* at 79:10-81:24.)  Atari Interactive respectfully declined, noting that it already had a long-term licensing relationship with AT Games, the licensee from which Hyperkin purchases the Atari Flashback units.  Despite Atari's rejection of Hyperkin's license proposal, Hyperkin continued selling the A77 anyway.  (*Id.* at 30:17-31:16.)

### 4.   Hyperkin Releases an Imitation Atari Console, Which It Marketed Alongside the A77 Joystick

After Atari declined Hyperkin's licensing overture, Hyperkin actually expanded upon its prior use of the Joystick Trade Dress.  In mid-2017, Hyperkin began promoting a gaming console inspired by the Atari 2600 console and compatible with original Atari gaming cartridges.  (Wesley Decl., Ex. D at 120:9-121:6, Ex. I.)  Hyperkin marketed its new console (dubbed the Retron77) in conjunction with the A77 controller at a leading industry trade show (E3) at which Atari Interactive also appears.  (*Id.*)  Below is a picture of Hyperkin's promotion of its A77 and Retron77 taken at the E3 trade show.  (*Id.*)



PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### 5.   In Response to Atari's Cease-and-Desist Letter, Hyperkin Indicates It Will Comply, But Continues Selling Anyway

On June 20, 2017, just days after the E3 show where Hyperkin promoted its new Retron77 console alongside the A77 joystick, Atari's lawyer sent Hyperkin a cease-and-desist letter.  (Wesley Decl., Ex. D at 119:7-19, Ex. I.)  Hyperkin did not inform any of its customers of the letter.  (Wesley Decl., Ex. D at 120:5-8.)

A few weeks later, Hyperkin's lawyer sent a response to the cease-and-desist letter.  (Wesley Decl., Ex. D at 124:14-125:7, Ex. J.)  In the letter, Hyperkin's lawyer denied wrongdoing, but concluded with the following:  "Hyperkin believes it has the right to sell products such as the CirKa's A77 Joystick Controller.  However, as a good faith gesture to resolve this current dispute, Hyperkin has taken the CirKa A77 Joystick Controller down from its website."  (Wesley Decl., Ex. D at 127:23-128:20.)

This "good faith gesture" seemingly solved Atari Interactive's problem. Unfortunately, Hyperkin's gesture was anything but made in good faith.  Hyperkin continued to sell the A77 and a few months later (allegedly inadvertently) put the A77 back up on its website.  (Wesley Decl., Ex. D at 128:10-131:18.)  According to Steven Mar, Atari should have recognized that Hyperkin would keep selling the A77. As Mar testified, Hyperkin's lawyer's letter "clearly conveyed to Atari that Hyperkin was going to continue to sell the CirKa A77."  (*Id.* at 131:15-18.)  A reasonable juror could (indeed would) find otherwise.

### 6.   Hyperkin Continues Selling the A77 Joystick After Being Sued, and the A77 Joystick Remains on Hyperkin's Amazon Page to this Day

Recognizing that Hyperkin refused to act in good faith, Atari filed this lawsuit. Even after being apprised of the lawsuit, Hyperkin continued selling the A77 joystick for several months more.  (Wesley Decl., Ex. D at 150:4-21, 153:9-24.)  The A77

1   continues to be sold through the Hyperkin webstore on Amazon.[4]  (Brown Decl. ¶19,
2   Ex. EE.)

3   **III.   STANDARD OF REVIEW**

4          Summary judgment is inappropriate if genuine material factual issues exist for
5   trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A factual dispute is
6   genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id.* at
7   248.  This Court "must draw all reasonable inferences in favor of the non-moving
8   party, including questions of credibility and the weight to be accorded particular
9   evidence."  *Adobe Sys. v. Stargate Software, Inc.*, 216 F. Supp. 2d 1051, 1053 (N.D.
10  Cal. 2002).

11         "Because of the intensely factual nature of trademark disputes, ***summary***
12  ***judgment is generally disfavored in the trademark arena*.***"  *Jada Toys, Inc. v.*
13  *Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (emphasis added).[5]

14  **IV.   SUMMARY JUDGMENT SHOULD BE DENIED**

15         **A.     THE LAW OF TRADE DRESS**

16         "Section 43(a) of the Lanham Act provides a remedy for a broad range of
17  deceptive marking, packaging and marketing of goods or services in commerce."
18  *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir. 1987); *see also*
19  15 U.S.C. §1125(a).  Individuals or businesses may identify themselves or their
20  goods and services in ways other than words or logos; therefore, a "trade dress" may
21  also be protected from infringement.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,

22

23  [4] Hyperkin claims that it has no ability to take down a picture from its own Amazon
24  webstore, although Hyperkin also conceded that it has never mentioned Atari's
    infringement claim to Amazon.  (Wesley Decl., Ex. D at 166:2-167:7.)

25  [5] *See also Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 935 (9th Cir. 2017)
    (reversing grant of summary judgment on trademark infringement claim); *JL*
26  *Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1112 (9th Cir.
    2016)(same); 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:120
27  (5th ed. June 2020) (hereinafter "*McCarthy on Trademarks*") (The Ninth Circuit "has
    been the most negative of all the circuits about summary dismissal of a trademark
28  infringement case.").

529 U.S. 205, 209-10 (2000); *see also Qualitex Co. v. Jacobson Products Co.*, Inc., 514 U.S. 159, 164 (1995) ("It is the source-distinguishing ability of a mark – not its ontological status as color, shape, fragrance, word, or sign – that permits it to serve these basic purposes").  "Trade dress generally refers to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

To sustain a trade dress infringement claim under section 1125(a), a plaintiff must show:  "(1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." *Clicks Billiards*, 251 F.3d at 1258. "[I]n evaluating . . . a trade dress claim, it is crucial that we focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Id.* at 1259 (emphasis in original).

**B.   A REASONABLE JUROR COULD CONCLUDE THAT ATARI INTERACTIVE OWNS THE JOYSTICK TRADE DRESS**

**1.   Atari Interactive Is the Senior User of the Joystick Trade Dress, Having Used It Continuously and Extensively For Over a Decade Prior to Hyperkin**

At pages 5-8 of the motion, Hyperkin argues that Atari Interactive "lacks standing" to sue for infringement of the Joystick Trade Dress because Atari Interactive's predecessors-in-interest "abandoned" the trade dress and thus Atari Interactive cannot own the trade dress either.  This argument is a red herring.  Even assuming *arguendo* that Hyperkin were correct, Atari Interactive is still the senior user (and thus owner) of the Joystick Trade Dress, both because (a) Hyperkin previously admitted that Atari Interactive owns the trade dress, and (b) Atari Interactive used the trade dress continuously and extensively for over a decade prior to Hyperkin.

<u>First</u>, Hyperkin admitted that Atari Interactive – not some other third party or the world at large – owned the trade dress.  Hyperkin placed a disclaimer on the A77 that the joystick is not affiliated with Atari Interactive.  If Hyperkin had not believed that Atari Interactive owned the trade dress, then Hyperkin would not have disclaimed a connection between the device and Atari Interactive.  At the least, a reasonable juror, when construing the evidence and all inferences in favor of Atari Interactive, could so conclude.  *Cf. Sengoku Works Ltd. v. RMC International, Ltd.*, 96 F.3d 1217, 1221 (9th Cir. 1996) (jury correctly instructed that ownership of trademark could be proven through admission by opposing party).

<u>Second</u>, from at least 2002 through the date of Hyperkin's admitted first use in September 2016, Atari Interactive continuously and extensively used the trade dress.  Atari Interactive's pre-September 2016 use is more than adequate establish priority and thus superior rights over Hyperkin.  *See id.* at 1219 ("It is axiomatic in trademark law that the standard test of ownership is priority of use"); *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 821 (9th Cir. 1996) ("So long as plaintiff proves rights superior to defendant, that is enough"), *quoting McCarthy on Trademarks*, §31.39[4].  In other words, if Hyperkin is correct that the entities that owned the Atari brand in the 1970s through 1990s "abandoned" the trade dress, then Atari Interactive could and did acquire rights in the trade dress through its own pre-September 2016 use.  *See, e.g.*, *McCarthy on Trademarks* at §17:2 ("Once abandoned, a mark may be seized immediately and the person so doing so may build up rights against the whole world").[6]

---

[6] Hyperkin's reference to the Joystick Trade Dress not being expressly identified in the Atari Chapter 11 bankruptcy schedules is irrelevant.  Hyperkin cites no case holding that an entity waives rights to a particular piece of intellectual property that is not expressly mentioned in a Chapter 11 bankruptcy schedule, and such a rule would be unduly harsh and contrary to the purposes of the Lanham Act in protecting against consumer confusion and brand dilution.  The intent of the reorganization process – in fact, Chapter 11 restructurings generally – was to enable the existing Atari entities to reorganize to attempt to return to profitability (which they have

2. <u>**Atari Interactive Would Still Own Superior Rights Even if its**</u>
<u>**Predecessors-In-Interest Did Not Abandon the Joystick Trade**</u>
<u>**Dress**</u>

Although Atari Interactive's pre-September 2016 use of the Joystick Trade Dress should be controlling on the questions of standing and ownership, Atari Interactive notes that Atari Interactive would own the trade dress even if its predecessors-in-interest had retained rights in the trade dress.

<u>First</u>, prior use by a third party is irrelevant. *See Yost*, 92 F.3d at 820 ("[A] third party's prior use of a trademark is not a defense in an infringement action"). Therefore, if the predecessors-in-interest had not abandoned the trade dress and if Atari Interactive had not validly acquired all of their rights in the brand (which Atari Interactive did do), then the earlier use by the predecessor-in-interest would have no effect on whether Atari Interactive owns superior rights to Hyperkin.

<u>Second</u>, a reasonable juror could find that Atari Interactive acquired all rights in the Atari brand from its predecessors, including any trade dress rights in iconic Atari designs like the 2600 joystick. As acknowledged by Hyperkin itself,[7] there is a series of written agreements linking Atari Interactive back to the original Atari entity that created and distributed the 2600 console and joystick. Each agreement evidences the intent to convey to the purchaser all rights in the Atari brand. (Brown Decl., Ex. P (Atari/Tramel Agreement: transferring "*all* assets, properties, rights and business" of Seller (and subsidiaries) relating to "the business of designing, manufacturing and selling home video games and game program cartridges and coin

---

done), not to strip them of rights that were not clearly identified in a schedule. (Chesnais Decl., ¶12.) Regardless, the schedules do list a variety of games that either depicted or incorporated the Joystick Trade Dress. (*Id.*, ¶13.) The fact that those items were listed as "copyright" or "trademark" rather than "trade dress" should matter not. Moreover, trade dress rights are constantly evolving because they depend on the passage of time and commercial activity. That a company does not claim a trade dress in 2013 in no way undermines the company's belief that it possesses a valid trade dress three years – and much additional commercialization – later.
[7] Doc. 41-4 at ¶¶ 27-28 (recognizing that "[f]rom 1996 through the present, the *Atari name and assets* trade hands numerous times").

operated electronic video games"), Ex. S (merger confirming that "*all* the property, rights, privileges, powers and franchises of Atari shall vest in [JTS]"), Ex. T (HIAC XI Corp., subsidiary of Hasbro, acquired "[a]ll rights, title and interest" in those products "whether now offered for sale or license by Seller or *discontinued*"), Ex. V-1 (Infogrames acquisition of Hasbro Interactive f/k/a HIAC XI Corp).

In sum, although Atari Interactive would own the trade dress regardless of what the agreements say, the agreements show that any remaining rights in the trade dress were properly assigned to Atari Interactive.[8] *See Yost*, 92 F.3d at 821 (affirming holding that plaintiff owned trademark in question either because plaintiff had assumed the rights from its successor or the successor had abandoned the rights before plaintiff's first use).

### 3.    The Joystick Trade Dress Is Not "Genericized"

At pages 7-8 of the motion, among other places, Hyperkin argues that the Joystick Trade Dress is unprotectable because it has become "genericized" due to its unauthorized use by third parties.  This is nonsense.

First, Hyperkin called the A77 an "Atari Style" joystick and included a disclaimer that the product is not affiliated with Atari Interactive.  If the Joystick Trade Dress had become so common as to be incapable of identifying a single source, then there would be no need for the disclaimer.  And a reasonable juror could find that the use of the phrases  "A77" and "Atari Style" were intended to convey to

---

[8] Because the entire Atari business and brand (as opposed to one or more IP rights) was being transferred at each step of the chain, there was no need to specify a "trade dress" and there was no issue with severing any trademark or trade dress from the accompanying goodwill or any "assignment in gross." *McCarthy on Trademarks*, §18.37 ("[e]ven if the words 'trademark' or 'good will' or similar terms are not mentioned in the contract of sale of the business, the trademarks of the business are presumed to pass to the buyer as an essential part of the business and its good will"); *see also Vaad L'Hafotzas Sichos, Inc. v. Kehot Publication Soc.*, 935 F. Supp. 2d 595, 600 (E.D.N.Y. 2013) ("[T]he transfer did not explicitly mention the right to use the logo. That omission is of no consequence because courts and commentators agree that the transfer of a going concern implicitly entails the transfer of trademarks and other goodwill.").

consumers that the product had the well-known look of the authentic Atari joystick.

Second, as explained above and below in the section regarding "secondary meaning," there is an abundance of evidence showing that, far from being generic, the Joystick Trade Dress has been and remains one of the most iconic source identifiers in video game history.

Third, where a defendant seeks to weaken the strength of a trademark through third party use, the burden is on the defendant to show how extensive the uses are and how long they have continued. *See Charles Schwab & Co., Inc. v. Hibernia Bank*, 665 F. Supp. 800, 806 (N.D.Cal. 1987) (*citing McCarthy on Trademarks*, §11:26). Hyperkin, however, offers no specific evidence of the nature or scope of the third-party use. Hyperkin simply says that "many companies" use the trade dress and attaches some recent web printouts. (Doc. 41-3 at 6.) Hyperkin's evidence is patently inadequate to prove really anything about the trade dress, and certainly not that the trade dress had become generic as a matter of law prior to Hyperkin's first use in September 2016. *Herman Miller, Inc. v. Blumenthal Distributing, Inc.*, 2019 WL 1416472, at *19 (C.D. Cal. March 4, 2019) (vague third-party use evidence inadequate to prove lack of distinctiveness as a matter of law).

Finally, it should be noted that whether a claimed trade dress is generic is a question of fact. *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000-01 (2d Cir. 1997). It is thus unsurprising that Hyperkin fails to cite any case holding that a product trade dress had become generic as a matter of law. Although Atari Interactive believes no reasonable juror could find that the Joystick Trade Dress is generic, at the very least, the question of "genericness" is for the jury. *See, e.g.*, *San Diego Comic Convention v. Dan Farr Productions*, 336 F. Supp. 3d 1172, 1180 (S.D. Cal. 2018) (denying summary judgment on genericness despite defendant's evidence of over 100 competitors using "Comic Con" mark).

**C.**     **A REASONABLE JUROR COULD CONCLUDE THAT THE JOYSTICK TRADE DRESS HAS ACQUIRED DISTINCTIVENESS**

As explained above, a product design trade dress is distinctive if it has achieved "acquired distinctiveness" – also known as "secondary meaning" – amongst the relevant consuming public. *Samara Bros*, 529 U.S. at 211; *Clicks*, 251 F.3d at 1258. A product trade dress acquires secondary meaning "when the purchasing public associates the mark or dress with a single producer or source rather than with the product itself." *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993). Secondary meaning can be demonstrated through, for example: "(1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying." *Brown Jordan Int'l, Inc. v. The Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1155 (D. Hawaii 2002). Direct evidence, such as survey data and consumer testimony, is not required as it is "difficult to obtain." *See Heartland Bank v. Heartland Home Finance, Inc.,* 335 F.3d 810, 820 (8th Cir. 2003); *see also McCarthy on Trademarks* §15:30. "Whether a particular trade dress has acquired secondary meaning is a question of fact. . . ." *Clicks*, 251 F.3d at 1262.

The evidence of secondary meaning here is overwhelming.

First, Hyperkin's own admissions prove secondary meaning. Hyperkin admits that relevant consumers recognize the Joystick Trade Dress. (Wesley Decl., Ex. D at 95:21-96:18 & Ex. L.) Hyperkin also admits that its customers asked for the "old Atari joystick." The customers did not ask for an "old school" joystick. The customers did not ask for an upside down T-shaped joystick. The customers asked for the "old Atari joystick." The fact that both the customers and Hyperkin knew exactly what each was referencing is perhaps the best evidence that the Joystick Trade Dress remains affiliated with a particular source. Indeed, the overall look and feel of the A77 was so linked to Atari Interactive that Hyperkin itself feared that

consumers would be confused but for the inclusion of a "disclaimer" on the side of the box. Although the disclaimer was patently inadequate, the inclusion of the disclaimer shows that Hyperkin itself recognized that consumers link the design of the A77 to Atari Interactive. Finally, Hyperkin advertised the A77 as having an "Atari Style." This indicates that Hyperkin believed the look and feel of the A77 is associated with Atari Interactive. *See, e.g.*, *Brighton Collectibles, Inc. v. Coldwater Creek, Inc.*, 2009 WL 10671818, at *6 (S.D. Cal. April 22, 2009) (defendant's emails describing "Brighton look" were "relevant to prove secondary meaning, as they tend to show that Brighton products have a distinct look that is well-known").

Second, intentional copying strongly indicates the secondary meaning of the trade dress and, "in appropriate circumstances," may itself suffice to establish secondary meaning. *Clicks*, 251 F.3d at 1264; *Fuddruckers*, 826 F.2d at 844. Hyperkin admits that the A77 is a deliberate imitation of the classic joystick. A cursory comparison of the products confirms it.

Third, the long-time and extensive commercialization of the trade dress, as described in the Brown and Chesnais Declarations, supports a finding of secondary meaning. (Brown Decl., ¶¶7-18, Chesnais Decl., ¶¶8-9.) Atari Interactive used the trade dress continuously for over a decade prior to Hyperkin, generating millions in sales nationally, including in prominent retailers. *Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*, 870 F.2d 512, 517 (9th Cir. 1989) ("Evidence of use and advertising over a substantial period of time is enough to establish secondary meaning").

Fourth, the trade dress has received unsolicited press both online and in published books, (Wesley Decl., Ex. B; Brown Decl., ¶¶4-5, Exs. M-N), which is indicative of and helps bolster the secondary meaning of a trade dress. *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350-51 (9th Cir. 1980) ("district court's finding that a secondary meaning has attached is supported by evidence of the extensive media coverage plaintiff's spa has received").

Finally, Tim Lapetino, an expert who wrote a 350-page book on the history of

1  Atari confirms that the Joystick Trade Dress has acquired secondary meaning.

2  (Lapetino Decl., Ex. A.)

3      This is not a close call.  A jury could find secondary meaning.

4      **D.      THE *DECKERS* CASE DOES NOT EXONERATE HYPERKIN**

5      At pages 11-12 of the motion, Hyperkin asserts that there is no liability as a

6  matter of law because Hyperkin designated itself (as opposed to Atari Interactive) as

7  the origin of the A77 joystick.  As support for this proposition, Hyperkin relies

8  exclusively on *Deckers Outdoor Corp. v. J.C. Penney Co. Inc.*, 45 F. Supp. 3d 1181,

9  1185-86 (C.D. Cal. 2014).  *Deckers* – which misapplied the Supreme Court's ruling

10 in *Dastar* – is an erroneous outlier, as other district judges, a Ninth Circuit panel, and

11 the leading authority on trademark law have concluded.  *Green Crush LLC v.*

12 *Paradise Splash I, Inc.*, 2018 WL 4940825, at *6 n.3 (C.D. Cal. May 3, 2018)("[t]he

13 ruling in *Dastar* should have no impact on ... classic claims of infringement");

14 *McCarthy on Trademarks*, §27:78.30 (explaining why *Deckers* was clearly

15 erroneous); *see also Mercado Latino, Inc. v. Indio Products, Inc.*, 649 Fed.Appx.

16 633, 634-35 (9th Cir. May 13, 2016) (reversing district court that had relied on

17 *Dastar* to preclude traditional trade dress claim); *Bobbleheads.com, LLC v. Wright*

18 *Bros., Inc.*, 259 F. Supp. 3d 1087, 1098 (S.D. Cal. 2017); *Sambonet Paderno*

19 *Industrie, S.P.A. v. Sur La Table, Inc.*, 2015 WL 4498795 (C.D. Cal. 2015).

20     **E.      THE USE OF THE JOYSTICK TRADE DRESS ALONGSIDE HYPERKIN'S**
           **"RETRON77" CONSOLE INCREASED A LIKELIHOOD OF CONFUSION**

21

22     At pages 12-16 of the motion, Hyperkin argues that there is no "likelihood of

23 confusion" between its Retron77 console and the Atari 2600 console design.

24 Although the Retron77 is clearly "inspired by" the original Atari 2600 console, Atari

25 Interactive again clarifies that it will not argue at trial that the Retron77 *in isolation*

26 violates the Lanham Act.  Rather, Atari Interactive will assert at trial that the

27 Retron77 is relevant in that it was unveiled in a promotional campaign that depicted

28 it together with the A77. In other words, a facsimile of the 2600 joystick was used to

promote an imitation of the 2600 console.  In combination, a reasonable juror could find an unlawful false designation of origin and unfair competition where consumers viewed the Joystick Trade Dress next to a wood-grained console clearly inspired by the original 2600 console.

 

The overall look and feel of the packaging are similar; the products are marketed to the same class of purchaser (indeed, on the very same website); Hyperkin intentionally imitates the original look and feel of the Atari products; and the products are inexpensive enough that a purchaser is not likely to spend substantial time researching whether the Hyperkin products are affiliated with or endorsed by Atari Interactive.  A reasonable juror could find that Hyperkin's placement of the Joystick Trade Dress alongside an imitation 2600 console only increased the likelihood of consumer confusion.  *See, e.g.*, *Green Crush, LLC v. Paradise Splash 1, Inc.*, 2019 WL 8640654, at **5-6 (C.D. Cal. Nov. 25, 2019).

### F.   A REASONABLE JUROR COULD FIND THAT THE JOYSTICK TRADE DRESS IS NON-FUNCTIONAL

At pages 17-19 of the motion, Hyperkin asserts that the Joystick Trade Dress is functional as a matter of law because it was the subject of a utility patent. Hyperkin is wrong on the facts and the law.

<u>First</u>, "[n]ot every configuration disclosed in a utility patent is automatically classified as primarily functional."  *Dogloo, Inc. v. Doskocil Mfg. Co.*, 893 F. Supp.

911, 919 (C.D. Cal. 1995) (citing *McCarthy on Trademarks* at §7.29 at 7–170) (citing *Best Lock Corp. v. Schlage Co.,* 413 F.2d 1195 (C.C.P.A. 1969)("[A] patent may not be evidence of functionality in regard to things of a ... mere design nature which happen to be disclosed in the patent but which are not attributed any functional significance therein"). In fact, "many non-functional shapes and configurations happen to be described or pictured as an incidental detail in functional patents." *Dogloo, Inc.*, 893 F. Supp. at 919. "A utility patent must therefore be examined in detail to determine whether the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of the patent." *Id*.

Here, the utility patent in question does not attach *any* particular functional significance to the design elements that are part of the Joystick Trade Dress – *i.e.*, the black and orange colors, rectangular housing, hexagonal joystick, button, and rubber boot with concentric rings. (Doc. 41-2 at 399-405.) The mere reference to these elements and depictions in one or more figures does not come close to establishing functionality as a matter of law.[9] *Dogloo, Inc.*, 893 F. Supp at 919.

Second, the Joystick Trade Dress is the subject of two expired design patents. "A design patent . . . is presumptive evidence of nonfunctionality," and in no way precludes continued protection under the Lanham Act if the requirements of a trade dress are met. *Fuji Kogyo Co., Ltd. v. Pacific Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006). Where the same product is the subject of both a utility patent and a design patent (and thus there are dueling presumptions), "this type of contradiction

---

[9] Separate from the utility patent, Hyperkin claims that additional elements of the trade dress are functional. As support, however, Hyperkin cites to Mr. Mar's declaration, which discusses functionality of elements of *Hyperkin's* infringing product. *See* Doc. 41-3 at 8 (discussing alleged functionality of A77 elements). This confirms yet again that the A77 incorporates the Joystick Trade Dress that Hyperkin is unsuccessfully attempting to invalidate. Regardless, functionality of individual elements is not the question. *See Clicks*, 251 F.3d at 1258-59 ("We emphasize here that, in evaluating functionality as well as the other elements of a trade dress claim, it is crucial that we focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create").

cannot be resolved without a trial." *Id.* at 684; *Herman Miller*, 2019 WL 1416472, at *12 (same).

Third, Hyperkin does not discuss or present evidence on the other relevant factors, all of which weigh in favor of Atari. No Atari Interactive advertising touts a utilitarian advantage of the Joystick Trade Dress, (Chesnais Decl., ¶10), there are myriad alternative designs available to Hyperkin and others (as the pictures attached to Hyperkin's expert's declarations shows), and there is no unfair competitive or cost advantage to Atari by owning the trade dress. Indeed, Hyperkin's own advertising touts the classic "look and feel" of the A77, (Wesley Decl., Ex. JJ), not its functional advantages, and not even Hyperkin could say with a straight face that the A77 is a cutting edge controller with all the functionalities of today's controllers.

Finally, consumers actually purchase depictions of the Joystick Trade Dress on products like t-shirts and accessories, further evidencing that the trade dress is viewed as a source identifier rather than a utilitarian advantage.

### G.    DISCLAIMERS DO NOT ELIMINATE LIABILITY AS A MATTER OF LAW

At page 19 of the motion, Hyperkin contends that "Hyperkin successfully took steps to assure that there is no likelihood of confusion as to the A77." Hyperkin is referencing the disclaimer on its packaging and the reference to "Cirka" on the bottom on the joystick itself. The disclaimers do not eliminate liability.

First, the disclaimers do nothing to eliminate post-sale confusion,[10] initial interest confusion,[11] or confusion as to an affiliation or endorsement,[12] which are all independently actionable forms of confusion. Regarding post-sale confusion, a person viewing the A77 in use will not view the original packaging or box and is

---

[10] *Au-tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006).

[11] *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004).

[12] *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir. 1963).

unlikely to examine the fine print on the bottom of the joystick.  Moreover, even if someone stumbles upon the "Cirka" reference on the bottom of the product, that person could believe that "Cirka" is simply a sub-brand of Atari Intarctive or an official licensee (analogous to AT Games) of Atari Interactive.  (Indeed, Hyperkin tells customers that Cirka is not a Hyperkin brand at all – Ex. D, Mar Depo at 164:8-165:8.)  Regardless, initial interest confusion is actionable even if the confusion is dispelled prior to purchase.

Second, in light of the small size and location of the disclaimers, as well as the fact that they're not visible at all in many online displays, the disclaimers do not eliminate point-of-sale confusion as a matter of law either.  *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315-16 (2d. Cir. 1987) (holding that disclaimers are oftentimes ineffective and noting several studies supporting the inefficacy of disclaimers to prevent confusion).  Indeed, several courts have held that similar disclaimers actually cut against the defendant because they "suggest a calculated effort by the defendant to escape liability for infringement."  *Coty Inc. v. Excel Brands, LLC*, 277 F. Supp. 3d 425, 448 (S.D.N.Y. 2017), *quoting Charles of the Ritz Group Ltd. v. Quality King Dist.*, 636 F. Supp. 433, 437 (S.D.N.Y. 1986).

### H.   THE JOYSTICK TRADE DRESS COULD BE FOUND TO BE FAMOUS

At pages 20-21 of the motion, Hyperkin argues that the Joystick Trade Dress is not famous as a matter of law and, therefore, Atari cannot prove a trade dress dilution claim.  A reasonable juror, viewing the evidence and all inferences therefrom, could disagree.

A famous mark is one that is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. §1125(c)(2)(A).  Whether a mark is "famous" is a factual question.  *Jada Toys,* 518 F.3d at 635.  The same evidence set forth above showing "secondary meaning" of the trade dress could lead a juror to conclude that the Joystick Trade Dress is famous.

In fact, Hyperkin's own witness, Curt Vendel, could support a finding that the trade dress is famous. While Vendel the paid expert opines that the designs of the joystick and console are not iconic and do not represent Atari's most successful product and video games (Doc. 41-5 at ¶ 10, 33), Vendel the independent video game historian authored a book about "the creation of the company's now *iconic* games and products" in which he wrote, "this model of the joystick [CX40] would become nearly as *iconic* for Atari as its 'Fuji' logo." (Wesley Decl., Ex. B (emphasis added.) And Vendel, as the founder and webmaster of the Atari Museum website, states that "Atari's VCS "is *still* the worlds [sic] most popular Video Game System."[13]  A reasonable juror could agree with Vendel on this point.

Similar to Kodak, Polaroid, Tiffany, Budweiser, and Barbie, the Joystick Trade Dress could be found to be widely recognized by the general consuming public.  *See, e.g., Adidas-Salomon AG v. Target Corp.*, 228 F. Supp. 2d 1216-1217 (2002) (denying defendants' motion for summary judgment on Adidas's claim for dilution of its trade dress in the "Superstar" line of shoes).

## I.    HYPERKIN'S REMAINING ARGUMENTS SHOULD BE MOOT

Hyperkin is correct that Atari Interactive's common law unfair competition claim rises and falls with the Lanham Act claim.  For the reasons set forth above, the Lanham Act claim should survive summary judgment, and thus the unfair competition law claim should as well.  Similarly, because summary judgment should be denied, and thus Hyperkin is *not* the prevailing party, the request for attorney fees should be moot.  There is, in fact, nothing "exceptional" – i.e., the standard for fees under the Lanham Act – about a brand owner trying in good faith to protect one of its most iconic symbols from clear and deliberate copying after pre-litigation requests were ignored.  In any event, the issue of fees is premature.  Regardless of which side

---

[13] http://www.atarimuseum.com/videogames/consoles/2600menu/2600menu.htm.

1  prevails, any fee motion should be separately and thoroughly briefed following entry

2  of judgment.  L.R. 54-7.

3  **V.**      **CONCLUSION**

4         For the reasons stated above, Plaintiff respectfully requests that this Court

5  deny Defendant's motion for summary judgment.

6         Respectfully Submitted,

7

8  Dated:  June 13, 2020                    BROWNE GEORGE ROSS LLP
                                            Keith J. Wesley
9                                           Milin Chun
                                            Eric C. Lauritsen
10

11
                                           By:  ___/s/ Keith J. Wesley_____
12                                                    Keith J. Wesley
13                                         Attorneys for Plaintiff ATARI INTERACTIVE,
                                           INC.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

## <u>PROOF OF SERVICE</u>

**Atari Interactive, Inc. v. Hyperkin, Inc.**
**Case No. USDC-2:19-cv-0608 CAS (AFMx)**

</div>

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

   At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California.  My business address is 2121 Avenue of the Stars, Suite 2800, Los Angeles, CA 90067.

On June 15, 2020, I served true copies of the following document(s) described as **PLAINTIFF ATARI INTERACTIVE, INC.'S OPPOSITION TO DEFENDANT HYPERKIN, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT**

   on the interested parties in this action as follows:

<div align="center">

**SEE ATTACHED SERVICE LIST**

</div>

   **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

   Executed on June 15, 2020, at Los Angeles, California.


                                    */s/ Marla Manion*
                                    Marla Manion

**SERVICE LIST**
*Atari Interactive, Inc. v. Hyperkin, Inc.*
**Case No. USDC-2:19-cv-0608 CAS (AFMx)**

| | |
|---|---|
| Jason Chuan<br>THE LAW OFFICE OF MARY SUN<br>128 E. Huntington Drive, Suite B<br>Arcadia, CA  91006<br>Tel. (949) 328-4097<br>Fax (626) 303-3366<br>Emails: jason@sunlegalgroup.com;<br>marv@sunlegalgroup.com | Attorneys for Defendant Hyperkin, Inc. |
| H. G. Robert Fong<br>Ku & Fong<br>444 S. Flower Street, Suite 2530<br>Los Angeles, California 90071<br>Tel.: 213.488.1400<br>Fax: 213.236.9235<br>Emails: bobfong@ix.netcom.com;<br>bfmc@ix.netcom.com | Defendant Hyperkin, Inc. |

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT