UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:                    Attorneys Present for Defendants:

Not Present                                        Not Present

**Proceedings:**     (IN CHAMBERS) - DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (Dkt. [41], filed June 1, 2020)

## I.     INTRODUCTION

Plaintiff Atari Interactive, Inc. ("Atari Interactive") filed this action against defendant Hyperkin Inc. ("Hyperkin") on January 25, 2019.  Dkt. 1 ("Compl.").  Atari Interactive asserts claims for: (1) false designation of origin, in violation of 15 U.S.C. § 1125(a); (2) common law unfair competition; and (3) trademark dilution, in violation of 15 U.S.C. § 1125(c).  Id.  Hyperkin filed an answer on March 21, 2019.  Dkt. 14 ("Answ.").  The gravamen of Atari Interactive's claims is that Hyperkin's videogame console and joystick controller infringe Atari Interactive's trade dress in Atari Interactive's own console and joystick controller.  Id.

Hyperkin filed a motion for summary judgment on June 1, 2020, dkt. 41 ("Mot."), and a statement of uncontroverted facts and conclusions of law on June 2, 2020, dkt. 42 ("SUF").  On June 15, 2020, Atari Interactive filed an opposition, dkt. 43 ("Opp."), a statement of genuine disputed facts, dkt. 43-1 ("SGDF"), and a statement of additional uncontroverted facts, dkt. 43-1 ("AUF").  On June 29, 2020, Hyperkin filed a reply, dkt. 44 ("Reply"), and an opposition to Atari Interactive's AUF, dkt. 44-1 ("AUF Opp.").

The Court took Hypkerkin's motion under submission on July 17, 2020.  Dkt. 47.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.     BACKGROUND

Unless otherwise noted, the Court references only those facts that are uncontroverted and as to which evidentiary objections have been overruled.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### A.     The Atari 2600 Game Console and Joystick Controller

Atari Inc., a well-known videogame company, was founded in California in 1972. SUF No. 6.  In 1977, Atari Inc. began selling the Atari 2600 videogame console ("the 2600 Console") and the Atari 2600 joystick controller ("the 2600 Joystick").  Id. No. 7.  Users controlled the 2600 Console by using the 2600 Joystick.  The 2600 Console and the 2600 Joystick are pictured below:



Dkt. 41-2 at 11.

In 1980, the United States Patent and Trademark Office ("PTO") issued two design patents, U.S. Patent Nos. D254,544 and D255,565, to Atari Inc. which covered the 2600 Joystick's ornamental design.  SUF No. 57.  The design patents contain the following illustrations depicting the 2600 Joystick's ornamental design:



Dkt. 43-10.  The parties agree that Atari Inc.'s design patents covering the 2600 Joystick have expired.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

The original 2600 Console featured "wood grain in order to match other home electronics from the 1970s." SUF No. 10. By 1982, Atari Inc. discontinued using wood grain in its 2600 Console, releasing an all-black version nicknamed the "Darth Vader." SUF No. 23. The 2600 Console subsequently "went through various iterations" including the "Atari 2600 Jr." and the "Atari 2800." These various iterations of the 2600 Console are pictured below:



Dkt. 43-21. Some experts in the field have described the 2600 Console as "the most popular system of its day." Id.

### B.    Plaintiff Atari Interactive Acquires the Atari Brand

Corporate ownership of the Atari brand—and of the intellectual property rights regarding the 2600 Console and the 2600 Joystick—has changed over time. For example, on July 1, 1984, Atari Inc. entered into an asset purchase agreement with Tramel Technology, Ltd. ("Tramel Technology"). See Dkt. 43-23 ("Tramel Agmt."). The agreement indicated that Atari Inc. had "been engaged primarily in the business of designing, manufacturing and selling home computers and related software, consumer video games and game program cartridges and coin-operated electronic video games." Id. at 7. The agreement further provided that "[t]he assets being sold to [Tramel Technology] consist of all of the assets, properties, rights and business of" Atari Inc. Id. at 9. Tramel Technology thereafter changed its name to "Atari Corp." See Dkt. 43-24.

In 1986, Atari Corp. changed its name to "Atari Corporation." Dkt. 43-25. Atari Corporation subsequently ceased selling the 2600 Console and the 2600 Joystick in 1992. SUF No. 42. Through a merger, JTS Corporation ("JTS") thereafter acquired Atari Corporation in 1996. SUF No. 48.

On February 23, 1998, HIAC XI Corp. ("HIAC"), a subsidiary of Hasbro, Inc. ("Hasbro"), acquired the Atari brand from JTS. Dkt. 43-27 ("Hasbro Agmt.") at 9. The purchase agreement included "[a]ll right, title, and interest in and to the Seller's Products" as well as "[a]ll Intellectual Property associated with the Seller's Products[.]" Hasbro

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

Agmt. at 9.  The agreement further defined "Intellectual Property" as: "any or all of the following and all statutory and/or common law rights throughout the world in, arising out of, or associated therewith: (i) all patents and applications[;] . . . (v) all trade names, logos, trademarks and service marks, trademark and service mark registrations and applications together with the good will of the business symbolized by the names and the marks; . . . and (x) all goodwill associated with any of the foregoing."  Hasbro Agmt. at 10.

HIAC subsequently changed its name to Atari Interactive, Inc., on May 7, 1998.  See Dkt. 43-28 at 5.  Infogrames Entertainment SA, a French company, purchased Hasbro Interactive and its subsidiaries in 2000, gaining a controlling interest in Atari Interactive.  See Dkt. 43-29; AUF No. 13.  Infogrames began using the name "Atari Interactive, Inc." in 2003.[1]  SUF No. 53.

### C.   Atari Interactive's Commercial Activities Since the Early 2000s

Between 1996 to 2004, neither JTS, HIAC, Infogrames, nor Atari Interactive designed, manufactured, released, or sold any standalone videogame console systems or any videogame console products.  SUF Nos. 54–55.  Atari Interactive's Director of Licensing, Casandra Brown, attests, however, that in 2002, "Atari Interactive partnered with a prominent toy and consumer products company, Jakks Pacific, to develop and promote a 'Plug and Play' joystick modeled off the original 2600 joystick design."  Dkt. 43-5, Declaration of Casandra Brown ("Brown Decl.") ¶ 8.

"The Plug and Play is a joystick that can be plugged into a television and plays well-known Atari games without the need for an accompanying console."  Brown Decl. ¶ 8.  The Plug and Play "has continued to be promoted, offered for sale, and sold nationwide from 2002 to the present, including through major online and brick-and-mortar retailers such as Walmart, Target, Costco, Kohl's, and Amazon[.]"  Id. ¶ 9.  The Plug and Play and examples of its packing are pictured below:

---

[1]   Plaintiff Atari Interactive, Inc. is the specific corporate entity that is the plaintiff in this action.  It avers that it was previously a subsidiary of Hasbro, that it acquired its interest in the Atari brand through the JTS-Hasbro transaction in 1998, and that it was party to the Hasbro-Infogrames transaction in 2000.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

  

Dkt. 43-33.

In 2005, Atari Interactive began licensing the "Atari Flashback" series of consoles and joysticks which are modeled off of the 2600 Console and the 2600 Joystick. Brown Decl. ¶¶ 10–12. "The Atari Flashback console and joystick enable[a] users to play a library of classic Atari games all through one device and without the need for separate cartridges or discs." Id. ¶ 10. Atari Interactive's Flashback series has been "promoted, offered for sale, and sold nationwide . . . through major online and brick-and-mortar retailers such as Walmart, Target, Costco, Kohl's, and Amazon[.]" Id. ¶ 12. The Atari Flashback 2 and its packaging are pictured below:



Dkt. 43-34. Since the Atari Flashback 2's release, Atari Interactive has continually updated the Flashback series, "which is now up to its tenth edition." Brown Decl. ¶ 11.

In addition to licensing retro-style consoles and joysticks modeled after the 2600 Console and the 2600 Joystick, Atari Interactive has marketed and promoted the 2600 Console and the 2600 Joystick in other ways. For example, "Atari Interactive has also licensed and promoted its games for use on other popular gaming systems." Brown Decl. ¶ 13. "In several instances, Atari Interactive has featured the 2600 joystick design on the cover of or in promotional materials related to Atari games." Id. Examples of the covers

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

of Atari games that Atari Interactive has licensed for use on the Nintendo Switch, Sony PlayStation 4, and Microsoft Xbox One videogame systems are pictured below:



Dkts. 43-36, 43-37.

Moreover, "[f]or over a decade, Atari Interactive has licensed products such as apparel and consumer products that depict or incorporate the 2600 joystick design."[2] AUF No. 23. Atari Interactive promotes and sells these products through multiple channels, including through its own website, through third-party websites, and at industry trade shows.[3] AUF Nos. 24–25. Examples of these products are pictured below:

---

[2] Hyperkin objects to this assertion on hearsay, original evidence, and relevancy grounds. See AUF Opp. No. 23. The Court **OVERRULES** these objections. Hyperkin also disputes Atari Interactive's assertion that Atari Interactive's apparel and consumer products "depict or incorporate the 2600 joystick design," since, according to Hyperkin, "the depictions are not consistent" and "Atari Corp. abandoned the 2600 joystick in 1992, and [Atari Interactive] has not sold replacements." Id.

[3] Hyperkin objects to Atari Interactive's assertion regarding Atari Interactive's trade show activities on hearsay, original evidence, and relevancy grounds. See AUF Opp. No. 25. The Court **OVERRULES** these objections. Moreover, Hyperkin disputes Atari Interactive's assertion regarding Atari Interactive's website on the grounds that Atari Interactive's website "does not show any joysticks for sale that are compatible with the original Atari 2600 game machine." AUF Opp. No. 24. Hyperkin also disputes Atari Interactive's assertions regarding its sale of promotional products at trade shows and on

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |



Dkt. 43-38.

### D.    Atari Interactive Declares Chapter 11 Bankruptcy in 2013

Atari Interactive declared Chapter 11 bankruptcy in 2013.  SUF No. 64.  The parties dispute whether Atari Interactive did in fact—or was legally required to—list its purported trade dress rights in the 2600 Console and the 2600 Joystick in its bankruptcy asset schedules during its bankruptcy proceedings.  Hyperkin contends Atari Interactive "failed to identify any trade dress rights" in "the bankruptcy asset schedules[.]"  SUF No. 65.

Atari Interactive's Chief Executive Officer, Frederic Chesnais, asserts, however, that "Atari Interactive's bankruptcy schedules did list a variety of games that either depicted or incorporated the 2600 joystick trade dress, and any failure to specifically separate the joystick trade dress from other related intellectual property rights certainly did not reflect any intent to waive such rights, nor any understanding that Atari Interactive did not hold such rights."  Dkt. 43-14, Declaration of Frederic Chesnais ("Chesnais Decl.") ¶ 13.  Chesnais states that "[a]fter the 2013 reorganization, [he] led an initiative to return Atari Interactive and its affiliates back to profitability and growth."  Id. ¶ 5.  According to Chesnais, "[t]hat initiative has succeeded, and the Atari Group is now profitable and has been engaged in a variety of new and exciting projects for several years."  Id.

---

Atari Interactive's website because, according to Hyperkin, "[t]he depictions presented are not consistent and lack elements of the claimed trade dress," "Atari Corp. abandoned the 2600 joystick in 1992, and [Atari Interactive] has not sold replacements."  AUF Opp. Nos. 24–25.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### E.   Hyperkin's CirKa A77 Joystick and Retron77 Console

Since its founding in 2007, Hyperkin has "developed various retro products to play games for products that can no longer be found on the market." SUF Nos. 77, 79. In 2016, "Hyperkin began advertising and selling a joystick modeled off the old Atari 2600 joystick[.]" AUF No. 34. Hyperkin sourced this joystick through a Chinese manufacturer, naming the product the "A77." AUF No. 35; SUF No. 90. According to Hyperkin, its A77 Joystick is "marked with Hyperkin's trademark, "'CirKa' and packaged in highly distinctive packaging[.]" Dkt. 41-3, Declaration of Steven Mar ("Mar Decl.") ¶ 11. Hyperkin's A77 CirKa Joystick and packing are pictured below:



Mar Decl., Exhs. A, C.

Hyperkin began marketing its Retron 77 console ("the Retron Console") in 2017, offering it for sale in July 2018. Mar Decl. ¶ 18. Unlike "game systems that play some old Atari 2600 games" and which "include games preloaded into the system," the Retron77 Console allows "people . . . to play their old Atari 2600 cartridges, [sic] on a modern television." Mar Decl. ¶¶ 18–19. According to Hyperkin, it "used its federally registered Hyperkin trademark and federally registered Retron trademark on the Retron77 packing to make sure customers knew that it was a Hyperkin product." Id. ¶ 23.

### F.   Negotiations Between Atari Interactive and Hyperkin

The parties agree that in 2016 or 2017, Hyperkin approached Atari Interactive to try to obtain a license from Atari Interactive. The parties dispute, however, the potential license's scope. According to Atari Interactive, "Hyperkin approached Atari Interactive

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

. . . to try to obtain a license to sell its imitation Atari joystick and console."[4]  AUF No. 36. Hyperkin contends, however, that "Hyperkin never asked [Atari Interactive] for any sort of license for the A77."  Dkt. 44-3, Reply Declaration of Steven Mar ("Reply Mar Decl.") ¶ 3.  Instead, Hyperkin asserts that it "approached [Atari Interactive] about the possibility of making a console that could play original cartridges" and that Hyperkin "was interested in licensing games from [Atari Interactive] so that the consoles would ship with built-in games."  Id.  The parties ultimately did not come to an agreement.

On June 20, 2017, Atari Interactive's counsel sent Hyperkin a cease-and-desist letter. Dkt. 43-16.  The letter indicated that Hyperkin "has developed, is promoting[,] . . . and is . . . offering for sale . . . what appears to be a console platform compatible with legacy Atari cartridge games[.]"  Id. at 2.  In addition, Atari Interactive accused Hyperkin of "prominently displaying registered trademarks and other intellectual properties owned by Atari, including without limitation the Atari 'Fuji' logo and the classic Atari joystick[.]" Id.  Hyperkin's counsel responded to Atari Interactive's cease-and-desist letter on July 10, 2017, stating that Hyperkin "believes it has the right to sell products such as the CirKa A77 Joystick Controller."  Dkt. 43-17.

### G.    Atari Interactive's Future VCS Console

"Atari Interactive has been actively creating, promoting, and readying to launch a new gaming system that puts a 21st Century spin on the original 2600 designs" and which "include[s] a modernized version of the 2600 joystick design[.]"  Brown Decl. ¶ 18.  Atari Interactive's future console and joystick are pictured below:



See Dkt. 43-8, Expert Report of Tim Lapetino ("Lapetino Report") ¶¶ 24–25.

---

4       The Court **OVERRULES** Hyperkin's objections that Atari's statement "itself is vague, ambiguous and misleading in its use of the term 'Atari.'"  AUF Opp. No. 36.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out "specific facts showing a genuine issue for trial" in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

## IV.   DISCUSSION

Atari Interactive's false designation of origin, dilution, and unfair competition claims are based on Atari Interactive's alleged trade dress rights. "In addition to protecting registered marks, the Lanham Act, in § 43(a), gives a producer a cause of action for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof which is likely to cause confusion as to the origin, sponsorship, or approval of his or her goods." Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209 (2000) (citing 15 U.S.C.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                                      **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|----------|--------------------------|------|----------------|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

§ 1125(a)) (internal alterations omitted). Accordingly, the Lanham Act's protections also extend "to the design of a product as a form of trade dress." Moldex-Metric, Inc. v. McKeon Prod., Inc., 891 F.3d 878, 881 (9th Cir. 2018). "Trade dress is the 'total image of a product,' including features such as size, shape, color, texture, and graphics." Id. (internal citation omitted). "Unregistered trade dress . . . may be protected under the Lanham Act." Id. "To sustain a claim for trade dress infringement," a plaintiff must establish: "(1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion. Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1258 (9th Cir. 2001).

Hyperkin moves for summary judgment as to each of Atari Interactive's claims, as well as for partial summary judgment as to the issues of likelihood of confusion, functionality, and fame. See Mot. The Court notes, however, that "[b]ecause of the factual nature of trademark disputes, summary judgment is disfavored in the trademark arena." Levi Strauss & Co. v. GTFM, Inc., 196 F. Supp. 2d 971, 974 (N.D. Cal. 2002) (citing Interstellar Starship Servs., Ltd. v. Epix Inc., 184 F.3d 1107, 1109 (9th Cir. 1999). With these principles in mind, the Court addresses Hyperkin's arguments in turn.

### A.    Atari Interactive's Standing

Hyperkin argues that Atari Interactive "does not have standing to assert a trade dress infringement claim because it did not acquire any rights from [the predecessor] Atari Companies[.]" Mot. at 5. The Court does not find Hyperkin's argument availing.

Hyperkin argues that "[t]he party claiming ownership of an unregistered mark must have been the first to use the mark in the sale of goods." Mot. at 5. Hyperkin further asserts that "it is indisputable that Atari Inc. was the first to use the claimed trade dress by selling the original 2600 Console and Joystick" and that Atari Interactive cannot "show a chain of assignments of unregistered, existing trade dress from Atari Inc., to Atari Corp., to JTS, to Hasbro, and then to [Atari Interactive] and that the trade dress was not abandoned." Id. at 6. The Court disagrees.

To the extent that Hyperkin challenges Atari Interactive's standing to enforce trade dress rights regarding the 2600 Console and the 2600 Joystick simply because Atari Inc., Atari Interactive's predecessor in interest, created the 2600 Console and the 2600 Joystick, Hyperkin's argument is unpersuasive. See, e.g., Comm. for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 820 (9th Cir. 1996) (noting that party could enforce protected trade name "Committee for Idaho's High Desert" even where it was not "the first user of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

name" and explaining that, "as a practical matter, CIHD appears to be the direct and immediate successor of any individuals who used the name between 1978 and 1981."); Gen. Motors Corp. v. Let's Make A Deal, 223 F. Supp. 2d 1183, 1191 (D. Nev. 2002) (noting that "plaintiff and its predecessors have been using these marks and trade dress since 1981."); Tamway Corp. v. Sunglass Hut Int'l, 173 F.3d 862 (9th Cir. 1999) (unpublished opinion) ("Tamway has standing to sue if it can establish that Metro, its purported predecessor in interest, assigned the MINIREADER trademark and trade dress rights to Tamway."). Indeed, Atari Interactive submits documents detailing the chain of title of assets, including intellectual property rights, associated with the Atari brand from Atari Inc. to Atari Corp. to JTS to Hasbro and then to Infogrames. See Dkts. 43-23, 43-24, 43-25, 43-26, 43-27, 43-28, 43-29, 43-30, 43-31. Nor does the Court find compelling Hyperkin's claim—for which it provides no authority—that Atari Interactive "itself failed to consider itself the owner of any trade dress rights" because it purportedly did not list these rights in the asset schedules it filed during its bankruptcy proceeding. See In re Electro-Motor, Inc., 390 B.R. 859, 869 (Bankr. E.D. Tex. 2008) (rejecting argument that debtor's failure to list intellectual property or trade secrets on debtor's schedule of assets during bankruptcy proceeding precluded debtor from suing to enforce intellectual property rights in subsequent adversary case, explaining "[t]hat assertion is also without merit.").

Similarly, the disputed record precludes the grant of summary judgment to Hyperkin on the basis that any trade dress rights in the 2600 Console and the 2600 Joystick were "abandoned."[5] "Under the Lanham Act, a trade dress is not protectable if it has been abandoned." Ferrari S.p.A. Esercizio Fabbriche Automobili E Corse v. McBurnie Coachcraft Inc., No. 86-cv-1812-B-IEG, 1988 WL 391519, at *4 (S.D. Cal. Aug. 31, 1988). Abandonment of a mark may occur in two ways. See 15 U.S.C. § 1127. First, abandonment of a mark occurs when "its use has been discontinued with intent not to

---

[5]     Hyperkin argues that Atari Interactive and its predecessors abandoned any trade dress rights in the 2600 Console, since the original 2600 Console featured a wood grain design, but the original console was subsequently replaced by other devices, including the all-black Darth Vader 2600 Console and the 2600 Jr., that differed in design. Mot. at 6. Atari Interactive's opposition brief indicates, however, that it "will base its case at trial on (a) Hyperkin's A77 joystick design; and (b) Hyperkin's promotion of its Retron77 console in conjunction with the A77 joystick design." Opp. at 3 n.1. Put differently, Atari Interactive states that it "will not claim liability based on the Retron77 console in isolation" and that "[t]o the extent that the complaint indicates otherwise, [it now] clarifies the scope of its claims for trial." Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

resume such use." 15 U.S.C. § 1127. "Intent not to resume may be inferred from circumstances," and "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment." Id. Second, abandonment occurs "[w]hen any course of conduct of the owner. . . causes the mark to . . . lose its significance as a mark." Id.

It is undisputed that Atari Corporation ceased selling the 2600 Console and the 2600 Joystick in 1992. SUF No. 42. It is also undisputed that between 1996 to 2004, neither JTS, HIAC, Infogrames, nor Atari Interactive designed, manufactured, released or sold any standalone videogame console systems or any videogame console products. SUF Nos. 54–55. However, "[a]bandonment is a question of fact." Levi Strauss, 196 F. Supp. 2d at 976 (citing Rivard v. Linville, 133 F.3d 1446, 1449 (Fed. Cir.)). And, "[i]t is axiomatic in trademark law that the standard test of ownership is priority of use." Halicki Films, LLC v. Sanderson Sales & Mktg., 547 F.3d 1213, 1226 (9th Cir. 2008) (internal citation omitted). Thus, "the first party to use an abandoned trademark in a commercially meaningful way, after its abandonment, is entitled to exclusive use and ownership of the trademark and trade dress." California Cedar Prod. Co. v. Pine Mountain Corp., 724 F.2d 827, 828 (9th Cir. 1984); accord 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 17:2 (5th ed., June 2020 Update) ("Once abandoned, a mark may be seized immediately and the person so doing so may build up rights against the whole world."). The finder of fact could reasonably determine, based on Atari Interactive's sale of the Plug and Play in  2002 and the Flashback 2 in 2005—both of which predated Hyperkin's sale of the CirKa A77 Joystick in 2016 and its sale of the Retron77 Console in 2017—that Atari Interactive resumed use of the trade dress, assuming *arguendo* that its trade dress in the 2600 Console and 2600 Joystick was abandoned.[6]

---

[6]   The Court notes that "[a] party cannot claim that use subsequent to abandonment of a mark has revived the rights obtained by the earlier use." J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 17:3 (5th ed., June 2020 Update). Although "a resumption of use . . . cannot cure the preceding abandonment," a party can resume using a mark, and "[s]uch a resumption represents a new and separate use with a new date of first use." Id. For that reason, the Court finds unavailing Hyperkin's additional arguments that: (1) Atari Interactive "cannot defend against a claim of abandonment by relying on some residual goodwill generated through post-abandonment sales"; and (2) that "[s]ince Atari Corp., JTS, and Hasbro did not sell the 2600 Console and Joystick at the time any assignments occurred, any such assignments would not be accompanied by the goodwill in the products, and thus would be invalid assignments in gross." Mot. at 10.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

Hyperkin further argues that Atari Interactive and its predecessors abandoned any trade dress in the 2600 Console and the 2600 Joystick because, according to Hyperkin, "every Atari company failed to stop numerous third-party sales of joysticks identical to the 2600 Joysticks." Mot. at 7. However, the failure of an owner of a mark to prosecute infringers is "relevant to the strength of the mark, not abandonment." adidas-Am., Inc. v. Payless Shoesource, Inc., 546 F. Supp. 2d 1029, 1078 (D. Or. 2008); accord J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 17:17 (5th ed., June 2020 Update) ("In the typical trademark dispute, the relevance of failure to prosecute others is not 'abandonment,' but the 'strength' of the senior user's mark."). Indeed, "[t]he owner of a mark is not required to police every conceivably related use thereby needlessly reducing non-competing commercial activity and encouraging litigation in order to protect a definable area of primary importance." Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc., 486 F. Supp. 414, 422–23 (S.D.N.Y. 1980). Moreover, the parties each submit conflicting evidence regarding whether Atari Interactive has enforced its alleged trade dress rights in the 2600 Console and the 2600 Joystick against other purported infringers. For example, Hyperkin indicates that it "searched online and on Amazon.com and found that there were many companies selling generic retro 2600 style joysticks." Mar Decl. ¶ 9. On the other hand, Atari Interactive's Chief Executive Officer, Frederic Chesnais, attests that Atari Interactive has taken action against alleged infringers, including: (1) sending a cease-and-desist to Hyperkin; (2) bringing suit against "various companies selling products depicting the 2600 joystick" including "a case we settled with SunFrog, a case that resulted in a default judgment against RageOn, as well as pending cases against Redbubble, ooShirts, and Teespring"; and (3) sending cease-and-desist letters to "two other companies, Innex and Video Game Advantage[.]" Chesnais Decl. ¶ 11. These factual disputes preclude the Court from granting summary judgment on this issue.

## B.   Functionality of 2600 Joystick

Hyperkin next moves for partial summary judgment on the issue of the 2600 Joystick's functionality. Mot. at 16. According to Hyperkin, "[s]ince there is no registered trade dress, Atari bears the burden of proving that the trade tress is nonfunctional." Id. at 17. Hyperkin urges that Atari Interactive "cannot meet its burden of proof because of an expired utility patent." Id.

"No protection under the Lanham Act is available if the claimed trade dress is functional." Moldex-Metric, 891 F.3d at 881. "This requirement makes it very difficult for sellers to use trademark rights to monopolize designs of products." Blumenthal Distrib., Inc. v. Herman Miller, Inc., 963 F.3d 859, 864 (9th Cir. 2020). For unregistered

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

trade dress, the party that seeks protection under the Lanham Act "has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). "The trademark statutes do not define functionality." Moldex-Metric, 891 F.3d at 881. However, "[i]n TrafFix Devices, Inc. v. Marketing Displays, Inc., the Supreme Court split functionality into two types, each with its own legal test." Blumenthal, 963 F.3d at 865 (citing 532 U.S. 23, 32–33 (2001)). "The two types are 'utilitarian functionality,' which is based on how well the product works, and 'aesthetic functionality,' which is based on how good the product looks." Blumenthal, 963 F.3d at 865 (citing Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457 F.3d 1062, 1067 (9th Cir. 2006)). "If the claimed trade dress has either type of functionality, it is unprotectable." Blumenthal, 963 F.3d at 865.

In addition, a "plaintiff may define its claimed trade dress as the 'overall appearance' of its product," and "such claimed trade dresses are subject to the tests for utilitarian and aesthetic functionality, just like any other claimed trade dresses." Blumenthal, 963 F.3d at 866. "[A]s a matter of law, a product's 'overall appearance' is functional, and thus unprotectable, where the whole product is 'nothing other than the assemblage of functional parts,' and 'even the arrangement and combination' of those parts is designed to make the product more functional." Id. at *5 (citing Leatherman Tool Grp., Inc. v. Cooper Indus., Inc., 199 F.3d 1009, 1013 (9th Cir. 1999)). "Consistent with that rule, . . . the proper standard for whether a claimed trade dress consisting of an 'overall appearance' is functional is whether protecting the trade dress threatens to eliminate a substantial swatch of competitive alternatives in the market." Blumenthal, 963 F.3d at 866.

Hyperkin does not specifically indicate whether its functionality challenge is based on "utilitarian functionality" or "aesthetic functionality." Citing Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002 (9th Cir. 1998), Hyperkin argues that "[f]our factors are typically considered to determine functionality[.]" Mot. at 17. "The Disc Golf factors are: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." Blumenthal, 963 F.3d at 865 (internal citation omitted). Because Hyperkin invokes the four factors that the Ninth Circuit articulated in Disc Golf, and because courts consider those factors in the context of utilitarian functionality, the Court construes Hyperkin's argument as one based on utilitarian functionality. See Blumenthal, 963 F.3d at 865 ("To determine whether [utilitarian functionality] is satisfied, we use the four-factor test from [Disc Golf]."). The Court addresses Hyperkin's arguments regarding functionality in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### 1.    Utilitarian Advantage

Here, Atari Interactive identifies the elements of its trade dress in the 2600 Joystick as, *inter alia*, "the rectangular base with a hexagonal joystick mounted near the center, a single prominent red button located at the top left corner of the base, and a dashed circle circumscribing the base of the joystick[.]"  Compl. ¶ 13; see also Opp. at 21 ("describing design elements of "Joystick Trade Dress" as "the black and orange colors, rectangular housing, hexagonal joystick, button, and rubber boot with concentric rings.").[7]   These elements are pictured below:



Compl. ¶ 13.

Hyperkin argues that "[s]ince all the elements of the asserted trade dress were included in the utility patent, or are admittedly functional, there can be no trade dress protection for the joystick."  Mot. at 19.   On September 14, 1982, Atari Inc., Atari Interactive's predecessor, obtained a utility patent, U.S. Patent No. 4,349,708 ("the utility patent"), which encompasses certain elements of the 2600 Joystick.  SUF No. 171.  A portion of the utility patent entitled "Summary of the Invention" indicates that: (1) "[t]he present invention provides a joystick controller in which a conventional handle is moveable radially with respect to its axis"; (2) "the present invention relies on a simple unitary resilient member to provide all of the spring action necessary" which is "thus far more reliable from a construction standpoint and a use standpoint, as well as being less expensive to construct"; and (3) a "resilient boot is fastened to the handle to maintain it in its nominal centered position when it is not being manually actuated."  Dkt. 41-2 at 403.  Claim 13 of the utility patent also describes the use of a "firing button projecting above the exposed surface of the housing unit[.]"  Id. at 405.  Portions of the utility patent therefore appear to

---

[7]     The parties also refer to the dashed circle circumscribing the base of the joystick as "the compass rose."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

refer to elements which also form the basis for Atari Interactive's claimed trade dress, including the rectangular housing, the joystick which is centrally situated with respect to the base, the rubber boot, and the firing button.  Further, the finder of fact could conclude that the utility patent's summary—which states that "[t]he present invention . . . avoids the necessity of both wire springs and plastic springs," "is more reliable from a construction standpoint and a use standpoint," and is "less expensive to construct"—indicate that these elements, which form the bases for Atari Interactive's claimed trade dress, confer some utilitarian advantage.  See Blumenthal, 963 F.3d at 865 ("A claimed trade dress has utilitarian functionality if it is essential to the use or purpose of a product or affects its cost or quality.").

On the other hand, "functionality is generally viewed as an intensely factual issue." Millennium Labs., Inc. v. Ameritox, Ltd., 817 F.3d 1123, 1129 (9th Cir. 2016) (internal citations and alterations omitted).  And while, "with respect to the factor of utilitarian advantage, the existence of an expired utility patent is weighty evidence of functionality, . . . that fact alone is not dispositive."  Disc Golf, 158 F.3d at 1006.  To the contrary, a "utility patent must be examined closely to ensure that the disclosure of the configuration is primarily functional and not merely incidental."  Id. (internal citation omitted).  Thus, a plaintiff seeking to enforce its trade dress may establish that its claimed trade dress is nonfunctional even where elements of the claimed trade dress appear in an expired utility patent.  See Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 516–17 (9th Cir. 1989) (noting that "considerable support exists for a determination of functionality" where "[a]n expired utility patent exists" but that plaintiff could nonetheless establish claimed trade dress was nonfunctional).  The disputed record before the Court prevents the Court from making this determination at the summary judgment stage.[8]

---

[8]      As an example—and despite the fact that Atari Interactive's predecessor previously received a utility patent covering the 2600 Joystick—Frederic Chesnais, Atari Interactive's Chief Executive Officer, asserts that "[b]ased on my decades of experience in the video game industry, I know that the 2600 joystick design does not yield a utilitarian advantage" and that "compared to modern joysticks, the 2600 joystick design is simplistic."  Chesnais Decl. ¶ 10.  The Court finds unavailing Hyperkin's argument that Chesnais' statement should be stricken as a violation of the "sham affidavit" rule, simply because Chesnais acknowledged, during deposition, that the joystick for the yet-to-be-released, future Atari console features a "redesigned . . . rubber boot" that "allow[s] for flexibility and manual ability[.]"  Dkt. 44-2 at 44.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

The Court's determination that the existence of the expired utility patent does not, itself, require the grant of summary judgment to Hyperkin on the issue of functionality is bolstered by the fact that the PTO previously issued two *design* patents to Atari's predecessor which cover the 2600 Joystick's design. A "design patent protects the way an article looks. In contrast, a utility patent protects the way an article is used and works." A-1 Elecs. Inc. v. Pang Chang, No. 02-cv-8579-DSF-CW, 2004 WL 7334928, at *2 (C.D. Cal. Mar. 1, 2004). Thus, while the existence of a utility patent is evidence that the features therein claimed as trade dress are functional, "[t]he existence of a design patent may be some evidence of non-functionality." In re R.M. Smith, Inc., 734 F.2d 1482, 1485 (Fed. Cir. 1984); Jenny Yoo Collection, Inc. v. Watters Designs, Inc., No. 3:17-cv-3197-M, 2018 WL 3330025, at *3 (N.D. Tex. June 6, 2018) ("Because a design patent is granted only for non-functional designs, it can serve as evidence that a plaintiff's trade dress is nonfunctional."); accord Govino, LLC v. WhitePoles LLC, No. 4:16-cv-06981-JSW-KAW, 2017 WL 6442187, at *9 (N.D. Cal. Nov. 3, 2017) ("the fact that govino obtained four design patents for various drinking glass and decanter designs incorporating the govino Trade Dress is further evidence of non-functionality."). That the PTO issued both utility and design patents encompassing the 2600 Joystick further highlights the existence of a triable issue—the functionality of Atari Interactive's claimed trade dress in the 2600 Joystick—which the Court cannot determine, as a matter of law, at this juncture. See Fuji Kogyo Co. v. Pac. Bay Int'l, Inc., 461 F.3d 675, 684 (6th Cir. 2006) ("while the product described in the '714 design patent is almost identical to that in the '488 utility patent, the utility patent presents a presumption of functionality and the design patent presents a presumption of nonfunctionality. Clearly, the variety of intellectual property in this case demonstrates that the issue cannot be decided through evidentiary presumptions. This type of contradiction cannot be resolved without a trial.").

Hyperkin also argues that each of the individual elements of Atari Interactive's claimed trade dress are functional such that "there can be no trade dress protection for the joystick." Mot. at 18. Hyperkin asserts that: (1) the 2600 Joystick's "hexagonal shape is functional since it provides contour and texture to aid grip"; (2) "[t]he concentric rings help center the joystick"; (3) "[t]he base was rectangular to fit into Atari Inc.'s console"; and (4) "the dashed circle was functional because it let users know the directions for the joystick." Id. at 18–19. However, "a product's overall appearance is necessarily functional if *everything* about it is functional, not merely if *anything* about it is functional." Blumenthal, 963 F.3d at 867 (emphases in original).

For example, in Clicks, the Ninth Circuit determined that a pool hall "presented sufficient evidence of the arbitrariness and non-functional nature of its design decisions

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

and the availability of alternative designs to clear the summary judgment hurdle" where the pool hall claimed trade dress in its overall appearance.  251 F.3d at 1261.  In that case, the Ninth Circuit identified "various arbitrary elements" of the pool hall's trade dress including "the size, placement, and layout of the pool tables; *the color combination*, including the contrast between the carpet and the dark wood; the lighting; the neon beer signs, bar tap handles, and the like; the cue racks; the selection of video games; the floor covering; the wall treatment; the drink rails; and the millwork."  Id. (emphasis added).  The Ninth Circuit explained that "[t]o be sure, many of these elements, considered in isolation, may be functional.  The issue, however, is whether, taken as a whole, *the overall look and feel* of the establishment *is functional*."  Id. (emphases added).

At bottom, "in evaluating functionality as well as the other elements of a trade dress claim, it is crucial that" the Court "focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." Clicks, 251 F.3d at 1259 (emphasis in original).  Here, even assuming that *individual* elements of Atari Interactive's claimed trade dress in the 2600 Joystick are functional— such as the 2600 Joystick's hexagonal shape, rectangular base, concentric rings, rubber boot and dashed circles—whether the combination, configuration, and black and red color scheme[9] of these elements, somehow improves the 2600 Joystick's use so as to render the 2600 Joystick's "overall appearance" functional is a question for the fact finder.  See Moldex-Metric, 891 F.3d at 882, 887 (determining that functionality of plaintiff manufacturer's green ear plugs "is a question for the jury" where defendant argued that green color of manufacturer's ear plugs "achiev[ed] the function of allowing ear plugs to be seen during safety compliance checks" but manufacturer argued that green color did not improve use of ear plugs because "numerous color shades are equally or more visible than its bright green color and would result in the same function of visibility during compliance checks[.]"); cf. Talking Rain Beverage Co. Inc. v. S. Beach Beverage Co., 349 F.3d 601, 604 (9th Cir. 2003) (finding that "bike bottle design yields a utilitarian advantage" because "bottle fits easily into a bicycle bottle holder," the bottle's "grip area helps the bottle to retain its shape for reuse," and "the grip area makes the bottle easier to grip, particularly for bicyclists and other users who might use the bottle while exercising.").

---

[9]     The United States Supreme Court has determined "that color alone, at least sometimes, can meet the basic legal requirements for use as a trademark.  It can act as a symbol that distinguishes a firm's goods and identifies their source, without serving any other significant function."  Qualitex Co. v. Jacobson Prod. Co., 514 U.S. 159, 166 (1995).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### 2. Remaining <u>Golf Disc</u> Factors

The parties dispute whether the remaining <u>Golf Disc</u> factors favor a finding that the 2600 Joystick is nonfunctional so as to create a genuine issue for trial. For example, as to the second <u>Golf Disc</u> factor, Atari Interactive submits evidence indicating that there are numerous alternative videogame controller designs available to its competitors. Atari Interactive points to the controllers used in connection with other videogame systems, such as the controller used with Nintendo's Nintendo Entertainment System, SEGA's Mega Drive six-button controller, Nintendo's N64 controller, Sony's Playstation Dualshock Controller, and Microsoft's Xbox 360 controller:



Dkt. 43-20.

In response, as to the third <u>Golf Disc</u> factor, which considers whether advertising touts the utilitarian advantages of the design, Hyperkin asserts that Atari Interactive "could have, but failed to, present advertisements touting the ornamental nature of the features, articles extolling the beauty or recognizability of the elements, or customer testimony praising the joystick's appearance." Reply at 22. Hyperkin points out that the only evidence that Atari Interactive submits to demonstrate that its advertisements do *not* tout the 2600 Joystick's utilitarian advantages appears to be the declaration of Frederic Chesnais, Atari Interactive's own Chief Executive Officer, who attests that "Atari Interactive has never advertised the functional advantages of the 2600 joystick design." Chesnais Decl. ¶ 10. According to Hyperkin, then, Atari Interactive "has done nothing more than point to . . . [the] lack of functional advertising, as evidence of non-functionality." Reply at 23. The Court, however, notes the "difficulties inherent in requiring a party to prove a negative[.]" <u>Uschold v. Carriage Servs., Inc.</u>, No. 17-cv-04424-JSW, 2020 WL 1466172, at *6 (N.D. Cal. Mar. 6, 2020) (internal citation and alteration omitted). In addition, while Hyperkin asserts that Atari Interactive failed to present advertisements touting the 2600 Joystick's ornamental features, Hyperkin does not present evidence that Atari Interactive has advertised the 2600 Joystick's utilitarian features either. <u>Cf.</u> <u>Talking Rain</u>, 349 F.3d at 603–604 (finding that no genuine issue existed regarding whether plaintiff water bottle manufacturer's bottle was functional where its "advertising tout[ed] its bottle's utilitarian features," "refer[red] to its bottle as the 'Grip Bottle,'" and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

used "Get a Grip!" slogan, explaining that "at least one meaning of its advertising is that the bottle is easy to grip.").

As to the fourth Disc Golf factor, the Ninth Circuit has concluded that "[a] functional benefit may arise if the design achieves economies in manufacture or use." Disc Golf, 158 F.3d at 1009 (internal citation and quotation marks omitted). Neither party appears to argue whether this factor favors a finding that Atari Interactive's claimed trade dress in the 2600 Joystick is functional.

Ultimately, in determining whether a party's claimed trade dress is functional, "[n]o one factor is dispositive; all should be weighed collectively[.]" Disc Golf, 158 F.3d at 1006. And, "[t]he issue of functionality has been consistently treated as a question of fact." Vuitton Et Fils S.A. v. J. Young Enterprises, Inc., 644 F.2d 769, 775 (9th Cir. 1981). For these reasons, the Court declines to grant summary judgment to Hyperkin on the issue of the 2600 Console's functionality.

## C.   Distinctiveness of 2600 Joystick Design

In order to establish trade dress rights, a plaintiff must also establish "that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning[.]"  Clicks, 251 F.3d at 1258.  A mark "is inherently distinctive if its intrinsic nature serves to identify a particular source." Wal-Mart, 529 U.S. at 210 (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)).  "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982).  Following the Supreme Court's decision in Wal-Mart, "[t]o succeed on a trade dress infringement based on product design, the plaintiff must show that her design has attained secondary meaning." Art Attacks Ink, LLC v. MGA Entm't Inc., 581 F.3d 1138, 1145 (9th Cir. 2009).  Put differently, "product design trade dress c[an] never be inherently distinctive and always require[s] proof of secondary meaning."  J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 8:11 (5th ed., June 2020 Update).

Here, the parties appear to agree that Atari Interactive must establish that its claimed dress in the 2600 Joystick has acquired secondary meaning.  But they disagree as to whether triable issues exist regarding whether the 2600 Joystick has acquired secondary meaning. The Court addresses the parties' arguments in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | ‘O’ |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

1.    **Genuine Disputes Exist Regarding Whether the 2600 Joystick has Become Generic**

Hyperkin argues that Atari Interactive "cannot establish acquired distinctiveness in the joystick design because it became generic." Mot. at 7. According to Hyperkin, "the 2600 joystick design is generic due to every Atari company's failure to police the claimed trade dress, leading to numerous third-party sales of generic product." Id. at 8. Hyperkin further urges that "the 2600 Joystick design became so generic that it was used for non-Atari products." Id.

Hyperkin relies on the Ninth Circuit's opinion in Freecycle Network, Inc. v. Oey, 505 F.3d 898 (9th Cir. 2007). In that case, the Ninth Circuit reasoned that "[w]here the majority of the relevant public appropriates a trademark term *as the name of a product (or a service)*, the mark is a victim of 'genericide' and trademark rights generally cease." Id. at 905 (emphasis added). The Ninth Circuit explained that "[s]uch genericide can occur as a result of a trademark owner's failure to police the mark, resulting in widespread usage by competitors leading to a perception of genericness among the public, who sees many sellers using the same term." Id. (internal citation omitted). Thus, "[g]enericide has spelled the end for countless formerly trademarked terms, including 'aspirin,' 'escalator,' 'brassiere,' and 'cellophane.'" Id.

Hyperkin's argument regarding the alleged "genericide" of the 2600 Joystick is unpersuasive. First, the Ninth Circuit's discussion of "genericide" has typically been in the context of a mark that is a word or term. See Freecycle, 505 F.3d at 905 (noting, with respect to plaintiff's clamed mark in the term "freecycle," that "[s]ome trademarks enter our public discourse and become an integral part of our vocabulary.") (internal citation omitted); Elliott v. Google, Inc., 860 F.3d 1151, 1156 (9th Cir. 2017) ("Genericide occurs when the public appropriates a trademark and uses it as a generic name for particular types of goods or services irrespective of its source."); accord San Diego Comic Convention v. Dan Farr Prods., 336 F. Supp. 3d 1172, 1179 (S.D. Cal. 2018) (discussing "genericide" in context of claimed mark in "Comic Con" name and noting that "[g]eneric terms are not protectable because they do identify the source of a product."). By contrast, at issue in this case is Atari Interactive's claimed trade dress in the overall appearance of the 2600 Joystick and its design, not Atari Interactive's claimed rights in a word mark. And, assuming *arguendo* that "genericide" could apply in product design context, "[w]hether a mark is generic is a question of fact." Advertise.com, Inc. v. AOL Advert., Inc., 616 F.3d 974, 977 (9th Cir. 2010). Moreover, Hyperkin's "genericide" argument is premised on Atari Interactive's alleged failure to police other purported infringers. But in declining to grant

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

summary judgment to Hyperkin on the issue of abandonment, the Court has already determined that the disputed record precludes the Court from deciding—at the summary judgment stage and as a matter of law—the extent to which Atari Interactive has policed other alleged infringers.

> **2.    Genuine Disputes Exist Regarding Whether the 2600 Joystick has Secondary Meaning**

The parties likewise dispute whether the 2600 Joystick has attained secondary meaning.  "Secondary meaning is required to establish the distinctiveness element of a design trade dress claim." OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc., 897 F.3d 1008, 1022 (9th Cir. 2018).  "The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source." Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 843 (9th Cir. 1987).  "A plaintiff may establish secondary meaning through direct and circumstantial evidence." Cont'l Lab. Prod., Inc. v. Medax Int'l, Inc., 114 F. Supp. 2d 992, 999 (S.D. Cal. 2000). "Direct evidence, such as consumer surveys and direct consumer testimony, often provides the strongest evidence of secondary meaning." CytoSport, Inc. v. Vital Pharm., Inc., 617 F. Supp. 2d 1051, 1079 (E.D. Cal.) (internal citation omitted).  "A plaintiff may also establish secondary meaning through circumstantial evidence, such as: exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market." Cont'l Lab. Prod., 114 F. Supp. 2d at 1000 (internal citations omitted).  In addition, "[e]vidence of deliberate copying may . . . support an inference of secondary meaning." Id. (internal citation omitted).

Hyperkin makes a number of arguments as to why, in its view, Atari Interactive fails to raise a genuine dispute regarding whether the 2600 Joystick Console has attained secondary meaning.  Hyperkin first assets that "there are no surveys or consumer declarations." Mot. at 9.  Indeed, it is undisputed that Atari Interactive and its expert, Tim Lapetino, did not perform any surveys in this case.  See SUF Nos. 75–76.  And, the Ninth Circuit has indicated that "[a]n expert survey of purchasers can provide the most persuasive evidence of secondary meaning." Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989).  But the Ninth Circuit has also subsequently made "clear . . . that survey evidence is only one of the most persuasive ways to prove secondary meaning, and not a requirement for such proof." Yost, 92 F.3d at 822; accord J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 15:30 (5th ed., June 2020 Update)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| **CIVIL MINUTES – GENERAL** | | | **'O'** |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

("Survey data is direct evidence of secondary meaning. But survey evidence is not required.").

Atari Interactive points to sufficient evidence in the record to raise a genuine dispute regarding whether the 2600 Joystick has acquired secondary meaning. For example, in connection with its motion for summary judgment, Hyperkin submits the declaration of its Chief Executive Officer, Steven Mar. See Mar Decl. Mar attests that it "decided to sell" its CirKa A77 Joystick "because its customers began asking whether Hyperkin carried replacement joystick controllers for the old Atari 2600 systems." Id. ¶ 6. Moreover, during deposition, Mar testified that "[p]eople who are intro retro gaming" would recognize the 2600 Joystick. Dkt. 43-11, Deposition of Steven Mar ("Mar Dep. Tr.") at 95:13–18. From this evidence, a jury could reasonably conclude that because consumers specifically recognize the 2600 Joystick, they attribute the 2600 Joystick to a particular source, even if they do not necessarily know that source is Atari Interactive or its predecessors. See Sazerac Co., Inc. v. Fetzer Vineyards, Inc., 251 F. Supp. 3d 1288, 1303 (N.D. Cal. 2017) ("Consumers need not be able to identify the source of the product by name."); Maljack Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 887 (9th Cir. 1996) (explaining that the secondary meaning of a mark is established through proof that the public associates the mark "with a single source, even if that source is anonymous").

In addition, the CirKa A77 Joystick's packaging indicates that the CirKa A77 Joystick is an "Atari Style" joystick controller:



Mar Decl., Exh. A. Based on Hyperkin's own branding of the CirKa A77 Joystick as "Atari Style," the finder of fact could reasonably conclude that Atari Interactive's claimed trade dress has attained secondary meaning. See, e.g., Brighton Collectibles, Inc. v. Coldwater Creek Inc., No. 06-cv-01848-H-POR, 2009 WL 10671818, at *6 (S.D. Cal. Apr. 22, 2009)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

(determining that defendant retailer's internal emails, including, *inter alia*, a request for "more 'brighton-y' look for Fall," are "relevant to prove secondary meaning, as they tend to show that Brighton products have a distinct look that is well-known."); <u>Faberge, Inc. v. Saxony Prod., Inc.</u>, 605 F.2d 426, 428 (9th Cir. 1979) ("the trial court properly considered indirect evidence of secondary meaning, including . . . the fact that Saxony had intentionally simulated the Brut trade dress in developing its packaging for Bravado[.]"); <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 314 F.2d 149, 157 (9th Cir. 1963) (finding secondary meaning in name "Black & White," and noting that when a defendant uses a name that incorporates the name of an already-existing product, "[t]he only possible purpose could have been to capitalize upon the popularity of the name chosen."). Further, Hyperkin's Chief Executive Officer, Steven Mar, testified during deposition that the CirKa A77 Joystick was modeled after the 2600 Joystick. Mar Dep. Tr. at 70:9–11; <u>cf.</u> <u>Cont'l Lab. Prod.</u>, 114 F. Supp. 2d at 1000 ("Evidence of deliberate copying may . . . support an inference of secondary meaning.").

Atari Interactive points to further circumstantial evidence from which the finder of fact could determine that the 2600 Joystick has attained secondary meaning. Indeed, "recognition by the trade, by the media and by potential customers" are sources of evidence regarding whether trade dress has attained secondary meaning. J. Thomas McCarthy, 2 <u>McCarthy on Trademarks and Unfair Competition</u> § 15:30 (5th ed., June 2020 Update). Here, Atari Interactive submits evidence that: (1) Hyperkin's own expert, Curt Vendel, co-authored a book entitled "Atari Inc.—Business Is Fun," which indicates that the 2600 Joystick "would be the mainstay for the [2600 Console] and many other products to follow for years to come," and that "this model of joystick would become nearly as iconic for Atari as its 'Fuji' logo"; (2) news articles that have been written about the 2600 Joystick, the 2600 Console, and Atari Interactive's future videogame console, including one which indicates that "[a]fter all, there's no gaming accessory quite as iconic as the" 2600 Joystick; and (3) other books have written about the history of Atari Interactive's predecessors, the 2600 Console, and the 2600 Joystick. Dkts. 43-9; 43-20, 43-21.

"Whether a particular trade dress has acquired secondary meaning is a question of fact[.]" <u>First Brands Corp. v. Fred Meyer, Inc.</u>, 809 F.2d 1378, 1383 (9th Cir. 1987). Thus, the finder of fact—not the Court—must determine whether the 2600 Joystick has attained secondary meaning sufficient to establish the distinctiveness element of Atari Interactive's trade dress claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| **CIVIL MINUTES – GENERAL** | | | **'O'** |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### D.     Likelihood of Confusion

"Regardless of whether a trade dress is non-functional and is inherently distinctive (or has acquired secondary meaning), there is no infringement if" the owner of the claimed trade dress "cannot prove a likelihood of confusion among consumers." Lisa Frank, Inc. v. Impact Int'l, Inc., 799 F. Supp. 980, 993 (D. Ariz. 1992). "A likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." Nova Wines, Inc. v. Adler Fels Winery LLC, 467 F. Supp. 2d 965, 979 (N.D. Cal. 2006). "The Ninth Circuit has identified eight factors ('the Sleekcraft factors') to help guide the analysis to determine whether such confusion is likely: (1) the similarity of the mark(s) or trade dress, (2) the strength of the mark(s) or trade dress, (3) evidence of actual confusion, (4) the proximity or relatedness of the goods, (5) the degree to which the marketing channels used for the goods converge, (6) the type of goods and the degree of care likely to be exercised by the purchasers, (7) the defendant's intent in selecting the mark or trade dress, and (8) the likelihood of expansion of the product lines." Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC, 741 F. Supp. 2d 1165, 1177–78 (C.D. Cal. 2010) (citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979)). "The test is a pliant one—some factors are more important than others, and the factors need not be mechanically added up in order to find a likelihood of confusion." Fiji Water, 741 F. Supp. 2d at 1178. "Given the highly fact-intensive nature of the Sleekcraft inquiry, summary judgment on 'likelihood of confusion' grounds is generally disfavored." Asuragen, Inc. v. Accuragen, Inc., No. 16-cv-05440-RS, 2018 WL 558888, at \*3 (N.D. Cal. Jan. 25, 2018) (internal citation omitted). Accordingly, "the Ninth Circuit has cautioned district courts to 'grant summary judgment motions sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record.'" Id. (internal citation omitted).

Hyperkin makes a number of arguments as to why, in its view, partial summary judgment is appropriate on the issue of likelihood of confusion. None are availing.

### 1.     Hyperkin's Reliance on Deckers Outdoor Corp.

Hyperkin argues that "no one is confused as to the source of Hyperkin's products." Mot. at 12. That is because, according to Hyperkin, "[w]here a defendant does not sell a plaintiff's product as their own, there is no false designation origin based upon similar trade dress." Id. at 11. Hyperkin asserts, then, that "[s]ince Hyperkin does not identify [Atari

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

Interactive] as the source of its products, and it identifies Hyperkin products with its own trademarks, no tenable false origin claim exists." Mot. at 12. The Court disagrees.

In Dastar Corp. v. Twentieth Century Fox Film Corp., the United States Supreme Court determined that Twentieth Century Fox ("Fox") could not maintain a Lanham Act claim for false designation of origin against Dastar, a competing film production company, based on Dastar's uncredited use of footage from Fox's 1949 "Crusade" television series, which was based on then-General Dwight D. Eisenhower's book on the Second World War. See generally 539 U.S. 23 (2003). In that case, "Dastar purchased eight beta cam tapes of the *original* version of the Crusade television series, which is in the public domain, copied them, and then edited the series." Id. at 26 (emphasis in original). Dastar "manufactured and sold" the compilation "as its own product." Id. at 27. Neither the compilation, its packaging, nor its screen credits made any reference to Fox's Crusade television series. Id.

The Supreme Court explained that the gravamen of Fox's claim "is that, in marketing and selling [Dastar's compilation] as its own product without acknowledging its nearly wholesale reliance on [Fox's] Crusade television series, Dastar has made a 'false designation of origin . . . which is likely to cause confusion as to the origin of [its] goods." Dastar, 539 U.S. at 31 (internal citation and alterations omitted). The Supreme Court reasoned that "[i]f 'origin' refers only to the manufacturer or producer of the physical 'goods' that are made available to the public (in this case the videotapes), Dastar was the origin. If, however, 'origin' includes the creator of the underlying work that Dastar copies, then someone else (perhaps Fox) was the origin of Dastar's product." Id. "In sum, reading the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were*)," the Supreme Court "conclude[d] that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." Id. at 37 (emphases in original).

In Deckers Outdoor Corp. v. J.C. Penney Co. Inc., upon which Hyperkin principally relies, another court in the Central District of California, determined, based on Dastar, that a boot manufacturer could not state a claim for false designation of origin against a retailer based on the manufacturer's claimed trade dress. See generally 45 F. Supp. 3d 1181 (C.D. Cal. 2014). In that case, Deckers, the manufacturer, alleged that JC Penney, the retailer, "has offered for sale 'knock-off' UGG boots, which infringe upon the Bailey Button trade dress and design patents." Id. at 1183. The court dismissed Deckers' false designation of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

origin claim, reasoning that Deckers' "proposed point of distinguishment—i.e., that Dastar involved a reverse passing-off claim whereas Deckers has brought a passing-off claim—does not remove this case from Dastar's grasp."[10] Deckers, 45 F. Supp. 3d at 1185. The court noted that "Deckers does not allege that JC Penney has sold Deckers's Bailey Button Boots as JC Penney's own products. Rather, Deckers confusingly contends that JC Penney has appropriated Deckers's Bailey Button Boot trade dress on to JC Penney's own boots and then caused consumer confusion as to the origin of JC Penney's boots." Id. The court therefore determined that "[u]nless JC Penney sold Deckers boots as its own—thus changing the 'origin' for Lanham Act purposes—the fact remains that JC Penney is the origin of its own goods. Deckers may not use § 1125(a) as 'a species of perpetual patent and copyright' to attach Lanham Act liability to what is more properly the province of patent and copyright law." Id. at 1186.

Here, Hyperkin asserts that "[l]ike the defendant in [Deckers], Hyperkin identifies its CirKa A77 and Retron77 products as originating from Hyperkin itself, not [Atari Interactive]." Mot. at 11. Hyperkin urges that it "does this through the use of its registered trademarks and disclaimers." But Hyperkin's reliance on Deckers is misplaced for several reasons.

For instance, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." Camreta v. Greene, 563 U.S. 692, 709 n.7 (2011) (internal citation omitted). To the contrary, "[d]istrict courts are bound by the law of their own circuit." Hasbrouck v. Texaco, Inc., 663 F.2d 930, 933 (9th Cir. 1981). The Court is therefore not bound by Deckers. Moreover, in a post-Dastar decision, the Ninth Circuit has determined that plaintiffs could maintain a claim for false designation of origin, even where the defendant did not literally "pass off" its goods as those of the plaintiffs and the defendant included "disclaimers" on its products "that deny any connection to" the plaintiffs. See Au-Tomotive Gold, 457 F.3d at 1065, 1077 (rejecting defendant's argument "that the disclaimers on its packaging dispel any potential for confusion" and explaining that "[e]ven if disclaimers may in some cases limit the potential for confusion, here they do not."); see also Mercado Latino, Inc. v. Indio Prod., Inc., 649 F. App'x 633, 634 (9th Cir. 2016)

---

[10] "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's. 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own." Dastar, 539 U.S. at 27 n.1 (internal citations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

(unpublished opinion) (explaining that Dastar "addressed the narrow instance in which a plaintiff alleges the defendant has violated the Lanham Act by falsely designating the origin of 'a communicative product,' . . . such as a book or a video" rather than "traditional trademark and trade dress claims that allege a defendant's production of tangible goods are so similar to [those of] the plaintiffs as to confuse consumers.") (internal alterations omitted). Moreover, courts and commentators have questioned the Deckers court's reliance on Dastar. See, e.g., Green Crush LLC v. Paradise Splash I, Inc., No. 17-cv-01856-CJC-JDE, 2018 WL 4940825, at *6 n.3 (C.D. Cal. May 3, 2018) (rejecting argument, based on Deckers, that "[p]laintiff's false designation of origin claim fails as a matter of law."); accord J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 27:78.30 n.8 (5th ed., June 2020 Update) (describing Deckers as "[e]rroneously finding that the rule in Dastar precludes a § 43(a) claim of trade dress infringement[.]"). The Court therefore declines to grant Hyperkin summary judgment on this basis.

### 2. The Sleekcraft Factors

Having determined that neither Dastar nor Deckers preclude Atari Interactive's false designation of origin claim, the Court next determines whether genuine disputes exist as to the likelihood of confusion between the parties' products.

#### a. Strength of the Trade Dress

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1058 (9th Cir. 1999). "This 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000). "Marks can be conceptually classified along a spectrum of increasing inherent distinctiveness." Id. From weakest to strongest, marks are characterized "from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful,' awarded maximum protection." Nutri/Sys., Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 605 (9th Cir. 1987). By contrast, "commercial strength" refers to "the marketplace recognition value of the mark." Lahoti v. Vericheck, Inc., 636 F.3d 501, 508 (9th Cir. 2011). "Likelihood of confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary trademark context" including, *inter alia*, "strength of the trade dress." adidas Am., Inc. v. Skechers USA, Inc., 890 F.3d 747, 755 (9th Cir. 2018).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL                    'O'

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

Here, Hyperkin asserts that "[t]he claimed trade dress is weak." Mot. at 12. According to Hyperkin, "[t]he conceptual strength in the 2600 Console trade dress is non-existent because, under [Wal-Mart], product design cannot be inherently distinctive." Id. at 12–13. Hyperkin further asserts that "any scope of protection [in the 2600 Console] would [be] very narrow due to widespread third-party use of wood grain and ribbing elements in electronics and videogames." Id. at 13. Indeed, one of Hyperkin's experts, Curt Vendel—a videogame historian and former designer who was previously an independent contractor to Atari Interactive—opines that: (1) "Atari Inc. designed the original VCS/2600 console to include wood grain because that was the style of the times, a style used by many electronic game systems and in general consumer electronic products"; (2) "[n]umerous other video game companies used wood-grain or ribbing in their consoles in the 1970s and early 1980s"; and (3) that "[r]ibbing is also a common element used for video game systems over the past few decades" such that "Nintendo, Sega, Sony and Microsoft all used ribbing in their systems." Dkt. 41-5, Declaration of Curt Vendel ("Vendel Decl.") ¶¶ 10–11, 16. Hyperkin's other expert, Ian Bogost, "a key figure in videogame studies . . . and digital culture[,]" renders similar opinions regarding the use of the wood grain. Dkt. 41-4, Exh. B, Expert Report of Ian Bogost ("Bogost Report") ¶¶ 3, 18.

In response, Atari Interactive asserts that the 2600 Console "became the first widespread home video game console, selling an estimated 30 million units," and that "[t]he design of the 2600 joystick in particular, *i.e.*, its single, bright, orange-red button, matching compass rose graphic, and the protective joystick boot – became synonymous with the Atari brand."[11] Opp. at 3. In support of its argument, Atari Interactive relies on the report of its expert, Tim Lapetino, a design and public relations executive whose work has focused on logo design and brand identity and who previously served as an adjunct professor at Chicago Portfolio School and the Executive Director of the Museum of Video

---

[11]     Atari Interactive "clarifies that it will not argue at trial that" Hyperkin's Retron77 Console "*in isolation* violates the Lanham Act. Rather, Atari Interactive will assert at trial that the Retron77 is relevant in that it was unveiled in a promotional campaign that depicted it together with the [CirKa] A77." Opp. at 19 (emphasis in original). "In other words, a facsimile of the 2600 joystick was used to promote an imitation of the 2600 console." Id. at 19–20. According to Atari Interactive, then, "[i]n combination, a reasonable juror could find an unlawful false designation of origin and unfair competition where consumers viewed the Joystick Trade Dress next to a wood-grained console clearly inspired by the original 2600 console." Id. at 20.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

Game Art.  See Lapetino Report.  Lapetino opines that "[n]ot only was the Atari 2600 commercially successful, selling an estimated 30 million units over its lifespan, but its popularity also helped make the console and its accompanying design elements iconic." Lapetino Report ¶ 19.  According to Lapetino, "[t]he heavy advertising and marketing created and employed by Atari ensured that the overall design and visual presentation of the console would go on to symbolize" Atari. Id.; cf. Sutter Home Winery, Inc. v. Madrona Vineyards, L.P., No. 05-cv-0587 MHP, 2005 WL 701599, at *9 (N.D. Cal. Mar. 23, 2005) (noting that "even if plaintiff's mark were not conceptually distinctive, it is possible for a mark to acquire 'commercial strength' through use in commerce" and determining that "evidence of substantial . . . promotional efforts undertaken by plaintiff and its predecessor-in-interest" and "extensive sales . . . support a conclusion that plaintiff's mark is commercially as well as conceptually strong.").

Some courts and commentators have indicated that the "generic" to "arbitrary" spectrum may be inapt in the context of claims for trade dress infringement. See Sazerac, 251 F. Supp. 3d at 1306 n.15 (noting that the Supreme Court's decision in "Walmart suggests that the spectrum is limited to word marks."); see also J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 11:4 (5th ed., June 2020 Update) ("The spectrum of descriptive, suggestive, arbitrary and fanciful was created to categorize word marks.  It is not suitable for non-word designations such as shapes and images and trade dress such as package and product design.").  Assuming arguendo that the spectrum applies to trade dress claims, the Ninth Circuit has determined that "[w]hich category a mark belongs in is a question of fact." Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010).  Other courts have looked to whether the trade dress has attained secondary meaning to determine the strength of the claimed trade dress. See Lisa Frank, 799 F. Supp. at 997 (noting, with respect to strength of trade dress factor, that "[p]laintiffs have brought forth evidence demonstrating that the LFI trade dress is strongly associated with LFI and its products" based on showing of "secondary meaning"); accord Glob. Tobacco, LLC v. R.K. Co., No. 15-cv-05227-RGK-PJW, 2015 WL 12911451, at *5 (C.D. Cal. Sept. 24, 2015) ("Plaintiff's showing that the Clipper Trade Dress has acquired secondary meaning, and thus commercial strength, weighs in favor of a likelihood of confusion.").  The Court has already determined that genuine disputes exist regarding whether the 2600 Joystick has attained secondary meaning.

"A mark's overall strength is relative and cannot be determined by mechanistically assessing its conceptual or commercial strengths." M2 Software, Inc., v. Madacy Entm't, 421 F.3d 1073, 1081 (9th Cir. 2005).  In accordance with the foregoing, the Court cannot

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

determine, at the summary judgment stage, the strength of Atari Interactive's claimed trade dress in the 2600 Console and the 2600 Joystick.

### b.    Proximity of the Goods or Services

"The proximity or relatedness of goods is relevant to determine whether the products 'are likely to be connected in the mind of a prospective purchaser.'" Mattel, Inc. v. MGA Entm't, Inc., 782 F. Supp. 2d 911, 1008 (C.D. Cal. 2011) (citing Fleischmann, 314 F.2d at 159). "Where goods are related or complementary, the danger of consumer confusion is heightened." E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992). "[T]he danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." Sazerac, 251 F. Supp. 3d at 1305–1306 (internal citation omitted). "The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1150 (9th Cir. 2011).

Hyperkin contends that its Retron77 Console and CirKa A77 Joystick are unrelated to the 2600 Console and the 2600 Joystick. For example, Hyperkin's Retron77 Console "is an interchangeable cartridge video-game system that plays cartridge ROMs built to run on the [2600 Console] and its compatible successors. To use it, the customer would need to acquire original[s] or make their own Atari [2600 Console]-compatible cartridges." Bogost Decl. ¶ 24. By contrast, Atari Interactive's "Flashback devices are not video-game consoles" because "[v]ideo-game consoles . . . are . . . hardware devices that connect to a television and allow users to insert compatible cartridges, disks, or cards in order to play a variety of games. The Flashback devices are totally incapable of playing those cartridges." Id. ¶ 23. Stated differently, whereas Hyperkin's Retron77 Console allows users to play videogames originally designed for the 2600 Console by inserting those games' decades-old, physical cartridges, Atari Interactive's current Flashback devices, which incorporate its claimed trade dress in the 2600 Console and 2600 Joystick, come with games pre-installed on the devices.

That Atari Interactive's devices, which incorporate its claimed trade dress in the 2600 Console and 2600 Joystick, and Hyperkin's Retron77 Console are not completely interchangeable does not mean that they are "unrelated" for the purposes of the Sleekcraft analysis. To the contrary, the Ninth Circuit has determined that "[t]he use need not be the same as, nor one in competition with the original use. The question is, are the uses related so that they are likely to be connected in the mind of a prospective purchaser?"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

Fleischmann, 314 F.2d at 159; accord Monster Energy Co. v. BeastUp LLC, 395 F. Supp. 3d 1334, 1353 (E.D. Cal. 2019) ("Goods are 'related' if customers are likely to mistakenly think that the infringer's goods come from the same source as the senior user's goods or are sponsored by, affiliated with or connected with the senior user.") (internal citation omitted); accord SunEarth, Inc. v. Sun Earth Solar Power Co., 846 F. Supp. 2d 1063, 1077 (N.D. Cal. 2012) ("Defendants argue that, because they sell photovoltaic products, which collect electricity that can be sold to the grid, and Plaintiffs do not sell photovoltaic products and instead sell solar collectors, the parties' products are dissimilar, precluding a finding of confusion. However, Defendants focus on exact identity of products, taking too narrow a view of relatedness."); see also Moroccanoil, Inc. v. Zotos Int'l, Inc., 230 F. Supp. 3d 1161, 1173 (C.D. Cal. 2017) (noting that "[t]he Ninth Circuit has held that goods as dissimilar as movies and sci-fi merchandise are proximate goods.").

In addition, Hyperkin's argument regarding its Retron77 Console does not foreclose Atari Interactive's separate claim that Hyperkin's CirKa A77 Joystick infringes Atari Interactive's trade dress rights in the 2600 Joystick. See Compl. ¶ 20 (alleging that Hyperkin's "CirKa A77 joystick controller incorporates [the] same . . . distinctive design elements that make up part of the Atari joystick controller's trade dress."). The finder of fact could conclude that the CirKa A77 is related to Atari Interactive's products because, during deposition, Steven Mar, Hyperkin's Chief Executive Officer, testified that the CirKa A77 was compatible with both the original 2600 Console and Atari Interactive's modern Flashback devices. Mar. Dep. Tr. at 110:23–112:10; cf. M2 Software, 421 F.3d at 1082 ("Where the goods are . . . complementary, the danger of confusion is heightened."). And, courts have also determined that goods may be related where they are sold through the same channels. See, e.g., Mattel, 782 F. Supp. 2d at 1008 (finding that goods were related where inter alia, "[t]he goods are often sold through the same . . . retailers, like Toys 'R Us and WalMart"). Here, Atari Interactive and Hyperkin both appear to sell their products through some of the same channels including Walmart, Target, and Amazon. See Brown Decl. ¶¶ 9, 12; Mar Decl. ¶ 3.

The disputed record prevents the Court from determining, at this juncture, whether the parties' products are so related that they present a danger of consumer confusion. See Calista Enterprises Ltd. v. Tenza Trading Ltd., 43 F. Supp. 3d 1099, 1126 (D. Or. 2014) (denying motion for summary judgment and noting that the "proximity of goods" factor "is disputed and should be resolved by the factfinder.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

####    c.    Similarity of the Trade Dress

"The similarity of the trade dress has always been considered a critical question in the likelihood of confusion analysis." Fiji Water, 741 F. Supp. 2d at 1178 (internal citation omitted). "Obviously, the greater the similarity between the two trade dresses at issue, the greater the likelihood of confusion." Id. (internal citation and alteration omitted). "To assess similarity, courts should consider the two trade dresses in their entirety and as they appear in the marketplace, judge similarity in terms of appearance, sound, and meaning, and weigh similarities more heavily than differences." Id.

The similarity inquiry requires the Court to compare the parties' products at issue in this case. See GoTo.com, 202 F.3d at 1205–06. In the trade dress context, the inquiry requires a "visual inspection." Fiji Water, 741 F. Supp. 2d at 1177. The 2600 Joystick, Hyperkin's CirKa A77 Joystick, the 2600 Console, and Hyperkin's Retron77 Console are pictured below:



| 2600 Joystick | CirKa A77 Joystick | 2600 Console | Retron77 Console |

Dkt. 41-2, Exh. 1; Bogost Decl., Exh. C. The parties' products appear to share several common features. For example, the 2600 Joystick and the CirKa A77 feature a square and black base, a single red firing button that is situated at the top left, a hexagonal and black joystick, a black rubber boot with concentric rings that surrounds the joystick, and a dashed circle that circumscribes the base of the rubber boot and joystick. With respect to the 2600

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

Console and the Retron 77 Console, both are rectangular in shape and feature wood grain and black ribbing.

Hyperkin urges that "the products differ completely in appearance." Mot. at 13–14. With respect to the 2600 Console and the Retron77 Console, Hyperkin's expert, Ian Bogost, points out the purported differences between the consoles, including in, *inter alia*: (1) shape, (2) detail; (3) front face; (4) bezel; and (5) the location of ports and controls. Bogost Decl. ¶ 16. Moreover, while the 2600 Joystick and the CirKa A77 Joystick feature a compass rose, the dashed circle that circumscribes the base of the rubber boot and joystick, each party's compass roses differs in color—the 2600 Joystick's compass rose is red, while the CirKa A77's is black.

The Ninth Circuit has determined that "[r]egardless of how much secondary meaning it possess, a product's trade dress will not be protected from an imitator [whose product] is sufficiently different in its features to avoid such confusion." First Brands Corp., 809 F.2d at 1383 (internal citation omitted). Based on the disputed record, the finder of fact could determine that the parties' products are so similar that a consumer could be confused as to the source of Hyperkin's products. Conversely, the fact finder could also determine that the parties' products are dissimilar. These disputes preclude the Court from granting summary judgment regarding the similarity of the parties' products. See Monster, 395 F. Supp. 3d at 1357–1358 (denying motion for summary judgment because "a triable issue remains regarding the similarity of the marks factor."); accord Calista, 43 F. Supp. 3d at 1125 (declining to grant summary judgment as to similarity of marks, reasoning that "[t]he factfinder will have to decide this.").

### d. Evidence of Actual Confusion

The Ninth Circuit has concluded that "evidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion' finding." Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1210 (9th Cir. 2012). Thus, "[i]f enough people have been *actually* confused, then a *likelihood* that people are confused is established." Playboy Enterprises, Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1026 n.27 (9th Cir. 2004) (emphases in original).

Here, Hyperkin's Chief Executive Officer, Steven Mar, attests that "[t]o date, outside this litigation, no one has ever asked Hyperkin whether the Retron77 or A77 were sold or licensed by any Atari company, or" Atari Interactive. Mar Decl. ¶ 26. However, [b]ecause of the difficulty in garnering such evidence, the failure to prove instances of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

actual confusion is not dispositive." Monster, 395 F. Supp. 3d at 1358 (internal citation and alteration omitted). Thus, "actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act." Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991). Atari Interactive's failure to point to any instances of actual confusion, while not dispositive, weighs slightly against a finding of likelihood of confusion. See Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1053–54 (C.D. Cal. 2013) (noting, at summary judgment stage, that "the absence of evidence of actual confusion is generally unnoteworthy because actual confusion is hard to prove"); Oculu, LLV v. Oculus CR Inc., No. 14-cv-0196-DOC, 2015 WL 3619204, at *13 (C.D. Cal. June 8, 2015) ("The lack of any competent evidence of actual confusion despite the fact that the marks have co-existed for three years thus weighs against a finding of likelihood of confusion."). The Court declines to grant summary judgment on this basis, however.

### e. Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." Nutri/Sys., 809 F.2d at 606. "Under this factor, courts should consider whether the predominant purchasers of the parties' goods are similar or different, and whether the parties' marketing approaches resemble one another." Sazerac, 251 F. Supp. 3d at 1307 (internal citation omitted). Put differently, "[i]n assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." Monster, 395 F. Supp. 3d at 1358–59 (internal citation omitted). "The greater the degree of overlap, the more likely there is to be confusion." Fiji Water, 741 F. Supp. 2d at 1180.

The parties offer little argument regarding this factor. The Court notes, however, that Casandra Brown, Atari Interactive's Director of Licensing, attests that Atari Interactive sells its Plug and Play and Flashback devices, which are modeled after the 2600 Joystick and the 2600 Console, "through major online and brick-and-mortar retailers such as Walmart, Target, Costco, Kohl's, and Amazon, just to name a few." Brown Decl. ¶¶ 9, 11. Similarly, a portion of Hyperkin's website lists Walmart, Target, GameStop, Amazon Toys R' Us, Fry's Electronics, Groupon, Fye, Micro Center, and Newegg as "SOME OF OUR RETAILERS." See Mar Decl. ¶ 3. It appears, then, that both companies sell their products through some of the same channels, including Walmart, Target, and Amazon. The finder of fact could therefore determine that the parties use convergent marketing channels, giving rise to a likelihood of confusion. See Monster, 395 F. Supp. 3d at 1359 (determining that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

"convergent marketing channels" factor favored finding of likelihood of confusion where "both parties sell their energy drinks through the same retailers[.]").

####     f.     Type of Goods and Degree of Purchaser Care

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 634 (9th Cir. 2005). "Courts look to both the relative sophistication of the relevant consumer and the cost of the item in determining the degree of care likely to be exercised by the purchaser." Monster, 395 F. Supp. 3d at 1359 (internal citations omitted). "[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." Brookfield, 174 F.3d at 1060. By contrast, the reasonably prudent consumer is expected "to be more discerning—and less easily confused—when he is purchasing expensive items, and when the products being sold are marketed primarily to expert buyers." Id. (internal citations omitted).

Here, Hyperkin adduces evidence that would tend to undermine Atari Interactive's claim that consumers are likely to be confused as to the source of Hyperkin's CirKa A77 Joystick and Retron77 Console. For example, Hyperkin's Retron A77 Console "is an interchangeable cartridge video-game system that plays cartridge ROMs built to run on the [2600 Console] and its compatible successors. To use it, the customer would need to acquire original[s] or make their own . . . cartridges." Bogost Decl. ¶ 24. Accordingly, Hyperkin's expert, Ian Bogost, opines that "[t]he audience for such a device is . . . niche[.]" Bogost Report ¶ 86. The Ninth Circuit has determined that the "degree of care" factor weighs against a finding of a likelihood of confusion where the purchasers of the products are "highly specialized," explaining that such purchasers "would be expected to exercise a high degree of care in making their purchase decisions." See Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1537 (9th Cir. 1989). Moreover, it appears that: Hyperkin sells its CirKa A77 Joystick for between $14.99 and $50.00 at the retail level and for $8.50 at the wholesale level; Hyperkin sells its Retron77 Console for $70.00; and Atari Interactive sells its Flashback devices at around $59.99 per unit. Dkt. 41-2 at 30, Dkt. 43-42 at 2; Dkt. 43-43 at 2; Dkt. 43-44 at 2; Bogost Report ¶ 91; cf. Surfvivor, 406 F.3d at 634 ("With respect to small, inexpensive goods such as sunscreen, the consumer is likely to exercise very little care."). This factor, then, appears to favor Hyperkin.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### g.    Hyperkin's Intent

"When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993). A plaintiff "need not prove intent to deceive because intent is not a necessary element," but [i]f a plaintiff can prove intent, however, he is likely to prevail because the courts then presume that the public will be deceived." Official Airline Guides, 6 F.3d at 1394.

Hyperkin asserts that it "took extensive efforts to avoid confusion." Mot. at 16. For example, its Chief Executive Officer, Steven Mar, attests that Hyperkin engaged in due diligence for its Retron77 Console and CirKa A77 Joystick, researching existing and expired trademarks and patents, ultimately determining that any "relevant patents had expired many years ago and there were no registered trademarks covering any trade dress relating to the original Atari 2600 or the original Atari 2600 joystick." Mar Decl. ¶ 8. Mar further asserts that in order to prevent confusion, Hyperkin designed its own packing for the Retron77 Console and CirKa A77 Joystick, placing disclaimers on the packaging, and affixing its own trademarks to the products and packaging. See Id. ¶¶ 11–14, 22–23. The finder of fact could determine that Hyperkin acted in good faith, weighing against a finding of likelihood of confusion. See, e.g., Stonefire Grill, 987 F. Supp. 2d at 1055–56 (finding that "intent" factor weighed against finding of likelihood of confusion where evidence demonstrated that defendant engaged in a trademark search and "defendant's attorney . . . counseled that its proposed mark would not infringe.").

On the other hand, "[a]bsence of malice is no defense to trademark infringement." See Surfvivor, 406 F.3d at 635 (rejecting producers' argument that they lacked intent where they "acknowledge[d] being aware of the Surfvivor mark before airing their show, but contend that they lacked intent to infringe upon that mark."). Moreover, "obvious similarity" between products "permits an inference of intent." See Fiji Water, 741 F. Supp. 2d at 1181. The Court has already determined that the finder of fact could reasonably determine that Hyperkin's CirKa A77 Joystick is similar to the 2600 Joystick and that Hyperkin's Retron77 Console is similar to the 2600 Console. And, "[k]nowing adoption of a mark closely similar to one used by another is a basis for inferring intent to deceive." Aurora World, Inc. v. Ty Inc., 719 F. Supp. 2d 1115, 1164 (C.D. Cal. 2009). Steven Mar, Hyperkin's Chief Executive Officer, demonstrated knowledge of Atari Interactive's claimed trade dress, even testifying during deposition that the CirKa A77 Joystick was modeled after the 2600 Joystick. Mar Dep. Tr. at 70:9–11.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

The Court therefore concludes that triable issues exist as to Hyperkin's intent regarding its Retron77 Console and CirKa A77 Joystick.

### h.     Likelihood of Expansion of Product Lines

"A strong possibility that either party will expand its business to compete with the other weighs in favor of finding" a likelihood of confusion. Fiji Water, 741 F. Supp. 2d at 1182. However, "[t]he likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent." Brookfield, 174 F.3d at 1060.

Here, the Court has already determined that genuine disputes exist regarding the degrees to which the parties' products are similar or the parties compete with another. Accordingly, this factor is relatively unimportant to the Court's analysis. See Playboy, 354 F.3d at 1029 (determining that likelihood of expansion in product lines factor "is irrelevant" where the parties' existing products "are already related[.]"). To the extent that this factor is relevant, Hyperkin urges that "[t]here is . . . no evidence that [Atari Interactive] is likely to expand into Hyperkin's market" because, according to Hyperkin, Atari Interactive "has never sold or licensed any cartridge-playing console." Mot. at 16. However, Casandra Brown, Atari Interactive's Director of Licensing, attests that "Atari Interactive has been actively creating, promoting, and readying to launch a new gaming system that puts a 21st Century spin on the original 2600 designs" and which "include[s] a modernized version of the 2600 joystick as part of its new system[.]"[12] Brown Decl. ¶ 18. Accordingly, the Court declines to grant summary judgment on this issue.

---

[12]     Many of the details regarding Atari Interactive's future console are unclear from the record, including whether it: (1) will, like Hyperkin's Retron77 Console, play original, physical game cartridges; and (2) will be compatible with Hyperkin's accessories, such as the CirKa A77 Joystick. Hyperkin's expert, Ian Bogost, opines, with respect to Atari Interactive's future console, that "[d]elays and mystery have mounted as the project has worn on" and that Atari Interactive recently "announced further delays, supposedly due to disruption of [its] Chinese supply chain [caused] by the coronavirus outbreak." Bogost Report ¶ 30. These disputes further bolster the Court's determination that genuine disputes exist regarding the likelihood of expansion of product lines factor.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

* * * * *

While the actual confusion and degree of consumer care <u>Sleekcraft</u> factors weigh against a finding of likelihood of confusion, the Ninth Circuit has instructed that "[t]he <u>Sleekcraft</u> factors are intended to function as a proxy or substitute for consumer confusion, not a rote checklist." <u>Rearden</u>, 683 F.3d at 1209; <u>accord</u> <u>Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.</u>, 618 F.3d 1025, 1031 (9th Cir. 2010) ("The <u>Sleekcraft</u> factors are not a scorecard, a bean-counter, or a checklist."). Therefore, "[g]iven the open-ended nature of this multi-prong inquiry, . . . summary judgment on 'likelihood of confusion' grounds is generally disfavored." <u>Rearden</u>, 683 F. 3d at 1210. Indeed, "the question of likelihood of confusion is routinely submitted for jury determination as a question of fact." <u>Levi Strauss & Co. v. Blue Bell, Inc.</u>, 778 F.2d 1352, 1356 n.5 (9th Cir. 1985). For these reasons, the Court declines to grant Hyperkin partial summary judgment as to the issue of likelihood of confusion.

**E.    Dilution Claim**

Atari Interactive also asserts a claim for dilution against Hyperkin. <u>See</u> Compl. ¶¶ 45–50. "'Dilution' refers to the 'whittling away of the value of a trademark' when it's used to identify different products." <u>Adobe Sys. Inc. v. Blue Source Grp., Inc.</u>, 125 F. Supp. 3d 945, 969 (N.D. Cal. 2015) (internal citation omitted). "By contrast to trademark infringement, the injury from dilution usually occurs when consumers *aren't* confused about the source of a product: Even if no one suspects that the maker of analgesics has entered into the snowboard business, the Tylenol mark will now bring to mind two products, not one." <u>Mattel, Inc. v. MCA Records, Inc.</u>, 296 F.3d 894, 903 (9th Cir. 2002) (emphasis in original). Accordingly, "[w]hereas trademark law targets 'interference with the source signaling function' of trademarks, dilution protects owners 'from an appropriation of or free riding on' the substantial investment that they have made in their marks." <u>Id.</u> "In order to prove a violation, a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." <u>Jada Toys, Inc. v. Mattel, Inc.</u>, 518 F.3d 628, 634 (9th Cir. 2008). "[D]ilution is a factual question generally not appropriate for decision on summary judgment." <u>Visa Int'l Serv. Ass'n v. JSL Corp.</u>, 610 F.3d 1088, 1090 (9th Cir. 2010). With these principles in mind, the Court addresses the parties' arguments in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | 'O' | |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### 1.    Fame of Atari Interactive's Claimed Trade Dress

Hyperkin argues that "[s]ummary judgment as to dilution is appropriate because [Atari Interactive] failed to produce evidence that the relevant trade dress is famous among the general public." Mot. at 20. According to Hyperkin, "there is no evidence, such as surveys or consumer declarations, showing that the general consuming public associates the relevant trade dress with [Atari Interactive]." Id. Hyperkin also points to the comparatively fewer Twitter followers that Atari Interactive has (less than 80,000) as compared to its competitors, including Sony (17 million), Microsoft (13 million), Nintendo (10 million), and SEGA (1 million).[13]  SUF Nos. 166–70.

Pursuant to the Trademark Dilution Revision Act of 2006 ("the TDRA"), "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2). "Niche fame," which is "fame within only a limited geographic area or a specialized market segment," is insufficient.[14] Blumenthal, 963 F.3d at 870. "The mark must have acquired the requisite level of fame by the time the defendant first began to use the mark in commerce." Stone Brewing Co., 2020 WL 1508489, at *18 (internal citation omitted). The TDRA sets forth the following factors to determine whether a mark possesses the requisite degree of recognition:

---

[13]    The Court **OVERRULES** Atari Interactive's objections to the admission of its competitors' number of Twitter followers. See Stone Brewing Co., LLC v. MillerCoors LLC, No. 3:18-cv-00331-BEN-LL, 2020 WL 1508489, at *19 (S.D. Cal. Mar. 27, 2020) (considering evidence of party's "industry-leading social media presence with hundreds of thousands of followers and/or viewers across multiple platforms" to determine whether genuine dispute existed regarding famousness of mark for purposes of dilution claim).

[14]    Prior to 2006, a plaintiff could establish fame, for the purposes of a dilution claim, based either on "niche fame" or "fame among the general consuming public." See Blumenthal, 963 F.3d at 869–70. Although Atari Interactive's predecessors released the 2600 Console and the 2600 Joystick, which form the bases for Atari Interactive's claimed trade dress, prior to 2006, Atari Interactive appears to agree that it must raise a genuine question regarding "fame among the general consuming public," rather than niche fame. See Opp. at 23.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

**(i)** The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

**(ii)** The amount, volume, and geographic extent of sales of goods or services offered under the mark.

**(iii)** The extent of actual recognition of the mark.

**(iv)** Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

Here, Atari Interactive adduces evidence regarding its sales of products that purportedly incorporate its claimed trade dress in the 2600 Console and the 2600 Joystick. For example, Atari Interactive has received at least $3,893,702 in licensing fees for its Plug and Play devices and $13,724,346 in licensing fees for its Flashback devices, with the "[t]otal value being significantly higher," as "this number reflect[s] only Atari Interactive's licensing fees." Brown Decl. ¶¶ 9, 12. In addition, Atari Interactive's expert, Tim Lapetino, opines that "the [original] Atari 2600 [was] commercially successful, selling an estimated 30 million units over its lifespan[.]" Lapetino Report ¶ 19. Atari Interactive has further promoted its claimed trade dress in the 2600 Console and the 2600 Joystick in other ways, including by licensing its use in connection with apparel, consumer products, and promotional materials. See Brown Decl. ¶¶ 13–17. And, Atari Interactive submits excerpts from online articles and books which have been written about, or refer to, the 2600 Joystick and the 2600 Console and reiterate their popularity. See, e.g., Dkt. 43-20 at 11 ("After all, there's no gaming accessory quite as iconic as the [2600 Joystick]."); Dkt. 43-20 at 19 (noting that 2600 Joystick "bec[ame] an absolute icon of video game design."); Dkt. 43-21 at 10 ("The 2600 . . . was the most popular system of its day[.]"); Dkt. 43-21 at 13 ("Though the 2600 is nearly forty years old, it still persists in the popular imagination, and has made a distinct impression on generations of video game fans.") cf. Blumenthal, 963 F.3d at 870–71 (noting, for purposes of dilution of trade dress claim, that "press accounts about the popularity of the brand, or pop-culture references involving the brand would provide evidence of fame.") (internal citation omitted). Finally, Tim Lapetino opines that Atari Interactive's predecessors engaged in "heavy advertising and marketing" that "ensured that the overall design and visual presentation would go on to symbolize not just Atari, but video games as a whole, decades after its release." Lapetino Report ¶ 19; cf. J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 24:106 (5th ed., June 2020 Update) (noting that "plaintiff's advertising and promotional efforts to make the mark

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

known" can be "circumstantial evidence" that "the mark has had such an impact on the public mind . . . that it deserves the label of 'famous.'").

"The Ninth Circuit has recognized that fame requires a high standard of consumer awareness beyond the trademark owner's specific market—the mark should be a 'household name' or 'part of the collective national consciousness.'" Pinterest, Inc. v. Pintrips, Inc., 140 F. Supp. 3d 997, 1033 (N.D. Cal. 2015). For example, the Ninth Circuit has determined that "Tiffany," "Polaroid," "Rolls Royce," "Kodak," and "Oscar" are marks with the requisite fame capable of dilution. See Fruit of the Loom, Inc. v. Girouard, 994 F.2d 1359, 1363–64 (9th Cir. 1993). Conversely, the Ninth Circuit has determined that some marks are insufficiently famous so as to be capable of dilution "despite decades of use, $3 billion in annual sales, and $5 million in advertising[.]" Vietnam Reform Party v. Viet Tan - Vietnam Reform Party, 416 F. Supp. 3d 948, 969 (N.D. Cal. 2019) (citing Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 873–75 (9th Cir. 1999)). Ultimately, however, "whether a mark is 'famous' is a factual matter." Apple, Inc. v. Samsung Elecs. Co., No. 11-cv-01846-LHK, 2012 WL 2571719, at *7 (N.D. Cal. June 30, 2012). The Court therefore concludes that the finder of fact—not the Court—must determine whether Atari Interactive's claimed trade dress in the 2600 Console and the 2600 Joystick is sufficiently famous so as to be capable of dilution. See Stone Brewing Co., 2020 WL 1508489, at *21 (denying defendant's motion for summary judgment as to plaintiff's dilution claim, explaining that "[w]hile this Court cannot, as a matter of law, find that [p]laintiff's STONE® mark is sufficiently famous, it does not find that [p]laintiff's claims lack all merit to justify granting summary judgment" because "[a]s the evidentiary record currently stands, such a determination would be improper on summary judgment.").

**2.     Tarnishing and Blurring**

"Courts recognize two principal forms of dilution; tarnishing and blurring." Kaisha v. Nat. Health Trends Corp., No. 04-cv-09028-DSF-E, 2005 WL 1041112, at *4 (C.D. Cal. Jan. 10, 2005) (internal citation omitted). "Blurring occurs when a defendant uses a plaintiff's trademark to identify the defendant's goods or services, creating the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1326 n.7 (9th Cir. 1998) (internal citations omitted). "Tarnishment occurs when a famous mark is improperly associated with an inferior or offensive product or service." Id. (internal citation omitted). Atari Interactive asserts both theories here. See Compl. ¶ 47.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
|---|---|---|---|
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### a.   Dilution by Tarnishing

"To properly support a dilution by tarnishment claim, a plaintiff must establish that the famous mark will suffer negative associations as a result of the use of the similar mark." Pendleton Woolen Mills, Inc. v. Round Up Ass'n., No. 3:11-cv-592-AC, 2012 WL 2721856, at *7 (D. Or. July 9, 2012). "'Tarnishment' generally arises when the plaintiff's trademark is linked to products of shoddy quality, diminishing the value of the mark because the public will associate the lack of quality with the plaintiff's unrelated goods." Sony Computer Entm't, Inc. v. Connectix Corp., 203 F.3d 596, 609 (9th Cir. 2000) (internal citation omitted).

Hyperkin asserts that "there can be no tarnishment by Hyperkin's acts since the Atari brand already suffered a negative image through its numerous failures." Mot. at 20. Hyperkin's argument appears to be, then, that since Atari Interactive's predecessors suffered several financial setbacks leading to a number of changes in corporate ownership and culminating in the cessation of sales of Atari videogame devices between the 1990s and early 2000s, Atari Interactive's claimed trade dress lacks any goodwill that could be further diluted by tarnishing. Indeed, "[t]here has to be something to tarnish in order to find dilution by tarnishment." Playmakers, LLC v. ESPN, Inc., 297 F. Supp. 2d 1277, 1285 (W.D. Wash. 2003).

However, "[t]he sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." Sony Computer Entm't, 203 F.3d at 609 (internal citation omitted). And, Atari Interactive submits evidence—in the form of purchaser reviews on Amazon—that would allow the fact finder to conclude that Hyperkin's CirKa A77 Joystick is of subpar quality. See, e.g., Dkt. 43-42 at 6 (purchaser review rating CirKa A77 Joystick with "one-star" and referring to CirKa A77 Joystick as "TRASH!" and "JUNK!!!!!!"); id. at 7 (purchaser review rating CirKa A77 Joystick with "one-star" and commenting that CirKa A77 Joystick is of "[e]xtremely poor quality.").

The Court has already determined that summary judgment is inappropriate as to whether Atari Interactive's claimed trade dress has attained secondary meaning. The finder of fact could also determine that the quality of Hyperkin's products tarnished whatever goodwill Atari Interactive accumulated as to Atari Interactive's claimed trade dress. See Coty Inc. v. Excell Brands, LLC, 277 F. Supp. 3d 425, 434 (S.D.N.Y. 2017) (determining, after bench-trial, that distributors of high-quality fragrances "ha[d] established a claim of dilution by tarnishment" where defendant "produced cheap 'versions' of [distributors'] fragrances, with similar names . . . and nearly identical packaging" and defendant "use[d]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

inferior oils" and "employ[ed] cheaper packaging components"). For these reasons, summary judgment is inappropriate as to Atari Interactive's dilution by tarnishing claim.

### b. Dilution by Blurring

With respect to blurring, Hyperkin argues that there can be "no blurring since there were already numerous third-party sellers of 2600 compatible joysticks before Hyperkin began selling its [CirKa] A77 [Joystick]." Mot. at 20. "To assess dilution by way of blurring, courts look to "(1) the degree of similarity between the marks; (2) the degree of distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusively use of the mark; (4) the famous mark's degree of recognition; (5) whether the user of the mark intended to create an association with the famous mark; and (6) any actual association between the two marks." Monster, 395 F. Supp. 3d at 1365 (citing 15 U.S.C.A. § 1125(c)(2)(B)). "This test is strikingly similar to the test for likelihood of confusion under traditional trademark infringement analysis." Airwair Int'l Ltd. v. Vans, Inc., No. 5:12-cv-05060-EJD, 2013 WL 3786309, at *7 n.1 (N.D. Cal. July 17, 2013). Because genuine disputes exist regarding the "likelihood of confusion" element of Atari Interactive's false designation of origin claim, genuine disputes similarly preclude the grant of summary judgment to Hyperkin as to Atari Interactive's dilution by blurring claim. See Monster, 395 F. Supp. 3d at 1366 (denying motion for summary judgment as to dilution by blurring claim "[f]or the same reasons discussed above regarding likelihood of confusion" with respect to infringement claim).

### F. Unfair Competition Claim

Atari Interactive also asserts a claim for common law unfair competition. See Compl. ¶¶ 39–44. "The courts have uniformly held that common law and statutory trademark infringements are merely specific aspects of unfair competition." New W. Corp. v. NYM Co. of California, 595 F.2d 1194, 1201 (9th Cir. 1979); accord Hokto Kinoko Co. v. Concord Farms, Inc., 810 F. Supp. 2d 1013, 1032 (C.D. Cal. 2011) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical is there a 'likelihood of confusion?'") (internal citation omitted).

Here, the Court has already determined that genuine disputes preclude the Court from granting summary judgment as to Atari Interactive's claim for false designation of origin. For that reason, summary judgment is likewise inappropriate as to Atari Interactive's unfair competition claim. See Monster, 395 F. Supp. 3d at 1361 (denying summary judgment as to "unfair competition claims for the same reasons [the court] has denied summary judgment on [the] Lanham Act claims.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**      **'O'**

| Case No. | 2:19-cv-00608-CAS(AFMx) | Date | July 27, 2020 |
| Title | ATARI INTERACTIVE, INC. v. HYPERKIN INC. | | |

### G.    Request for Attorneys' Fees

"The Lanham Act provides that in 'exceptional cases' the court 'may award reasonable attorney fees to the prevailing party.'" Brown v. Elec. Arts, Inc., 722 F. Supp. 2d 1148, 1152 (C.D. Cal. 2010) (citing 15 U.S.C. § 1117(a)).  Hyperkin asserts that "an award of attorneys' fees is appropriate" because Atari Interactive's "claims are deceptive and untenable, qualifying as an 'exceptional case' under the Lanham Act."  Mot. at 21. Because the Court has concluded that genuine disputes preclude the grant of summary judgment to Hyperkin, Hyperkin is not entitled to an award attorneys' fees.  See Glob. Truss Am. LLC v. GLP German Light Prod. Inc., No. 11-cv-00168-SJO-SS, 2011 WL 13220296, at *11 (C.D. Cal. Dec. 1, 2011) (denying party's request for attorneys' fees where the court denied party's motion for summary judgment as to Lanham Act claim).

## V.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Hyperkin's motion in all respects.

IT IS SO ORDERED.

|  | 00 | : | 00 |
| Initials of Preparer | | CMJ | |